# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

98 FEB -3  PM 3: 57

U.S. DISTRICT COURT
N.D. OF ALABAMA

**JAMES BARNEY HUBBARD,**        ]
                                 ]
    Petitioner,           ]
                                 ]
    vs.                   ]   CV-94-N-2639-W
                                 ]
**MORRIS THIGPEN,**              ]
**Commissioner of the Alabama**  ]
**Department of Corrections,**   ]
                                 ]
    Respondent.           ]

ENTERED

FEB   3  1998

# Table of Contents

I.   Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.  Factual and Procedural Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     A.   The Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     B.   The Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

          1.   The petitioner's statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

          2.   Admission of the 1957 conviction. . . . . . . . . . . . . . . . . . . . . . . . . 33

               a.   Ineffective assistance of 1957 counsel. . . . . . . . . . . . . . . . . 34

               b.   Conflict of interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

          3.   The malice instruction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

          4.   The claimed mandatory sentencing instruction. . . . . . . . . . . . . . 45

          5.   Ineffective assistance of counsel at the pretrial stage. . . . . . . . . 46

               a.   Failure of counsel to support motion to suppress with
                    applicable decisional law. . . . . . . . . . . . . . . . . . . . . . . . . . . 46

               b.   Failure of counsel to present relevant evidence on the
                    motion to suppress the petitioner's statement. . . . . . . . . . 51

                    (1)   Lack of expert testimony. . . . . . . . . . . . . . . . . . . . . . 54

                    (2)   Failure to use state hospital records on alcoholism. 58

                    (3)   Failure to use state hospital records on low I.Q. . . . 62

          6.   Ineffective assistance of counsel at trial. . . . . . . . . . . . . . . . . . . 65

               a.   Failure to investigate the petitioner's competency to stand
                    trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

2

b.      Failure to object to police misconduct. . . . . . . . . . . . . . . . 67

(1)     Interrogation of the petitioner. . . . . . . . . . . . . . . . . . 67

(2)     Failure to object to claimed police tampering with evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

(3)     Failure to raise issue regarding failure of police to administer an intoximeter test. . . . . . . . . . . . . . . . . . 71

(4)     Failure to procure state-funded psychiatric assistance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

(5)     Failure to pursue suicide claim. . . . . . . . . . . . . . . . . 79

(6)     Failure to object to pecuniary gain argument. . . . . . 81

(7)     Failure to present the "real culprit" defense. . . . . . . 82

(8)     Failure to object to the testimony of Judge Nicol. . . 83

(9)     Failure to lay foundation for medical records. . . . . . 84

(10)    Failure to object to malice instruction. . . . . . . . . . . . 85

(11)    Counsel's reference to the petitioner's first trial. . . . 97

(12)    Failure to challenge the composition of the jury. . . . 99

7.      Ineffective assistance of counsel at sentencing. . . . . . . . . . . . . . 102

a.      Failure to request a continuance. . . . . . . . . . . . . . . . . . . . . . 102

b.      Failure to introduce evidence in mitigation. . . . . . . . . . . . 103

(1)     General. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

(2)     Evidence of the petitioner's alcoholism. . . . . . . . . . 106

(3)     Evidence of the petitioner's mental retardation. . . 106

(4)     Evidence of good prison adjustment. . . . . . . . . . . . 107

3

                    (5)      Prejudice from want of mitigation evidence. . . . . . 107

            c.      Failure to object to sentencing arguments. . . . . . . . . . . . 112

            d.      Failure to object to claimed mandatory death sentence instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

            e.      Failure to object to pecuniary gain arguments. . . . . . . . . 117

      8.     Ineffective assistance of counsel on direct appeal. . . . . . . . . . . . 118

      9.     Failure to administer intoximeter test. . . . . . . . . . . . . . . . . . . . . . . 120

     10.    Claimed exclusion of mitigating factors. . . . . . . . . . . . . . . . . . . . 12▮

     11.    Reliance upon allegedly inapplicable aggravating factors. . . . . 122

     12.    Admission of testimony of Judge Nicol. . . . . . . . . . . . . . . . . . . . 124

     13.    Denial of motion to quash the indictment. . . . . . . . . . . . . . . . . . 127

     14.    Claimed failure to give *Miranda* warnings before interrogation. 130

     15.    The statute as violative of the Equal Protection Clause of the Fourteenth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

     16.    Challenge to the statute on proportionality grounds. . . . . . . . . . 142

     17.    Evidence from warrantless searches. . . . . . . . . . . . . . . . . . . . . . . 148

IV.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

**Memorandum of Opinion**

## I.    Introduction.

This is a petition for the writ of habeas corpus brought pursuant to 28 U.S.C. § 2254 by an Alabama inmate under sentence of death. With the assistance of counsel, petitioner filed his petition on October 31, 1994, challenging his April 21, 1982, conviction of capital murder and his sentence of death in the Circuit Court of Tuscaloosa County, Alabama. The matter is ripe for decision and, upon due consideration, will be denied.

## II.   Factual and Procedural Background.

On October 10, 1957, James Barney Hubbard (the "petitioner" or "Mr. Hubbard") was convicted of second-degree murder in the Circuit Court of Tuscaloosa County, Alabama, for the killing of David Dockery. In October of 1976, he was released from the Alabama prison system, having served the sentence imposed for that conviction. (R. 1679-80). Within a short time Mr. Hubbard moved into the home of and began living with Lillian Montgomery ("Ms. Montgomery") near Tuscaloosa, Alabama. The house was next door to and adjoined a store owned and operated by her.

On January 10, 1977, at about 8:15 a.m., an ambulance was dispatched to Ms. Montgomery's home after the petitioner made an emergency telephone call to report that there had been a shooting. (R. 34-35). Approximately ten minutes later, the ambulance, with attendants David Freeman and Ricky Lee, arrived at the scene. (R. 34-35). Freeman and Lee observed the petitioner at the door of the house, indicating that they should enter the carport and then the house. (R. 35, 43). When they entered, both Freeman and Lee saw Ms. Montgomery's body lying on the kitchen floor. (R. 35). In response to Freeman's question

5

regarding whether he had moved anything, Hubbard stated he had "carried the gun upstairs." (R. 35). The three men then returned to the outside, closing and locking the door behind them.[1] (R. 35-36).

At about 8:53 a.m., Tuscaloosa Police officers Jack Manley and Charles Stephens, responding to a police dispatch regarding an "attempted suicide," reached the scene. (R. 1724, 1739). Manley discovered that the house was locked and asked Hubbard for the door key. The petitioner voluntarily produced the door key. (R. 1717). Using the key that was provided by the petitioner, Manley and Stephens entered the house, where they observed Ms. Montgomery's body and concluded that she had been shot. (R. 1717-18).

After exiting the Montgomery residence, Officer Manley asked the petitioner what had happened. (R. 1718, 1720). Hubbard responded that he and Montgomery had argued that morning and the night before. (R. 1734). Hubbard said that Montgomery went downstairs at about 7:00 a.m., after which he heard shots. (R. 1734). When Manley asked him where the gun was, the petitioner stated he had it in his pocket. (R. 1734). Manley then searched the petitioner and found a pistol, a partially filled box of .38 caliber ammunition, and a half-pint bottle of whiskey. (R. 1734). He then read the petitioner the warnings required by *Miranda v. Arizona*,[2] placed him in the officers' patrol car and requested that a homicide investigator be dispatched to the scene. (R. 1734-36). While sitting in the patrol

---

[1] The evidence indicated that the door automatically locked when it was closed.

[2] 384 U.S. 436, 476-77, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), *reh'g denied sub nom*, California v. Stewart, 385 U.S. 890, 87 S. Ct. 11, 17 L. Ed. 2d 121 (1966).

car the petitioner opened his billfold and held it up to show the officers some currency in it, stating he was "no bum." (R. 1742).

Witnesses who observed the petitioner at the scene that morning testified that he did not slur his words, stagger or otherwise exhibit indications that he was intoxicated, although he did smell of alcohol and evidently had been drinking. (R. 38-39, 49-50, 57, 72-73, 1723, 1740-41).

At about 9:15 a.m., Tuscaloosa homicide investigator Dempsey Marcum arrived at the Montgomery residence. (R. 1791). He received from Officer Manley those items that had been taken from the petitioner's person. (R. 1747). Marcum later gave the pistol to state toxicologist James Brittin, who determined that it was fully loaded. (R. 2260-61, 2265).

Coroner Earl Mitchell and state toxicologist Brittin arrived at the scene soon after Marcum, and they all entered Ms. Montgomery's house. (R. 111, 223, 404, 1695, 1746-49). Marcum observed the body and photographed the scene. (R. 1749). He observed a partial set of bloody dentures clutched in the right hand. (R. 1750). A portion of another bloody, and apparently broken denture, was lying near the body. (R. 208). Marcum and Mitchell found a spent, mutilated bullet on the kitchen stove and two spent .38 caliber shell casings in a wastebasket in an upstairs bedroom. (R. 1750, 1753, 1795). That afternoon, after discovering there were three wounds to Montgomery's body, Marcum returned to the scene and retrieved yet another shell casing from the same wastebasket. (R. 118, 1756-57). The three shell casings from the wastebasket were determined by Brittin to have been fired from the pistol taken from the petitioner at the crime scene. (R. 2284-85).

7

Officers Manley and Stephens took the petitioner to the police homicide office (R. 1738) and, at about 11:00 a.m., Marcum arrived there, having completed his investigation at the scene. (R. 1757, 1762-63). He again advised the petitioner of his *Miranda* rights (R. 1758), and at about 11:35 a.m., the petitioner signed a waiver of rights form in which he stated that he understood his rights, that he understood what he was doing, that he did not want a lawyer, and that he desired to make a statement and answer questions. (R. 1759-60, 1763). The form also contained an acknowledgment that no promises had been made to the petitioner, and that no threats, pressure, or coercion of any kind had been used against him. (R. 1760). Marcum testified that the petitioner did not appear to be intoxicated when he signed the waiver form. (R. 1766).

The petitioner then made a statement to Marcum, who paraphrased and wrote out the information as the petitioner spoke, over a period of approximately 30 minutes to an hour. (R. 1781, 1796). Marcum read the completed statement to the petitioner, in which he stated:

> [A]bout two or three a.m. this morning I went downstairs to the store and got
> me a half pint of Kentucky corn whiskey and drank most of the half pint. After
> I went back upstairs, Lillian said she had a headache and that she wanted
> something to drink to see if she could stop her headache. I asked her what
> she wanted to drink and she said get her a pint of that J.W. Dant and I went
> downstairs to the store and got her some ice and a Coke and brought it back
> up to her. She mixed it and she mixed it in a large glass and drank it. I asked
> her if she was feeling any better. I was laying on the other side of the bed

8

from her. She said, "I'm going to fix me another one." I'd already drank enough and was settled enough that I was fixing to doze back off to sleep. Before she had the drink, she said she wanted to go where her mother was. I said, "What are you talking about, Sugar?", and she said she had so many debts to pay that she just wanted to get out of her misery. I was just dozing when she got up. I didn't see her with the pistol. But she keeps it under her pillow. She went downstairs and I heard two shots. I went downstairs and saw her laying in the floor. I asked her, "What in the world have you done?", and she said, "I just wanted to leave and get out of the way." The last thing she said was to tell me for me and Jimmy and Johnny to take care of what she had and said, "You tell Jimmy and Johnny I want you to have my car." She then just passed out and then I went back upstairs and looked in a book and got Mildred's phone number and then I called Mildred on the upstairs phone. Mildred told me to call the ambulance and the police. Then I called my mother, Mrs. Benny Hubbard, at the rest home in Northport and I told her what Lillian had done. Mother said, "Well, call the ambulance or call somebody." I hung up the phone, then I called Nettie at the bar at the Old Southern Dairy where that lounge is there. I told Nettie what Lillie had done and asked her what I had ought to do. She said, "Call a doctor or ambulance," that she couldn't come down there. Then I called the operator and she told me to call the police headquarters and she dialed them for me. I told her it was an emergency, the police department answered and said

9

they would send the ambulance right on out there. When I saw Lillian, the pistol was under her left hand. I took the pistol out from under her left hand and carried it back upstairs and took two empty shells out of it and put two more bullets in it. I stuck the pistol in my pocket and was fixing to go hide it. I put the box of shells in my pocket and came downstairs. I believe the police got the pistol off me. I put the two empty shells in a trash can upstairs. The police brought me to the homicide office. This is my true and correct statement.



(R. 1782-84). After reading the statement to the petitioner, Marcum allowed him to examine it and asked him whether it was truthful and if he would sign it on each page. (R. 1781). After he began to sign the statement, Mr. Hubbard stopped, told Marcum he was nervous and having trouble writing, (R. 1798), and asked if he might have a drink from the bottle that had been taken from him that morning, to "steady his nerves." (R. 1766-67). Marcum replied that it was "his whiskey" and gave him the bottle. (R. 1767). The petitioner drank from the bottle and then signed the statement. (R. 1767, 1770). Marcum testified that, when the petitioner gave the statement, he did not seem intoxicated or to be suffering from *delirium tremens*. He also stated that the petitioner appeared to be nervous but was in control of his faculties and did not slur his words. (R. 1777-78).

After he signed the statement, the petitioner was taken to the county jail. (R. 1771). The inventory of his personal possessions at the jail yielded a woman's gold and diamond

wristwatch with a broken wristband. (R. 1788).[3] Officers also found a number of checks which totaled $230.00. (R. 1788). Two checks were payable to "cash" (R. 2364) and two others were payable to Ms. Montgomery. (R. 2364). Among the checks was one written by Stephanie Gravey in payment of the monthly rent on a house owned jointly by Ms. Montgomery and her son. (R. 2301, 2365). It was Ms. Montgomery's practice to collect the rent, make the mortgage payment and upkeep expenses on the rental house, and to divide the remainder of the rent with her son. (R. 2301).

The inventory of Mr. Hubbard's personal properties also included $260.00 in currency and $12.22 in change, including twenty-two pennies. (R. 1788, 1790-91). Ms. Montgomery's son testified that he was familiar with his mother's business and that she usually kept cash and change in the store cash register (R. 2307-08) and, when he checked the register after Ms. Montgomery's death, it was empty. (R. 2302). He also testified that Ms. Montgomery had been supporting the petitioner financially and had spent approximately $10,000.00 on him. (R. 2302, 2306). A friend of Ms. Montgomery's, Mildred Burgin, testified that she took Ms. Montgomery to the hospital the week before her death and that she had seen Ms. Montgomery give the petitioner approximately $1,100.00. (R. 2323-24). At or about the same time, Ms. Montgomery had shown Burgin some bills that the petitioner had incurred, and Ms. Montgomery had complained that she was spending more money than she was taking in. (R. 2328-30).

---

[3] Ms. Montgomery's son later testified that he had given this watch to his mother about fifteen years before her death, that it had then cost approximately $400.00, and that his mother valued it greatly, always wore it and had it repaired immediately whenever it was broken. (R. 2300, 2304, 2306-07).

11

While his personal property was being inventoried, the petitioner, without prompting, stated to Marcum that, after she was shot, Ms. Montgomery had said she wanted him, Hubbard, to have her watch and valuables. (R. 1806-07). Marcum stated that the petitioner did not then appear to be intoxicated. (R. 1800). Marcum also stated that the petitioner appeared to be in control of his faculties at all times he saw him during that day, and did not slur his words or stagger. (R. 1805-06).

The autopsy on Ms. Montgomery's body by Dr. Henry Santina revealed that Ms. Montgomery had been shot three times. (R. 1812) One bullet went through her left shoulder. (R. 1816-18). Another bullet entered her mouth and exited under her right ear, cutting her tongue, shattering her jaw and dentures and damaging some of her large blood vessels, which caused most of the blood loss she suffered. (R. 1818, 1820, 1824-25). Dr. Santina opined that Ms. Montgomery would have been unable to speak with this wound. He said, "I don't think anyone would be able to articulate words with the injury that I have described." (R. 1821).

Another bullet entered above Ms. Montgomery's left eyebrow, passed through the brain, and lodged in the lower right rear of the skull. (R. 1819). Dr. Santina opined that this injury was the cause of death and that Ms. Montgomery's heart would have probably stopped beating almost immediately after such an injury. (R. 1815-16, 1822). He also opined that Ms. Montgomery was shot in the mouth before she was shot through the brain because most of the blood around her body came from the mouth wound and her heart had to be pumping while she was bleeding from that wound. (R. 1824-25). State toxicologist Jim Brittin

stated his opinion that the muzzle of the gun used to shoot Ms. Montgomery was between fifteen and thirty-nine inches from her body when it was fired. (R. 2282-83).

On February 18, 1977, Mr. Hubbard was charged by indictment in two counts with the murder of Lillian Montgomery. Count One charged first degree murder and count two charged second degree murder, each with the aggravating circumstance that he had been "convicted of murder in the first or second degree in the twenty years preceding the crime." *Ala. Code* § 13-11-2(a)(13)(1975).[4]

At his trial, Hubbard argued, in essence, that he did not kill Ms. Montgomery, but that she had inflicted her own mortal injuries while he had remained upstairs.

The petitioner was convicted of "murder in the first degree with aggravating circumstances" and punishment was "fix[ed] . . . at death." (R. 608). After a separate sentencing hearing, the trial court accepted the jury's recommendation and imposed the death sentence. *See Hubbard v. State*, 500 So. 2d 1204, 1207 (Ala. Crim. App. 1986). The petitioner appealed to the Alabama Court of Criminal Appeals, which remanded the case

---

[4] In pertinent part, the indictment charged:

I. The Grand Jury of said County charge that before the finding of this Indictment J.B. HUBBARD, alias JAMES BILLY HUBBARD, alias JOHN BARNEY HUBBARD, whose name is otherwise unknown to the Grand Jury, unlawfully and with malice aforethought, killed Lillian Montgomery, on to-wit: January 10, 1977, by shooting her with a pistol, and the Grand Jury further charge that at the time said killing was perpetrated, the said J.B. HUBBARD, alias JAMES BILLY HUBBARD, alias JOHN BARNEY HUBBARD had been convicted of murder in the second degree in the preceding twenty (20) years, on to-wit: October 10, 1957.

II. The Grand Jury of said County further charge that before the finding of this Indictment J.B. HUBBARD, alias JAMES BILLY HUBBARD, alias JOHN BARNEY HUBBARD, whose name is otherwise unknown to the Grand Jury, unlawfully and with malice aforethought killed Lillian Montgomery, on to-wit: January 10, 1977, by shooting her with a pistol, but without premeditation or deliberation, and the Grand Jury further charge that at the time said killing was perpetrated, the said J.B. HUBBARD, alias JAMES BILLY HUBBARD, alias JOHN BARNEY HUBBARD had been convicted of murder in the second degree in the preceding twenty (20) years, on to-wit: October 10, 1957.

to the trial court with instructions to set out in writing its findings of fact and the mitigating circumstances it had considered as required by Alabama's then existing death penalty statute. *See id.* Following remand, the trial court complied with the mandate, and the Court of Criminal Appeals, which then affirmed the conviction and sentence. *Hubbard v. State*, 382 So. 2d 577 (Ala. Crim. App. 1979). The Alabama Supreme Court also affirmed. *Hubbard v. State*, 382 So. 2d 597 (Ala. 1980). Later, following the mandate of the United States Supreme Court in *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), the Alabama Supreme Court reversed and remanded the case to the Court of Criminal Appeals with instructions to remand to the trial court for a new trial. *See Hubbard*, 500 So. 2d at 1207.

A second trial, using the bifurcated procedures required by *Beck*, was held in May of 1982. *Hubbard*, 500 So. 2d at 1207. At his second trial, Mr. Hubbard was represented by attorneys Douglas Hendrix and Charles Michael Stilson. They filed a number of pretrial motions on February 8, 1982, including a Motion to Suppress Evidence, a Motion to Quash the Indictment, Motion to Suppress Hubbard's Statement, and a Motion to Strike, which were heard by the trial court on February 22 and March 16, 1982. (R. 2824-25). During these hearings, the petitioner presented the testimony of witnesses, including attorney Ralph Knowles (who gave his opinions concerning representation provided to the petitioner by his first attorney, James Marshall), Coroner Mitchell, Officer Stephens, Officer Manley and Officer Marcum, the entire transcript from the petitioner's 1977 trial, numerous medical records of Ms. Montgomery, and transcript records related to the petitioner's 1957 murder conviction. (R. 6-1632). Each motion was denied.

14

At the second trial, Mr. Hubbard did not himself testify, but called witnesses Eugene Schultz and Robert Gooden, two of Ms. Montgomery's neighbors, who had tried to help the petitioner start the victim's car early on the morning of the shooting. They had both seen him with Ms. Montgomery and testified that the two acted agreeably toward one another. (R. 2313-20). Mr. Hubbard also called Mildred Burgin, who testified, as decribed above, that Ms. Montgomery had given the petitioner $1,100.00 about a week before the shooting and had complained about bills incurred by the petitioner. (R. 2323-24, 2328-30). She stated that the petitioner called her on the morning of the shooting and said that Ms. Montgomery had shot herself and that he thought she was "down there bleeding to death." (R. 2328).

The petitioner again argued that Ms. Montgomery had taken her own life and that he was innocent. He was again convicted of first-degree murder. At the sentencing hearing, held immediately after the guilt phase of the trial, (R. 2438-41), neither the State nor the petitioner presented any additional evidence, but made arguments based upon the evidence already heard at trial. The petitioner argued that the evidence was insufficient to support a finding of aggravating circumstances and emphasized that he was intoxicated at the time of the crime. The jury recommended that the petitioner be sentenced to death. (R. 2455).

At a separate sentencing hearing before the court, without a jury, (R. 2459), the state offered no new evidence. The petitioner, however, offered the testimony of Olin Zeanah, who had been the prosecuting attorney at Mr. Hubbard's 1957 murder trial. Mr. Zeanah testified that the petitioner had been cooperative with the State in its prosecution of Divid Hubbard for the murder of David Dockery. Zeanah testified that, according to the State's

15

information, Divid Hubbard was probably the instigator of the crime, having supplied the petitioner with alcohol and having urged him to kill Dockery. (R. 2466). Zeariah had written a letter to the Alabama Board of Pardons and Parole on Hubbard's behalf, explaining his cooperation and the help he had given the State. The petitioner also presented the testimony of Flora Thornton, who stated that she was the petitioner's fiancee, and planned to marry him despite the criminal proceedings against him. (R. 2478-79).

After presenting this new evidence, the petitioner argued strongly that his 1957 conviction should not be considered an aggravating factor in the death of Ms. Montgomery. He argued that there was no evidence of premeditation or deliberation but that it was clear that both he and Ms. Montgomery had been intoxicated. He stressed that the police knew he had been drinking, but gave him more alcohol at the police station after he had given his statement. He argued that the evidence suggested that he may have been experiencing the onset of *delirium tremens*. He also argued that there was no logical reason for him to want to kill Ms. Montgomery. He stressed the nineteen-year and three-month gap in time between his 1957 murder conviction and Ms. Montgomery's murder. He argued that this was, at most, a crime of passion, not deserving of the death penalty. (2481-90). The trial judge accepted the sentencing recommendation of the jury, (R. 2554), made findings of fact from the sentencing hearing, and concluded there were three aggravating circumstances present as follows: (1) the petitioner's 1957 murder conviction; (2) the murder was committed for pecuniary gain; (3) and, the murder was committed in a heinous, atrocious and cruel manner. (R. 2565-68). He also found there were no mitigating circumstances, and there was no indication, other than his voluntary consumption of

16

alcohol, that the petitioner was unable to appreciate the criminality of his conduct. (R. 2566).

On direct appeal, Mr. Hubbard was again represented by Mr. Stilson and by new counsel, Joseph G. Pierce. He raised eight issues:

1. that his 1957 conviction was invalid and should not have been used in the 1982 proceedings. He argued that his 1957 counsel, James Marshall, had a conflict of interest during trial and that Marshall failed to obtain a free transcript for the appeal, thereby denying him an opportunity to appeal;

2. that the trial court erred in failing to quash the indictment because it made his 1957 conviction both an element of his 1977 offense and a factor to be considered at sentencing, raising double jeopardy concerns;

3. that the provision of Alabama law under which he was indicted denied him equal protection of the laws by using an arbitrary classification, a twenty-year period between a murder and a prior murder conviction;

4. that the trial court erred in denying him two-for-one jury strikes;

5. that the trial court should have granted his motion to quash the indictment because the provision under which he was indicted could have provided for the execution of someone guilty of only second-degree murder, in violation of the Eighth Amendment;

6. that his statements to police were involuntary and inadmissible due to his intoxication at the time of questioning and the use of alcohol as an inducement for him, an alcoholic, to sign the statement;

7. that the trial court committed reversible error in admitting evidence that was the fruit of a warrantless search of his residence; and

8. that his statement to Officer Manley was inadmissible because it resulted from a custodial interrogation prior to the reading of his *Miranda* warnings.

(Brief of Appellant, filed April 16, 1984, in the Alabama Court of Criminal Appeals at 20, 38, 43, 47, 50, 54, 59, 67).

The Alabama Court of Criminal Appeals and the Alabama Supreme Court affirmed. *Hubbard v. State*, 500 So. 2d 1204 (Ala. Crim. App. 1986); *Hubbard v. State*, 500 So. 2d 1231 (Ala. 1986). The Supreme Court of the United States denied the petition for the writ of certiorari on March 23, 1987. *Hubbard v. Alabama*, 480 U.S. 940, 107 S. Ct. 1591, 94 L. Ed. 2d 780 (1987).

On September 30, 1988, Mr. Hubbard petitioned the trial court for permission to file a late appeal of his 1957 second degree murder conviction. He had dismissed his original notice of appeal from that conviction because he could not pay for a transcript and had not requested a free transcript pursuant to *Griffin v. Illinois*, 351 U.S. 12, 76 S. Ct. 585, 100 L. Ed. 891 (1956). On December 7, 1988, the trial court denied the motion for an out-of-time appeal and then overruled the application for rehearing. The Alabama Supreme Court then denied his petition for writ of certiorari on April 7, 1989. *Hubbard*, 544 So. 2d 932 (Ala. 1989).

The petitioner returned once again to the trial court on April 5, 1988, seeking post-conviction relief under then Rule 20, Alabama Rules of Criminal Procedure (Temporary).[5] Mr. Hubbard raised numerous issues in his Rule 20 motion, including some he had already raised on direct appeal, as well as a multitude of new claims based upon the claimed ineffectiveness of both his trial and appellate counsel. He presented numerous documents

---

[5]Temporary Rule 20 has since been codified as Rule 32 of the Alabama Rules of Criminal Procedure.

and called Hendrix and Stilson as witnesses on the claims of ineffective assistance of counsel. He also requested funds for expert witnesses, which the Rule 20 court denied.

The trial court denied the petition for post-conviction relief and the Alabama Court of Criminal Appeals affirmed. *Hubbard v. State*, 584 So. 2d 895 (Ala. Crim. App. 1991). The United States Supreme Court denied his petition for the writ of certiorari. *Hubbard v. Alabama*, 502 U.S. 1041, 112 S. Ct. 896, 116 L. Ed. 2d 798 (1992).

The petitioner filed the present petition on October 31, 1994. Among other things, Mr. Hubbard seeks relief from his imprisonment or at least from his death sentence, a hearing to submit evidence on his habeas claims, funds for expert witnesses, and an opportunity to conduct discovery to support his claims. The petitioner subsequently filed separate motions, which have been denied by the court, for the appointment of an investigator and of expert witnesses as well as a motion for an evidentiary hearing.

## III.   Discussion.

### A.   The Claims.

The petitioner makes the following claims:

1.   The trial court improperly admitted the statement, which the police obtained from the petitioner on the morning Ms. Montgomery was killed in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights.

2.   The trial court improperly admitted evidence of his 1957 second degree murder conviction to support an element of the indictment in violation of the petitioner's Fifth, Eighth and Fourteenth Amendment rights.

3.   The trial court's malice instruction improperly shifted the burden of proof from the State to the petitioner, violating his rights to a fair trial and due process.

4.  The trial court improperly gave the jury a mandatory sentencing instruction, violating the petitioner's Fifth, Eighth and Fourteenth Amendments.

5.  Ineffective assistance of counsel at the pretrial stage violated the petitioner's Sixth, Eighth and Fourteenth Amendment rights.

6.   Ineffective assistance of counsel at trial violated the petitioner's Sixth, Eighth and Fourteenth Amendment rights.

7.  Ineffective assistance of counsel at the sentencing hearing violated the petitioner's Sixth, Eighth and Fourteenth Amendment rights.

8.  Ineffective assistance of appellate counsel violated the petitioner's Sixth, Eighth and Fourteenth Amendment rights.

9.  The police failed to administer an intoximeter test in violation of the petitioner's Sixth, Eighth and Fourteenth Amendment rights.

10. The trial court improperly excluded all mitigating factors from its sentencing decision in violation of the petitioner's Sixth, Eighth and Fourteenth Amendment rights.

11. The court improperly sentenced the petitioner to death based upon inapplicable aggravating factors.

12. The trial court improperly admitted the irrelevant and inflammatory testimony of Judge Nicol.

13. The trial court erred in denying the petitioner's motion to quash the indictment in violation of his Sixth and Fourteenth Amendment rights.

14. The police subjected the petitioner to a custodial interrogation prior to providing him with *Miranda* warnings in violation of the privilege against self-incrimination guaranteed by the Fifth Amendment.

15. An Alabama statute denied the petitioner equal protection of the law by arbitrarily deeming as a capital crime any murder committed within twenty years of a prior murder conviction.

16. The trial court erred by overruling the petitioner's motion to quash the indictment on the grounds that Ala. Code § 13-11-2(a)(13) is unconstitutional under the Eighth and Fourteenth Amendments.

17.     The trial court improperly admitted evidence seized during warrantless and nonconsentual searches.

The State argues that a number of these claims are procedurally barred. The others, it asserts, are meritless. The court will analyze them each in turn.

**B.     The Analysis.**

**1.     The petitioner's statement.**

The petitioner claims that the statement he gave to homicide investigator Marcum was involuntary because at the time of the statement he had been consuming alcohol, was intoxicated, and was suffering alcohol withdrawal.[6] He asserts that, at the time of his arrest and statement, he was "a chronic, severe, and lifelong alcoholic." (Petition at ¶ 46). He argues that Marcum coerced him to sign the statement by offering or withholding alcohol in exchange for his signature on the statement and that the police should not have taken his statement while he was in a "biologically coercive" state. (Affidavit of James C. Beck, M.D., Ph.D. at ¶ 9).[7]

---

[6] Apparently, the petitioner intended the statement to be exculpatory, but it effectively incriminated him because other evidence at trial clearly divulged its falsity. In discussing the privilege against self-incrimination, the Supreme Court has refused to draw a distinction between inculpatory statements and those intended to be exculpatory but which are later used to impeach the defendant's testimony or to prove guilt by implication due to the false nature of the statement. *See Miranda v. Arizona*, 384 U.S. 436, 476-77, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The same distinction must be rejected in this case as well, because the voluntariness standard relevant here is grounded in policies intended to protect the defendant's right against self-incrimination. *Davis v. North Carolina*, 384 U.S. 737, 740, 86 S. Ct. 1761, 16 L. Ed. 2d 895, 897-98 (1966). *But see Harris v. New York*, 401 U.S. 222, 224-26 (1971)(Scope of the exclusionary rule is limited to prosecution's case-in-chief, making unlawfully obtained confession admissible to impeach defendant.)

[7] Petitioner offers, for the first time in any proceeding, the affidavit of Dr. Beck in an effort to show that he was an alcoholic and that his alcoholism affected the voluntariness of his statement. This affidavit was not fairly presented to the state courts. Arguably, this court may not even consider it absent a showing of cause and prejudice for Petitioner's failure to present it to the state court or a showing of a fundamental miscarriage of justice. *Powell v. Bowersox*, 895 F. Supp. 1298, 1306 (E.D. Mo. 1995), *aff'd*, 112 F.3d 966 (8th Cir. 1997), *cert. denied*, --- S. Ct. ---, 1998 WL 5774 (Jan. 12, 1998)(citing *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 11-13, 112 S. Ct. 1715, 1721, 118 L. Ed. 2d 318 (1992)). The petitioner has made no such showing, as is explained in the court's previous Memorandum Opinion and Order denying certain of the petitioner's subsidiary motions. In this

Due process considerations prohibit the use of an involuntary confession. *Miller v. Fenton*, 474 U.S. 104, 109, 106 S. Ct. 445, 88 L. Ed. 2d 405, 410 (1985). Although this court must independently determine whether a confession was voluntary, the state court's findings regarding "subsidiary factual questions" are entitled to a presumption of correctness under 28 U.S.C. § 2254(d).[8] *Miller*, 474 U.S. at 112.



---

proceeding, the court will consider the affidavit only for the sake of argument, inasmuch as all petitioner's claims fail, whether or not the affidavit is considered.

[8]In April of 1996, the Congress enacted the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") which *inter alia* amended 28 U.S.C. § 2254 to provide that "a determination of a factual issue made by a State court shall be presumed to be correct" unless rebutted by the petitioner "by clear and convincing evidence." It is reasonably clear, however, that the provisions of that act do not apply retroactively to this habeas corpus proceeding. In *Lindh v. Murphy*, --- U.S. ---, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), the United States Supreme Court held that the amendments to Chapter 153 of Title 28, United States Code, which includes 28 U.S.C. § 2254, do not apply retroactively to noncapital habeas cases. The court reasoned that Congress did not indicate an intent to make the Chapter 153 amendments apply retroactively because it was silent as to that chapter while explicitly providing that the new Chapter 154, dealing specifically with habeas corpus proceedings in capital cases, would be applied to pending petitions. The court noted that some parts of Chapter 154 specifically refer to and incorporate provisions of Chapter 153, most notably 28 U.S.C. § 2264(b). This court notes that, by its explicit terms, Chapter 154 applies only to habeas corpus proceedings in capital cases where the provisions of Section 2261(b) and (c) are met. Those sections set out specific requirements regarding provisions for the appointment of counsel for indigent prisoners sentenced to death whose convictions and sentences have been affirmed on direct appeal. There is nothing in this record to suggest, and the State of Alabama has not asserted, that it has satisfied the requirements of Section 2261(b) and (c) and is entitled to the benefits of the AEDPA. In any event, the court has decided the issues in this case under the prior law, generally being more favorable to the petitioner than that established by AEDPA. The court is satisfied that the AEDPA does not aid the petitioner. *See Hayes v. Alabama*, 85 F.3d 1492, 1495 n.1 (11th Cir. 1996), *cert. denied*, 117 S. Ct. 1262, 137 L. Ed. 2d 341 (1997).

The federal habeas court must apply the presumption of correctness to the state court's findings of fact unless one of the exceptions enumerated in § 2254(d) applies.[9] As the U.S. Supreme Court has explained:

> Of course, subsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the Miranda warnings, often require the resolution of conflicting testimony of police and defendant. The law is therefore clear that state-court findings on such matters are conclusive on the habeas court if fairly supported in the record and if the other circumstances enumerated in § 2254(d) are inapplicable. But once such underlying factual issues have been resolved, and the moment comes for determining whether, under the totality of the circumstances, the confession was obtained in a manner consistent with the Constitution, the state-court judge is not in an appreciably better position than the federal habeas court to make that determination.

*Miller v. Fenton,* 474 U.S. 104, 117, 106 S. Ct. 445, 453, 88 L. Ed. 2d 405, 415 (1985). None of the exceptions of § 2254(d) are present here.[10] Therefore, this court must presume the state court findings to be correct, including those made by the state appellate courts. See *Sumner v. Mata*, 449 U.S. 539, 545-47, 101 S. Ct. 764, 66 L. Ed. 2d 722 (1981) ("[s]ection

---

[9] Under pre-AEDPA law, the presumption of correctness applies unless: (1) the merits of the factual dispute were not resolved in the State court hearing; (2) the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing; (3) the material facts were not adequately developed at the State court hearing; (4) the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding; (5) the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding; (6) the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; (7) the applicant was otherwise denied due process of law in the State court proceeding; or (8) that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record. 28 U.S.C.A. § 2254(d) (1994).

[10] The petitioner claims that the Rule 20 court denied him the opportunity to develop facts by rejecting his request for state-funded expert witnesses and he now offers expert testimony on issues of alcoholism, police misconduct and coercion. The court has previously determined in its previously issued Memorandum Opinion and Order denying the petitioner's Motion for the Appointment of Expert Witnesses that the state had no obligation to provide such expert assistance during post-conviction proceedings.

2254(d) by its terms thus applies to factual determinations made by state courts, whether the court be a trial court or an appellate court.").

Absent explicit state court findings on an issue, this court "may reconstruct those findings 'either because [the state trial judge's] view of the facts is plain from his opinion, or because of other indicia.'" *Waldrop v. Thigpen*, 857 F. Supp. 872, 895 (N.D. Ala. 1994), *aff'd sub nom, Waldrop v. Jones*, 77 F.3d 1308 (11th Cir.), *cert. denied sub nom, Waldrop v. Hopper*, --- U.S. ---, 117 S. Ct. 247, 136 L. Ed. 2d 175 (quoting *Townsend v. Sain*, 372 U.S. 293, 314, 83 S. Ct. 745, 758, 9 L. Ed. 2d 770 (1962)).[11]

In this case, the trial court failed to make any explicit finding of facts with respect to the circumstances under which the petitioner made his statement. *Hubbard*, 500 So. 2d 1204, 1227-31. Implicit in that court's decision to admit the statement, however, are findings that the petitioner was not significantly impaired by alcohol or alcohol withdrawal and that the police did not offer or withhold alcohol as a threat or inducement for the petitioner to make the statement. The court's decision to admit the statement clearly shows that it believed the police and other witnesses who testified that the petitioner was not intoxicated or suffering from *delirium tremens* at the crime scene or during questioning, even though he may have ingested some significant amount of alcohol earlier that day.

On direct appeal, the Alabama Court of Civil Appeals made a number of explicit findings as to the petitioner's statements. The court wrote:

---

[11]*Townsend* was partially overruled on a point not at issue here by *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 112 S. Ct. 1715, 118 L. Ed. 2d 318 (1992), which held that a "cause-and-prejudice" standard, rather than the "deliberate by-pass" standard, is the correct standard for excusing a habeas petitioner's failure to develop a material fact in state-court proceedings. 504 U.S. at 5-6, 112 S. Ct. at 1717-1718.

In the instant case, Manley and Stephens, who were the first officers to arrive on the scene at approximately 8:53 a.m., testified that appellant had obviously been drinking alcohol. They based this observation upon his demeanor and the smell of his breath. He had a partially filled bottle of liquor on his person. Both officers testified, however, that in their opinion he was "not drunk." He cooperated with the officers, and with the ambulance drivers who had arrived earlier. He made telephone calls, ostensibly seeking advice as to what to do, and he asked the telephone operator to call the police and an ambulance. He was observed by neighbors around 5:00 a.m. and again at 6:00 a.m., when they helped him try to start Ms. Montgomery's automobile. These neighbors apparently did not observe anything unusual about his conduct. The questioning of appellant which led to the statement did not begin at police headquarters until 11:35 a.m. He had been in the presence of officers since 8:53 a.m. and had not had access to alcohol during that period of time. Prior to questioning, appellant was properly advised of his *Miranda* rights, and he signed a form acknowledging that he understood them. He waived his rights, including his right to have counsel present, and stated that he wished to make a statement. He made a statement, which was reduced to writing, and he read and signed it. Officer Marcum, who advised appellant of his rights and who took the statement from him, testified that he believed that the officers who were at the scene had told him that appellant had been drinking, but he testified that when he advised appellant of his rights and took his statement, appellant was not intoxicated and did not stagger or indicate in any way that he was intoxicated. Marcum testified that appellant was responsive to the questions asked him, did not slur his words, and appeared to be in control of his faculties. The detail and substance of the statement indicate that appellant had control of his mental processes and knew what he was doing. The evidence indicates that nothing was promised him and that he was not threatened or coerced in any manner. His statement fell short of being an outright confession, but, in view of the evidence developed in the case, it proved to be incriminating and very damaging to his interests. As has been pointed out, appellant did not testify at the hearing on the motion to suppress, nor at trial. The testimony of the officers concerning the sobriety of appellant and the circumstances surrounding the taking of the statement stands unrefuted. There was substantial credible evidence from which the trial judge could conclude that the statement was voluntary and was given with full knowledge and understanding of its consequences. There is no substantial evidence to support appellant's contention that his statement was inadmissible due to "intoxication and chronic abuse of alcohol." The trial judge's decision in admitting the statement into evidence was not contrary to the great weight of the evidence, and therefore should not be disturbed on appeal. We find no error here in admitting appellant's statement.

*Hubbard*, 500 So. 2d 1204, 1218-19.[12]

The Court of Criminal Appeals also made the following findings with respect to

Officer Marcum's giving the petitioner alcohol before he signed the statement:

> The record shows that after the statement had been given, appellant was afforded an opportunity to read it, which he did. It was also read to appellant by Marcum while appellant looked on. Appellant signed it on each page. As he was preparing to sign the statement, he said that his hand was shaking and he needed a drink to steady his nerves. Marcum allowed appellant to take a drink from the half-pint bottle which had previously been taken from appellant, and he then signed the statement. The record shows the following testimony from Marcum:



> "Q.    When you talked to Mr. Hubbard at the homicide office, did he have any odor of alcohol about his person?
>
> "A.    Yes, sir, I recall that he had an odor with the flavor of alcoholic beverages about him.
>
> "Q.    Now, what did you do with the bottle after?
>
> "A.    It's at the office now. As I recall, I believe it's listed among the other items of evidence taken. It's in the property room at the homicide office.
>
> "Q.    All right. Did it ever come back into the defendant's possession?
>
> "A.    Yes, it did.
>
> "Q.    When was that?
>
> "A.    Oh, about the time he read his statement, when he went to sign the statement, he said he was so nervous that he could hardly write, and he asked me if he could have a drink, and I told him it was his whiskey, and I opened it--I let him have it, and he took a drink from it.

---

[12] The court has been unable to confirm from the record that the petitioner orally declared his wish to make a statement, although he otherwise manifested his wish to do so. He signed a waiver form indicating that he wanted to make a statement and freely spoke with Officer Marcum about the shooting and answered his questions.

"Q.   All right. Do you recall how much of it he drank?

"A.   He took a pretty good--a couple of pretty good belts, as I recall.

"Q.   And this was as he was signing the statement then, is that correct?

"A.   Yes, sir, that's correct. He said he needed it to steady his nerves.

"Q.   Had there been any conversation about him getting anything to drink earlier than that?

"A.   No, sir, that's the first time he had said anything about it.

"Q.   All right. The odor of alcohol you had smelled about him, you had smelled it that morning, is that correct?

"A.   Yes, sir.

"Q.   All right, Mr. Marcum, in that statement that you took from Mr. Hubbard, that statement was in response to questions you asked generally, is that correct?

"A.   Some of it was, yes, sir.

"Q.   All right. And were you writing things down as Mr. Hubbard was speaking?

"A.   As I recall, we went through it in--he told me his version of it and I probably may have asked him questions and anything that I didn't understand and didn't know about, and then after that we went back over it again and I committed it to paper in writing, what he had told me."

Marcum further testified as follows:

"Q.   Now, I believe you stated on cross-examination that after he had given the statement to you, that he at that point asked for something to calm his nerves, a drink of whiskey, and at that point you gave it to him. Anytime prior to that, had he asked you for any of it, and you withheld it?

"A.   No, sir.

27

"Q.   Had he asked you for it at all?

"A.   No, sir.

"Q.   Did you tell him that you would not give it to him unless he did sign or talk?

"A.   No, sir, I did not. It wasn't mentioned until he went to sign--said he was nervous when he went to sign it, and said--he asked me about having a drink of something to settle his nerves.

"Q.   All right. And what did you tell him when he did that?

"A.   I told him it was his liquor.



"Q.   All right. Did you tell him that you were giving it to him so he would talk?

"A.   No, sir, I did not.

"Q.   So that he would sign the rights form?

"A.   No, sir.

"Q.   So he would acknowledge the statement in any way whatsoever?

"A.   Did not.

"Q.   Did at anytime, did he become in your judgment drunk?

"A.   No, sir.

"Q.   He retained his coherence during the entire time this statement was taken?

"A.   That's correct."

The trial court asked Marcum, "Mr. Marcum, let me ask you this. Did you hold the whiskey as an enticement to Mr. Hubbard to get him to make any statement?" Marcum answered, "No, sir, I did not." Marcum testified that appellant was not suffering from delirium tremens, but did appear to be nervous. His testimony stands uncontroverted. It is not disputed that Mr. Hubbard had been drinking on the morning that Ms. Montgomery was

28

murdered and that he asked for a drink of whiskey before signing his statement. There is nothing in the record, however, to support his claim that he was unlawfully induced to make or sign the statement in return for a promise of a drink of liquor.

Appellant's counsel makes much of the amount of liquor consumed from the bottle. He contends that it was full when appellant took the drink at the signing and that appellant must have drunk a half bottle. A reading of the entire record does not bear this out. The evidence tends to show that the bottle was not full when initially taken from appellant. Regardless of the amount consumed at the signing, we do not believe that it affected the voluntariness of appellant's acknowledgment of his statement by signature or that it was an inducement to the signing.

\*         \*         \*

Although we strongly disapprove of what Marcum did, we find, after examining all the attending circumstances, that there was no improper inducement that overbore appellant's free will and rational intellect at the time he made and signed the statement. We further find that the statement was clearly not the product of a direct or implied promise. The statement had been completed, all but the signing, when the conversation about the liquor arose, and, therefore, Marcum's acquiescence in appellant's taking a drink could not have induced the statement. No error was committed in admitting the statement into evidence.

*Hubbard*, 500 So. 2d at 1219-20.

After reviewing the record, this court concludes that it provides a satisfactory basis for the findings of fact as quoted from the Court of Criminal Appeals and, as noted, none of the exceptions of former Section 2254(d) are present. Accordingly, those findings are presumed to be correct.

In analyzing the voluntariness of a confession, however, the federal habeas court must make its own independent examination and evaluation of the totality of the circumstances surrounding the confession. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 2047, 36 L. Ed. 2d 854 (1973). In so doing, the court must determine whether

the accused made "an independent and informed choice of his own free will, possessing the capacity to do so, his will not being overborne by the pressures and circumstances swirling around him." *United States v. Rouco*, 765 F.2d 983, 993 (11th Cir. 1985), *cert. denied* 475 U.S. 1124, 106 S. Ct. 1646, 90 L. Ed. 2d 190 (1986) (quoting *Jurek v. Estelle*, 623 F.2d 929 (5th Cir. 1980), *cert. denied*, 450 U.S. 1001, 101 S. Ct. 1709, 68 L. Ed. 2d 203, *cert. denied*, 450 U.S. 1014, 101 S. Ct. 1724, 68 L. Ed. 2d 203 (1981)). The confession must be a product of the accused's free and deliberate choice rather than the product of coercion, intimidation, or deception by the police. *United States v. Mendoza-Cecilia*, 963 F.2d 1467, 1475 (11th Cir. 1992), *cert. denied sub nom*, *Marin-Hernandez v. United States*, 506 U.S. 964, 113 S. Ct. 436, 121 L. Ed. 2d 356 (1992). Factors relevant to the inquiry include the accused's intelligence, the length of detention, the nature of interrogation, use of physical force, and promises or inducements. *See Colorado v. Connelly*, 479 U.S. 157, 163 n. 1, 107 S. Ct. 515, 520 n. 1, 93 L. Ed. 2d 473, 482 n. 1 (1986); *Campaneria v. Reid*, 891 F.2d 1014 (2d Cir. 1989), *cert. denied*, 499 U.S. 949, 111 S. Ct. 1419, 113 L. Ed. 2d 471 (1991). Each of these factors, along with other surrounding circumstances, combine to determine the crucial question--was there any "overreaching" on the part of the police. *Connelly*, 479 U.S. at 163, 107 S. Ct. at 520.

Given the state court findings and the record evidence, it is apparent that the petitioner did not give his statement due to any coercion, intimidation or deception by police. As a convicted murderer, he had prior experience with the police and the criminal justice system. Neither was he subjected to a lengthy interrogation; he gave and signed his statement within a few hours of his arrest. The interview itself lasted between thirty minutes

and an hour. (R. 1796). There is no indication that the petitioner was denied food, water or the use of a bathroom. On the contrary, the record indicates that he was provided with lunch at the police station. (R. 1804, 1809).

The petitioner also argues that he has a low intelligence level, but there is no indication that he lacked the intellectual capability to make an independent and informed choice of his own free will to give his statement. His attorneys testified that he was competent and intelligent enough to assist in his own defense. The Bryce Hospital records, which the petitioner claims serve as evidence of his low I.Q. and alcoholism, also indicate that he had no mental disease or defect, which would affect his criminal responsibility for the crime. *Hubbard*, 584 So. 2d at 902. According to those records, the petitioner "appears to understand the charges against him and to cooperate and assist in the conduct of his defense." (R. 735).

The Eleventh Circuit has found:

> [t]he low intelligence of a defendant will not in itself render a confession involuntary. *See Colorado v. Connelly*, 479 U.S. 157, 107 S. Ct. 515, 523-24, 93 L. Ed. 2d 473 (1986); *Dunkins v. Thigpen*, No. 87-7529, 847 F.2d 664, 667 (11th Cir. 1988). Rather, "coercive police activity is a necessary predicate" to a finding that the confession by a person with a low intelligence level is involuntary. *Connelly*, 107 S. Ct. at 522; *see United States v. Scheigert*, 809 F.2d 1532, 1533 (11th Cir. 1987). [Defendant] cites to mental state evidence which he contends is necessary to the court's inquiry into the voluntariness of the confession. Absent an allegation of coercive police tactics to obtain the statement, however, the confession will not be deemed involuntary. *See Connelly*, 107 S. Ct. at 522; *Bell v. Lynaugh*, 828 F.2d 1085, 1092 (5th Cir.), *cert. denied*, --- U.S. ----, 108 S. Ct. 310, 98 L. Ed. 2d 268 (1987).

*Singleton v. Thigpen*, 847 F.2d 668, 670-71 (11th Cir. 1988), *cert. denied*, 488 U.S. 1019, 109 S. Ct. 822, 102 L. Ed. 2d 812 (1989). There is no record evidence that the police acted in

any way to coerce the statement from the petitioner, even considering the petitioner's low intelligence level. The petitioner's will was not overborne due to his alcohol use.

In his statement, the petitioner claimed that he had been drinking on the morning of the murder. Witnesses who saw him that morning acknowledged that he smelled of alcohol, but testified that he did not appear to be intoxicated or incoherent at the murder scene that morning or when he gave and signed his statement later in the day. Officer Marcum testified that the petitioner seemed nervous during his interview, but did not appear to be suffering from *delirium tremens* or the onset thereof.[13]

Neither the state court findings nor the record reflect that the petitioner's ability to resist was overborne by Marcum's allowing him to drink alcohol before signing the statement. The petitioner did not condition his willingness to give or sign the statement on the immediate or future receipt of alcohol. He gave his entire statement without asking for or being offered any alcohol. He did not tell police that he was suffering or was in need of medical attention, and Officer Marcum testified that he did not appear to be experiencing *delirium tremens*. It was only after the petitioner had given his statement and indicated his willingness to sign it that he asked for the alcohol to steady his nerves, not as a condition of signing the statement.

Even if the petitioner's signature on his statement had been involuntary, as he now strongly argues that it was, the statement would still have been admissible. It is not

---

[13] The evidence shows then that police had no reason to believe that the petitioner was suffering the beginning effects of *delirium tremens* before or as he began to give his statement. The evidence is that, at the time, police knew he had been drinking, that he had alcohol on his breath and that he had a bottle of alcohol on his person. This evidence does not support the further leap to the conclusion that Mr. Hubbard was suffering the onset of *deliruim tremens* before he gave his statement or that police should have known as much.

necessary that a statement be signed for it to be admissible. *See Wong Sun v. United States*, 371 U.S. 471, 491, 83 S. Ct. 407, 419, 9 L. Ed. 2d 441 (1963) ("[t]he fact that the statement was unsigned . . . does not render it inadmissible; Wong Sun understood and adopted its substance, though he could not comprehend the English words."). *See also Landsdown v. United States*, 348 F.2d 405, 411 (5th Cir. 1965) ("the [defendant's] statement would have been admissible even if unsigned. [Citation omitted]. Therefore, the circumstances surrounding its execution did not render admission of the statement prejudicial error.")

Assuming, as the petitioner argues, that Officer Marcum violated professional standards for police officers by allowing him to drink alcohol before signing his statement, this did not render the statement involuntary.[14] What constitutes a violation of professional standards for police and what makes a confession involuntary are two entirely different issues. In this case, the court concludes, as a result of its own independent review, that the totality of the circumstances demonstrates that the petitioner's statement was voluntary, whether or not officer Marcum acted inappropriately. This claim therefore fails.

### 2. Admission of the 1957 conviction.

The petitioner argues, for two reasons, that evidence of his 1957 conviction for second degree murder should not have been admitted at the trial of the indictment at which he was convicted of the murder of Ms. Montgomery. He argues that, during those earlier

---

[14] The petitioner has offered expert testimony to suggest that it was inappropriate for Officer Marcum to allow the petitioner to drink alcohol. The court needs no expert to agree with that statement. The court's concern in its consideration of this habeas corpus petition, however, is less with the propriety of Marcum's behavior and its conformity to police standards of conduct than with whether it resulted in an involuntary statement from the petitioner.

proceedings, (1) he was denied an appeal due to the ineffective assistance of his counsel and (2) he was represented by counsel who labored under an impermissible conflict of interest. The court will discuss each of these claims.

### a.   Ineffective assistance of 1957 counsel.

The petitioner claims that his 1957 conviction is tainted because he was denied an appeal due to the ineffectiveness of his appellate counsel. His argument is that his attorney, James Marshall, did not obtain a free trial transcript for the purpose of his appeal, even though the United States Supreme Court, eighteen months earlier, had ruled that where a state provided for appellate review of criminal convictions for defendants who were able to pay for transcripts, it could not deny such appellate review to indigent defendants on the basis of their inability to pay for such transcripts. *Griffin v. Illinois*, 351 U.S. 12, 19 (1956). Marshall acknowledged that Mr. Hubbard's appeal from the 1957 conviction was dismissed due to his inability to pay for a transcript. (R. 1496). He stated that, at the time of the dismissal, he had never heard of the state paying for a transcript. (R. 1495).

In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court formulated a two-prong test for assessing whether the representation provided by an attorney during a criminal proceeding would constitute "ineffective" representation under the Sixth Amendment. The court wrote that

> [a] convicted defendant's claim that counsel's assistance was so defective as to require a reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed that defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's

34

> errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted in a breakdown of the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687 (1984). To prove his ineffective assistance claims, the petitioner is thus required to meet both the performance and prejudice prongs of the *Strickland* test.

Meeting the first prong is almost always difficult because "[j]udicial scrutiny of counsel's performance must be highly deferential," and courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *Strickland*, 466 U.S. 689. In addition, "counsel's performance must be judged by the professional norms prevailing at the time of counsel's action." *Id.* at 687; *Bonds v. Wainwright*, 579 F. 2d 317 (5th Cir. 1978).

To meet the second prong, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[15] A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

In this case, the state courts found that Marshall's performance with respect to any potential appeal of the petitioner's 1957 conviction was competent, measured by the prevailing standards of the time and place in which Marshall then practiced. Regarding this issue, the Alabama Supreme Court said:

---

[15] In certain limited circumstances, not present here, prejudice is presumed. *Strickland*, 466 U.S. at 692.

[e]ven as late as 1961, the Supreme Court of Alabama expressed uncertainty regarding the import of *Griffin v. Illinois*, *supra*, and refused to grant an appellant a free transcript of his trial. In dismissing the appeal because the record was not timely filed the Court noted:

> "We, of course, are familiar with the case of *Griffin v. People of State of Illinois*, 351 U.S. 12, 76 S. Ct. 585, 100 L. Ed. 891, but are not sure of the exact meaning of the sum total of the opinions in the case or their impact upon such a state as Alabama, which has no department or institution with funds from which this Court or any other court could order payment of the expenses of the transcript of the evidence for the appellant. Perhaps Illinois had such a statutory system whereby the Supreme Court of the United States could justify its judgment in ordering the Supreme Court of Illinois to have a transcript prepared for defendant Griffin. But Alabama has no such statute and there is no fund in any department of the state from which such expenses can be paid. Of consequence of which we can not, and will not, order anyone to prepare a transcript of the evidence for this appellant."
> *Bland v. State*, 272 Ala. 215, 130 So. 2d 385 (1961).



In 1961 the Alabama Legislature formally responded to the rights announced in *Griffin* with the passage of what is now Sections 12-22-190 to 12-22-201, Code 1975, providing a record on appeal for indigents. A search of the official case reports of this state reveals no instance where an appellant was provided a free transcript of his trial before the passage of this act.

In view of the attitude of the Alabama Supreme Court to *Griffin v. Illinois, supra*, as expressed in *Bland, supra*, we do not think that Attorney Marshall's failure to advise the defendant of his right to a free transcript on appeal constituted ineffective assistance of counsel.

*Hubbard v. State*, 382 So. 2d 577, 585-86, also quoted in *Hubbard v. State*, 500 So. 2d 1204, 1212-13 (Ala. 1986).

Marshall's performance following the 1957 conviction was inconsistent with the current prevailing understanding of the *Griffin* decision. At the time, however, the Alabama Supreme Court found that the case could not be applicable in Alabama, and did not

require that transcripts be provided for indigent defendants until the state legislature addressed the issue several years after *Griffin* was decided. Thus, Marshall's performance was not constitutionally unreasonable according to the legal standards and professional norms prevailing in Alabama in 1957. The court is therefore unwilling to declare that the petitioner's 1957 conviction is void due to any alleged ineffective assistance rendered by Marshall. To do so would be to impose the standards of today on legal work performed forty years ago. The *Strickland* court clearly did not intend such a result. The claim that ineffective assistance taints the petitioner's 1957 conviction thus fails because the petitioner cannot meet the first prong of the *Strickland* test. Thus, it is unnecessary to analyze this claim under the second prong of *Strickland*.

### b.  Conflict of interest.

At the 1957 trial, Marshall represented both the petitioner and his co-defendant, Divid Hubbard. Both had been indicted for the killing of Carl Dockery. The petitioner was convicted and Divid Hubbard was acquitted. The petitioner claims that if Divid Hubbard had been called as a witness, he would have testified that Dockery had been having an affair with the petitioner's wife, that Dockery had threatened the petitioner, and that Dockery was armed at the time of the shooting. (Petition for Writ of Habeas Corpus, ¶ 52). As evidence of the alleged conflict, the petitioner cites Marshall's testimony at the petitioner's 1977 trial that he considered the possibility that Divid Hubbard could have hurt his own case by testifying in the petitioner's 1957 trial:

> Q:  Now, did you make a judgment at that time [the 1957 trial] as to whether it would have been beneficial or harmful for Mr. Divid Hubbard to testify at the trial of J.B. Hubbard?

37

A:    Yes, are you talking about on Mr. Divid Hubbard's behalf?

Q:    Yes sir, whether it'd be beneficial or harmful to Mr. Divid Hubbard to testify in J.B. Hubbard's trial?

A:    Well, it wouldn't of--it's been a calculated risk I don't think it was beneficial, and I think quite possibly think it could have been quite harmful to the defense of Divid Hubbard, when his case came up."

Q:    Right. Was that one of the considerations that you thought about when not putting Mr. Divid Hubbard on the stand?

A:    Sure it was.

(R. 1479).

Where an ineffective assistance claim arises out of an actual conflict of interest, prejudice is presumed if a defendant shows that his counsel "'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland*, 466 U.S. at 693 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350, 348, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980)) (footnote omitted).

In this case, the petitioner argues that Marshall rendered ineffective assistance because, when deciding whether to put Divid Hubbard on the stand, he considered the fact that Divid Hubbard might have hurt his own case by testifying in the petitioner's trial. The petitioner also points out that he was convicted while Divid Hubbard was acquitted.

On direct appeal from the petitioner's 1977 murder conviction, the Alabama Court of Criminal Appeals considered this issue. It quoted the findings of the state trial court which heard the petitioner's 1962 coram nobis petition challenging the 1957 conviction. Those findings included:

38

The Court finds Divit Hubbard was an eye witness and that he testified in this coram nobis hearing to the effect that at the time of the fatal shooting of the victim by the petitioner, the victim was unarmed, that he heard no threat from the victim to the petitioner uttered, and that he saw no sign of any provocation for the shooting. Thus, the Court finds that Mr. Marshall was wise in not using Mr. Divit Hubbard's testimony in the original case, since it would have been very hurtful to the defense of the petitioner.

The Court finds further that since at the time of the trial of the petitioner in the original case the said, Divit Hubbard, was also charged with the murder of this same victim, he could not have been required to testify in petitioner's trial, and that the said Divit Hubbard could not reasonably have been expected to testify in petitioner's case due to the possibility of self incrimination.

*Hubbard v. State*, 382 So. 2d 577, 581.[16] On direct appeal of the petitioner's 1982 conviction, the Alabama Court of Criminal Appeals referred to these findings. *Hubbard*, 500 So. 2d at 1211-12.

The record and the above findings, which are supported by the record, indicate that there is no proof, aside from the unsubstantiated assertions of the petitioner, that he would have benefitted from Divid Hubbard's testimony. The record shows instead that the petitioner's own case would have been harmed by that testimony, since it tended to confirm the testimony of other witnesses who testified against him (R. 1489, 1497). Also, Marshall did not recall Divid Hubbard ever telling him that he saw Dockery with a gun or that Dockery reached for his pocket. (R. 1493, 1495). The petitioner testified at the 1957 trial that he did not see Dockery with a gun. (R. 1493).

---

[16]"Divit Hubbard" appears to be an alternate spelling of Divid Hubbard's name, as the court is obviously referring to the petitioner's co-defendant in the 1957 proceedings. That co-defendant is referred to as Divid Hubbard in these proceedings.

Marshall's decision not to call a witness whose testimony would have been harmful to the witness's own case does not indicate that there was an "actual conflict" in this instance. Instead, it reveals that Divid Hubbard's interest in not testifying at the petitioner's trial was wholly compatible with the petitioner's interest at his 1957 trial. There is no evidence, as is required in the Eleventh Circuit, that the two men had "inconsistent interests" or that "the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." *McConico v. Alabama*, 919 F.2d 1543, 1548 (11th Cir. 1990) (quoting *Smith v. White*, 815 F.2d 1401, 1404 (11th Cir. 1987), *cert. denied*, 484 U.S. 863, 108 S. Ct. 181, 98 L. Ed. 2d 133 (1987)). Therefore, this claim must fail.

### 3.   The malice instruction.

The petitioner claims that the trial court improperly instructed the jury on the issue of malice by relieving the State of the burden of proof on that issue and by shifting the burden to Hubbard. The instruction about which the petitioner complains was:

> Malice may arise on the instant and from the use of a deadly weapon whereby one intentionally takes the life of another. The law raises a prima facie presumption that the killing was done maliciously unless the circumstances of the killing disprove malice. The intentional and unjustifiable use of a deadly weapon in a deadly manner raises the presumption of malice. This prima facie presumption prevails unless the circumstances instant to the killing rebut the presumption. . . .

> If one person intentionally shoots another with a gun or other deadly weapon and death ensues, the law implies or presumes malice. And imposes upon the slayer the burden of rebutting this presumption by other proof unless the evidence which proves the killing rebuts the presumption.

(R. 2419, repeated on 2421-22). The petitioner claims that this instruction is contrary to the rule of *Sandstrom v. Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979). In *Sandstrom*, the Supreme Court held it impermissible in a criminal trial for the court to shift the burden of proof on the issue of intent by instructing the jury that "the law presumes that a person intends the ordinary consequences of his voluntary acts."

The respondent argues that this claim is procedurally barred because the petitioner failed to raise it at trial, as well as on direct appeal. As the Eleventh Circuit has stated:

> [t]he federal courts' authority to review state court criminal convictions pursuant to writs of habeas corpus is severely restricted when a petitioner has failed to follow applicable state procedural rules in raising a claim, that is, where the claim is procedurally defaulted. Federal review of a petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, *Harris v. Reed*, 489 U.S. 255, 263, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989), and that bar provides an adequate and independent state ground for denying relief. *See id.* at 262, 109 S. Ct. at 1042-43; *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S. Ct. 1981, 1987, 100 L. Ed. 2d 575 (1988). The doctrine serves to ensure petitioners will first seek relief in accordance with state procedures, *see Presnell v. Kemp*, 835 F.2d 1567, 1578-79 (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S. Ct. 882, 102 L. Ed. 2d 1004 (1989), and to "lessen the injury to a State that results through reexamination of a state conviction on a ground that a State did not have the opportunity to address at a prior, appropriate time." *McCleskey v. Zant*, 499 U.S. 467, 111 S. Ct. 1454, 1470, 113 L. Ed. 2d 517 (1991).

*Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991), *cert. denied*, 506 U.S. 930, 113 S. Ct. 361, 121 L. Ed. 2d 274 (1992). Thus, if a claim has already been presented in some form to a state court, a federal habeas court may refuse to hear that claim if the last state court rendering the judgment "'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris*, 489 U.S. at 263.

The last state court to review the claims here asserted was the Alabama Court of Criminal Appeals, which affirmed the Rule 20 court's denial of the petitioner's Rule 20 petition and adopted the Rule 20 court's opinion. In that opinion was a list of the petitioner's rule 20 claims, including the *Sandstrom* claim, which the court "clearly and expressly" stated were procedurally barred. *Hubbard*, 584 So. 2d at 899, 916. As the Court of Criminal Appeals stated, each of these claims was barred for at least one of the following reasons: (1) it was raised and addressed on direct appeal, (2) it could have been raised at trial and on direct appeal but was not, or (3) it was not raised in the Rule 20 proceeding. *Id.* at 899.

This malice instruction claim apparently was barred for the second of these reasons. Rules 20.2(a)(3)&(5) of the Alabama Rules of Criminal Procedure (Temporary) (now codified as Rules 32.2(a)(3) & (5)) state that

> [a] petitioner will not be given relief under this rule based upon any ground:
> (3) Which could have been but was not raised at trial . . . ; or
> (5) Which could have been but was not raised on appeal . . . .

Ala. R. Crim. P. (Temporary) 20.2(a)(3),(5), *now codified*, Ala. R. Crim. P. 32.2(a)(3), (5). Since such rules are independent and adequate state grounds for denying relief, this claim is procedurally defaulted. *See Waldrop v. Jones*, 77 F.3d 1308, 1314-15 (11th Cir.), *cert. denied sub nom*, *Waldrop v. Hopper*, --- U.S. ---, 117 S. Ct. 247, 136 L. Ed. 2d 175 (1996)(Rule 32.2(a)(5) is "adequate and independent" state ground for denial of relief); *Hill v. Jones*, 81 F.3d 1015, 1023 (1996), *cert. denied*, --- U.S. ---, 117 S. Ct. 967, 136 L. Ed. 2d 851 (1997)("firmly established and regularly followed" state procedural rules may bar federal habeas claims)(quoting *Ford v. Georgia*, 498 U.S. 411, 423-24, 111 S. Ct. 850, 857, 112 L. Ed. 2d 935 (1991)).

A petitioner who has procedurally defaulted on a constitutional claim is barred from litigating that claim in a federal habeas corpus proceeding unless he can show adequate "cause" for and "actual prejudice" arising from the default.[17] *Engle v. Issac*, 456 U.S. 107, 128, 102 S. Ct. 1558, 71 L. Ed. 2d 783, 801 (1982), *reh'g denied*, 456 U.S. 1001, 102 S. Ct. 2286, 71 L. Ed. 2d 1296 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977), *reh'g denied*, 434 U.S. 880, 98 S. Ct. 241, 54 L. Ed. 2d 163 (1977); *Wilson v. Jones*, 902 F.2d 923, 925 (11th Cir. 1990), *reh'g denied*, 927 F. 2d 615 (11th Cir. 1991).

The petitioner does not argue that the default of his malice instruction claim should be excused under the cause and prejudice test. Instead, he argued in his separate Motion for an Evidentiary Hearing that a hearing is required to determine whether he is entitled to circumvent the procedural bar. As is set forth in this court's previous Memorandum Opinion and Order denying the petitioner's Motion for Evidentiary Hearing, the petitioner is not entitled to an evidentiary hearing as to any cause and prejudice that would excuse the default of these claims.[18] As the petitioner has not shown cause and prejudice, he may not circumvent the procedural bar under that exception.

---

[17] According to the U.S. Supreme Court, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 397 (1986). *See also Amadeo v. Zant*, 486 U.S. 214, 221-22, 108 S. Ct. 1771, 100 L. Ed. 2d 249 (1988). The petitioner must also demonstrate that he was prejudiced; he must show "not merely that the errors ... created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982) (emphasis in original).

[18] The petitioner also claims trial counsel rendered ineffective assistance by failing to object to the malice instruction at trial. As set forth below, this claim *fails*. The failure to object could therefore not serve as cause (even if the petitioner had argued that it should) for the procedural default of this claim. *See Murray v. Carrier*, 477 U.S., at 488, 106 S. Ct., at 2645 (defendant represented by counsel whose performance is not constitutionally ineffective under *Strickland* must bear the risk of attorney error that results in a procedural default).

Because he is unable to meet the cause and prejudice test, the petitioner cannot avoid the procedural default on his malice instruction claim unless he falls under the "fundamental miscarriage of justice" exception, which allows a federal habeas court to consider a procedurally defaulted claim in the absence of cause if a "fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent" or where the petitioner shows "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, ___, 115 S. Ct. 851, 865-67, n.44, 130 L. Ed. 2d 808 (1995) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 335, 112 S. Ct. 2514, 2517, 120 L. Ed. 2d 269 (1992)); *Smith v. Murray*, 477 U.S. 527, 537-38, 106 S. Ct. 2661, 91 L. Ed. 2d 434 (1986) (quoting, respectively, *Engle*, 456 U.S. at 135, and *Murray*, 477 U.S. at 496). The petitioner has not made the showing of "actual innocence" necessary to circumvent his procedural default of any claim in his habeas corpus petition, including the one here discussed.[19] The malice instruction claim was procedurally defaulted and, for that reason, fails.

---

[19] The petitioner must show "actual innocence" either as to the crime or his eligibility for the death penalty. As to his guilt, such a showing requires the petitioner "to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts or critical physical evidence--that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 115 S. Ct. 851, 865, 130 L. Ed. 2d 808 (1995). The petitioner has not made such a showing. As to his eligibility for the death penalty, he would be required to show by clear and convincing evidence that, but for a constitutional error at his sentencing hearing, no reasonable juror would have found him eligible for the death penalty under state law. *Id.*; *Sawyer v. Whitley*, 505 U.S. 333, 112 S. Ct. 2514, 120 L. Ed. 2d 269 (1992). With a second degree murder conviction less than twenty years before the murder giving rise to this case, along with evidence that the crime was committed for pecuniary gain and in a heinous, atrocious and cruel manner, the petitioner was clearly eligible for the death penalty under state law. He has made no showing of mitigating circumstances compelling enough to establish his "actual innocence."

### 4.    The claimed mandatory sentencing instruction.

The petitioner claims that the trial court improperly gave a mandatory sentencing

instruction when it charged the jury as follows:

> To fix punishment at death in this case the jury must find beyond a
> reasonable doubt and to a moral certainty that this aggravating circumstance
> [the petitioner's 1957 murder conviction] is present. By your verdict finding
> the defendant guilty of the capital offense charged in the indictment you have
> found the existence of the aggravating circumstance beyond a reasonable
> doubt and to a moral certainty.

(R. 2541).

The State argues that this claim is procedurally defaulted because the petitioner

failed to raise it either at trial or on direct appeal. The last state court to review this claim

was the Alabama Court of Criminal Appeals, which, by adopting the Rule 20 court's

opinion, "clearly and expressly" stated that this claim was procedurally barred. *Hubbard*,

584 So. 2d at 899, 916. The Court of Criminal Appeals found that each of the petitioner's

defaulted claims was barred because (1) it was raised and addressed on direct appeal, (2)

it could have been raised at trial and on direct appeal but was not, or (3) it was not raised

in the Rule 20 proceeding. *Hubbard*, 584 So. 2d at 899, 916. As the state argued during the

Rule 20 proceedings, it appears that this claim was procedurally barred under Ala. R. Crim.

P. (Temporary) Rule 20(a)(3) and (5), which provide independent and adequate state

grounds for barring relief, because the petitioner failed to raise the claim either at trial or

on direct appeal. This claim is therefore procedurally defaulted.

As set forth in section III.B.3. above, the petitioner has not demonstrated either cause

or prejudice, nor has he demonstrated that he was actually innocent of crime or death

45

penalty factors, which is required for him to fall within the "fundamental miscarriage of justice" exception to the procedural default rules. Therefore, he cannot avoid the procedural bar as to this claim and the claim fails.

### 5.    Ineffective assistance of counsel at the pretrial stage.

The petitioner claims that he received constitutionally ineffective assistance of counsel at various stages of the criminal proceedings against him. A number of these allegations, set forth in the section below, focus on conduct occurring during the pretrial stage, when he was represented by Douglas Hendrix and Charles Michael Stilson. Hendrix and Stilson also represented the petitioner during his trial and sentencing. All of the ineffective assistance claims, to the extent they are not procedurally barred, must be analyzed under the two-prong analysis of *Strickland*, which is discussed above in section III.B.2.a.

### a.    Failure of counsel to support motion to suppress with applicable decisional law.

The petitioner claims that his trial counsel provided him ineffective assistance when they failed to cite applicable case law to support the motion to suppress items discovered by the authorities during the warrantless searches of Ms. Montgomery's residence. The only case he now cites, however, is *Duncan v. State*, 176 So. 2d 840 (Ala. 1965), which he describes as "a case with facts strikingly similar to Mr. Hubbard's in which the Alabama Supreme Court held that failure to obtain ongoing consent to multiple searches must result in a reversal." (Petition for Writ of Habeas Corpus at ¶ 77).

46

The respondent argues that this claim is not properly before the court because the petitioner did not "fairly present" it to the Rule 20 court and notes that this claim was dismissed by the Rule 20 court when the petitioner failed to support it with any evidence or authority.

In dismissing this claim, the state court stated as follows:

> This broadly stated claim was presented to this Court without any specific statement of the grounds for which relief is sought or any disclosure of the factual basis of these grounds. A bare allegation that constitutional rights have been violated is not sufficient. Accordingly, pursuant to Rule 20.6(b) [now codified as Ala. R. Crim. P. 32.6(b)], this claim is dismissed.

*Hubbard*, 584 So. 2d at 908.

An examination of the Rule 20 record reveals that the petitioner did indeed fail to present evidence in support of this claim. In his Rule 20 petition, the petitioner stated that his "[t]rial and appellate counsel failed to be aware of and failed to direct the courts to longstanding precedents which clearly support petitioner's claims for inclusion or exclusion of evidence under the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution, and Article I, Sections 5 and 6 of the Constitution of the State of Alabama." (Rule 20 Transcript at 172-73). In his brief to the Rule 20 court, however, the petitioner cited *Duncan* and other authority on warrantless searches only for the purpose of attacking the warrantless searches, not to support his ineffective assistance claims. (Rule 20 Transcript at 201-02). In that portion of his Rule 20 brief addressing ineffective assistance of counsel, the petitioner stated little more than:

> Among other serious errors, Hubbard's counsel erred by failing to obtain psychiatric, medical and other experts to testify for defendant; by failing to present any evidence at the sentencing hearing; and by failing to investigate

47

> Hubbard's defense that someone else committed the crime. Petitioner will
> further develop the facts regarding counsel's errors, through testimony at the
> hearing on this Petition.

(Rule 20 Transcript at 220-21).

On appeal from the Rule 20 court's denial of relief, the petitioner cited almost nothing from the Rule 20 hearing in support of this claim. He stated that "[t]rial counsel testified at the Rule 20 hearing that he followed recent developments in the law and did numerous hours of legal research on this case. (R. 44). Therefore, judged on the basis of his own statements he should have been aware of the relevant cases." (Brief of Appellant, Appeal from Denial of Rule 20 Petition, at 34.)

On this record, it is clear that the state courts were not afforded a "full and fair opportunity to address and resolve [this] claim on the merits" for the purposes of exhaustion of state remedies. *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 112 S. Ct. 1715, 1270, 118 L. Ed. 2d 318 (1992). *See also Footman v. Singletary*, 978 F.2d 1207, 1210-11 (11th Cir. 1992).

To exhaust a habeas claim, a petitioner must "fairly present" it to the state courts. He must raise all the essential factual elements and the same legal theories that he raises in his habeas petition, so the state court has had an opportunity to apply the controlling legal principles to the facts. *Waldrop*, 857 F. Supp. at 897 (citations omitted). This petitioner did not do that on this claim. He is now barred from presenting this claim in state court by the time limitation set forth in current Rule 32.2(c), which disallows a collateral attack more than two years after a conviction becomes final. Dismissing the claim to allow the petitioner to pursue it in state court would therefore be futile. Because this claim is

48

procedurally barred in state court, it is procedurally barred in this proceeding as well. *Id.* (citations omitted).

As is explained above, the petitioner cannot circumvent the procedural bar under the cause and prejudice test or under the "fundamental miscarriage of justice" exception.

Even if this claim were not procedurally defaulted, however, it is doubtful that the failure to cite *Duncan*, would amount to the ineffective assistance of counsel under the two-prong *Strickland* test. First, the facts of *Duncan* are not "strikingly similar" to the facts of this case as the petitioner suggests. In *Duncan*, the defendant merely acquiesced to the police search of his hotel room when officers came to his door without warning. In this case, the petitioner actually called authorities to Ms. Montgomery's house, invited them inside, and cooperated with them as they carried out their duties. Second, the failure to cite a particular case in support of an argument would not seem to be the kind of omission falling outside the wide range of reasonable professional assistance, at least where the case would not mandate relief. In *Waldrop, supra*, the failure of appellate counsel to cite any cases at all in an initial brief on direct appeal was held not to constitute deficient performance under the Sixth Amendment. *Waldrop*, 857 F. Supp. at 921-22. The *Waldrop* court stated that, although the appellate briefs

> [fell] far short of being models of advocacy for death penalty defendants, the court cannot say that [appellate counsel's] representation of the petitioner on direct appeal was so inadequate that it fell below the objective standard of competence expected of attorneys. Far from thorough and plainly lacking in any serious effort, the briefs nevertheless raise substantive issues for consideration by the appellate court. The briefs effectively put before the court challenges to the admission of the confession, the trial court's refusal to change venue, the trial court's refusal to commit the defendant for mental examination, and the unfairness of arguments made by the prosecutor. That

> none of these proved persuasive on appeal does not mean that the briefs fell below an objective standard of competence. The mere fact that the initial brief failed to cite any case authority, even if one expands that issue to attack generally the quality of the briefs themselves, cannot be said to make the briefs so deficient and so inadequate that appellate counsel failed to meet the broad scope of competence expected of defense counsel.

*Id.* In view of such authority and the facts as they appear, the court is unwilling to classify the failure to cite *Duncan* as constitutionally deficient performance by counsel.

In addition, the petitioner has not shown that he was prejudiced by this claimed failure of counsel; he has not shown that there is a reasonable probability that, but for the failure to cite *Duncan*, the trial court would have granted the motion to suppress evidence. Likewise, the petitioner has not shown that, even if the motion to suppress had been granted, he would not have been convicted of first-degree murder or given a different sentence. There was adequate evidence to convict and sentence the petitioner without the evidence gathered during the warrantless searches: he called police to respond to the suicide of Ms. Montgomery, whose injuries revealed that she had been murdered; he gave a statement about the killing that was demonstrably false; on the day of the killing, police found the murder weapon, along with money and property belonging to Ms. Montgomery, on the petitioner's person; he tried to explain his possession of Ms. Montgomery's property by making another false statement; and a witness testified that Ms. Montgomery had complained of the bills incurred by the petitioner just before she was killed. This was sufficient evidence to have supported the petitioner's conviction. Also, the evidence gathered from the house was not necessary to support the finding of aggravating factors that made the petitioner eligible for the death penalty.

### b.   Failure of counsel to present relevant evidence on the motion to suppress the petitioner's statement.

The petitioner claims that his trial counsel was ineffective by failing to present relevant evidence in support of the motion to suppress his statement to the police. In particular, the petitioner complains that counsel failed to introduce "evidence of [the petitioner's] alcoholism or expert testimony concerning the effects of alcohol withdrawal on [the petitioner's] capacity to sign the statement voluntarily." (Petition for Habeas Corpus at ¶ 80). The petitioner also complains that trial counsel neglected evidence in Bryce Hospital records showing that he was an alcoholic with I.Q. scores indicating low average intelligence or borderline mental retardation. (*Id.* at ¶ 82; Rule 20 Transcript at 29). He argues that if trial counsel had simply offered "available evidence indicating that the statement was involuntary, the court quite probably would have granted Mr. Hubbard's motion to suppress" and that there consequently would have been "a reasonable probability that the jury would not have found Mr. Hubbard guilty or sentenced him to death." (Petition for Writ of Habeas Corpus at ¶ 85).

To show ineffective assistance of counsel, the petitioner must first demonstrate that counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 689. Conduct that "might be considered sound trial strategy" does not fall outside the wide range of reasonableness allowed defense counsel and therefore does not satisfy the performance prong of *Strickland*. *Id.* Where a decision not to present evidence is made for tactical or strategic reasons, strong deference is accorded that decision. *Stevens v. Zant*, 968 F.2d 1076, 1082-83 (11th Cir. 1992) (in mitigation context), *cert. denied*, 507 U.S.

929, 113 S. Ct. 1306, 122 L. Ed. 2d 695 (1993). To meet the second prong of *Strickland*, the

petitioner "must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Strickland*,

466 U.S. at 694.

In this case, the Rule 20 court made a number of factual findings applicable to the

claims set forth in this section. They were:

> In paragraph 1q of his petition, petitioner alleged that his trial counsel were
> ineffective in failing to offer evidence or expert testimony as to the effect on
> petitioner of Officer Marcum giving petitioner alcohol just prior to the time
> that petitioner signed his statement. This issue was brought out in the
> testimony of Officer Marcum, who testified that petitioner said he needed a
> drink to steady his nerves before signing his statement. Hendrix argued to
> the jury in closing that petitioner was intoxicated at the time petitioner gave
> his statement to Marcum. (R. 2398-2399) In Hendrix's opinion anyone old
> enough to be on a jury who heard this testimony would have understood
> petitioner was intoxicated. Hendrix thought that there was no need for any
> further evidence on this point. Hendrix thought that this evidence helped
> petitioner's cause and that other expert testimony might have hurt petitioner's
> case on this point if it established that the amount of alcohol was not
> sufficient to intoxicate petitioner.
>
> Stilson was not sure that psychiatric reports from Bryce Hospital would have
> helped demonstrate that petitioner was intoxicated at the time petitioner
> made his statement to Marcum. Stilson argued to the jury in closing that
> petitioner was intoxicated at the time he was questioned by police. (R.
> 2379-2381)
>
> The Court of Criminal Appeals found that petitioner's statement was properly
> admitted into evidence notwithstanding the effect the alcohol had on the
> petitioner. The appellate court specifically found that the statement had been
> completed before petitioner imbibed any alcohol and only petitioner's
> signature was obtained after the drink. *Hubbard v. State*, 500 So.2d 1204,
> 1220 (Ala.Crim.App.1986). Given this determination by the appellate court,
> trial counsel's performance was not deficient and certainly no prejudice can
> attach to trial counsel's actions.

> Even if, against their own judgment, trial counsel had sought to introduce expert testimony concerning the effect on petitioner of Marcum's giving him alcohol prior to petitioner signing his statement, this would not have changed the outcome of petitioner's trial. The trial judge ruled that petitioner's statement was complete prior to his taking the drink and the appellate court specifically affirmed on this point. Petitioner has failed to meet his burden of proving that but for trial counsel's failure, the outcome of petitioner's trial would have been different.

*Hubbard*, 584 So. 2d at 907. The Rule 20 court also found that

> [t]here was ample evidence at trial, if believed, to show that petitioner had been drinking the day of the murder and the preceding evening. Trial counsel were not deficient because they did not present scientific or some other form of testimony regarding petitioner's claim of intoxication. Marcum's testimony showed that petitioner was given whiskey after making his statement, but prior to signing the written copy of the statement. Other witnesses testified to smelling alcohol on petitioner's breath the day of the murder. This evidence was presented at the suppression hearing in 1977 and rejected. It was rejected on petitioner's first appeal. It was presented at petitioner's 1982 suppression hearing and rejected. It was presented at both of petitioner's trials and rejected and it was rejected on the direct appeal of petitioner's second conviction.

*Hubbard*, 584 So. 2d at 903. The Rule 20 court also found that

> [a]t the Rule 20 hearing, Hendrix was not aware of any witnesses who could have been called to rebut the testimony of the state's expert witnesses. Given the evidence in the case, Hendrix was of the opinion that other expert witnesses would not have assisted the defense. At trial, Stilson was able to utilize expert testimony from the toxicologist and pathologist who were called by the prosecution. Stilson did not believe that the statute allowed for state-funded expert witnesses at the time of petitioner's trial.

> Trial counsel were not deficient for failing to request state-funded expert witnesses. Trial counsel were able to use expert testimony concerning the physical evidence from Dr. Santina and Jim Britton.

> This court notes that Stilson testified that he would have made a motion for expert witnesses if state funds had been available at the time of trial.

> Further, petitioner has failed to introduce or proffer any evidence that trial counsel could have presented in 1982 concerning the physical evidence in

the case. Petitioner failed to meet his burden of proving that there was a reasonable probability that, but for trial counsel's actions, the outcome of petitioner's trial would have been different.

*Hubbard*, 584 So. 2d at 903-04.

The state court's factual findings were fully supported by the record and the available evidence and they will be presumed correct.

### (1)   Lack of expert testimony.

Petitioner complains that his trial counsel rendered ineffective assistance by failing to present, in support of the motion to suppress the statement, expert testimony regarding the effect of his alcoholism on the voluntariness of his statement.

The record and the state court factual findings reveal that trial counsel attempted to show that the petitioner was intoxicated and possibly beginning to suffer withdrawal symptoms from alcohol when he made the statement.[20] In making this argument, rather than focus on a medical diagnosis of alcoholism or on scientific explanations of *delirium tremens*, petitioner's trial counsel chose to focus on testimony that the petitioner had been drinking alcohol, that he was intoxicated and shaky and that he asked for alcohol when he had difficulty signing his name. (R. 1536; see also Rule 20 Transcript at 34-35, 70). Attorney Hendrix apparently felt that expert testimony was unnecessary because most adults, if they believed the plaintiff's version of the facts, would have the common sense and life experience to conclude, without the assistance of expert testimony, that the statement was

---

[20]The gist of trial counsel's testimony during Rule 20 proceedings was that their primary strategy in arguing the motion to suppress the statement was to show that the petitioner was so intoxicated when he made it that it could not have been voluntary. At the hearing on the motion to suppress, however, counsel also argued that the petitioner's shakiness and difficulty in writing were due to the onset of *delirium tremens*. (R. 1536-40).

involuntary. *Hubbard*, 584 So. 2d at 907; (Rule 20 Transcript at 78-79, 97). There is no indication that the trial judge required expert assistance in order to understand the petitioner's argument.

Under these circumstances, to hold that trial counsel acted so unreasonably as to violate the Constitution in foregoing expert testimony on the voluntariness of the statement would be to engage in the sort of hindsight and second-guessing of attorney strategy that is enjoined by *Strickland*.

Even if the failure to use expert testimony on alcoholism did meet the first prong of *Strickland*, it would not meet the second. There is no reasonable probability that, but for the failure to use the expert testimony, the court would have granted the motion to suppress. In now offering the affidavit of James C. Beck, M.D., Ph.D., the petitioner apparently tries to show the sort of expert testimony he believes should have been offered in support of the motion to suppress. As was explained above, this affidavit was not fairly presented to the state courts, and arguably should not be considered here. For the sake of argument, however, the court notes that Beck's affidavit reflects that the petitioner was an alcoholic with a history of alcohol abuse, that the petitioner had ingested alcohol on the morning of Ms. Montgomery's murder, and that he was apparently unsteady and had difficulty signing the statement. This information is reflected in the record. The affidavit further sets out a medical explanation of the phenomenon, cause and major symptoms of *delirium tremens*, and gives the expert's opinion that the petitioner was in a "life-threatening," "biologically coercive" position when he gave the statement, and could not have known the risks of signing.

The petitioner has not shown that there is a reasonable probability that the trial court would have granted the motion to suppress the statement if such expert testimony had been offered. Such testimony would not have given the court any new information that would have aided in deciding whether to grant the motion to suppress. The record already contained information about the petitioner's alcoholism, via the Bryce Hospital records, even if it was not pointed out during argument on the motion to suppress the statement. Also, the record contains a number of common-sense indications that the petitioner had a drinking problem, including the fact that he had alcohol on his breath in mid-morning, which was apparent from the evidence argued at the motion to suppress. As to the information about *delirium tremens*, most adults in this society, and particularly educated adults such as the trial judge, are aware of the condition of alcoholism and that alcoholics can suffer withdrawal symptoms from alcohol, including shakiness and hallucinations. Although Dr. Beck opined that the petitioner was suffering from *delirium tremens* when he signed the statement and that, therefore, he could not have signed voluntarily, such an opinion is not relevant to the voluntariness of the statement, because, as noted above, there is no requirement that a statement be signed in order to be admissible. *Wong Sun*, 371 U.S. at 491. Such expert testimony would probably not have changed the trial court's ruling on the motion to suppress the statement.

The petitioner fails to meet the second prong of *Strickland* for yet another reason: even if the court had suppressed the statement, there is not a reasonable probability that the petitioner would have avoided his first-degree murder conviction or death sentence; evidence other than the statement supports both the conviction and the sentence. The

petitioner called police to respond to "a suicide" at Ms. Montgomery's house. Later, it was determined that he had waited a significant amount of time after the shooting before calling the police, the petitioner having first made several other calls seeking advice regarding what he should do. The police arrived and found Ms. Montgomery with multiple gun shot wounds, including two to her face, which made it clear that Ms. Montgomery did not commit suicide. They found the murder weapon, which had been reloaded, on the petitioner's person along with money and personal property belonging to Ms. Montgomery. One item of this property, her gold watch, was one that she always wore and always repaired it immediately when needed. The record reflects that Ms. Montgomery had spent significant sums of money for the petitioner's benefit but that she had begun to complain, shortly before her death, about bills incurred by the petitioner and the fact that she had been spending more money than she was making.

Even though the statement undoubtedly contributed to the petitioner's conviction because, while it was meant to be exculpatory, it was so obviously false, nonetheless, the other evidence presented was sufficient to support the petitioner's conviction even without the statement. The statement was also unnecessary to the court's finding that several aggravating factors were present, which finding permitted imposition of the death penalty.[21]

---

[21]The statement was not required to show that, within twenty years prior to Ms. Montgomery's murder, the petitioner had been convicted of another murder. Neither was it required to show that the murder was committed in a heinous, atrocious or cruel manner or for pecuniary gain, although it did support the finding of the latter of these factors.

As the petitioner fails to meet either prong of *Strickland* with respect to trial counsel's omission of the use of expert testimony to support the motion to suppress the statement, this claim must fail.

### (2)   Failure to use state hospital records on alcoholism.

The petitioner also argues that trial counsel erroneously failed to support the motion to suppress his statement with records from Bryce Hospital, which showed that he was an alcoholic with a history of alcoholism and alcohol-related problems. This failure was not based upon any neglect to discover the records. Counsel apparently knew about the Bryce Hospital records and chose not to use them while arguing the motion to suppress. While trial counsel could not specifically recall, during the Rule 20 proceedings, whether or not they had seen the Bryce Hospital records before trial,[22] attorney Stilson did recall that he had reviewed some of the petitioner's psychiatric or psychological reports that had been subpoenaed by the attorney who represented Hubbard at his 1977 trial. (Rule 20 Transcript at 401-05). There is no indication that the records reviewed by Stilson could have been any records other than the Bryce Hospital records, which had been subpoenaed in June 1977 and which were part of the court file from the 1977 trial. Trial counsel thus probably knew that the records were available and chose to focus on other evidence to show that the statement was involuntary. Also, because the same judge presided over both the 1977 trial and the 1982 trial, he had access to these records during the 1982 trial, and was likely to have been aware at least of their existence, if not their contents.

---

[22] This failure in recollection is understandable, given the six year gap that separated the April 1982 trial from the June 1988 Rule 20 hearing.

As the Rule 20 court found, trial counsel had doubts that the Bryce Hospital reports would have helped establish that the petitioner was intoxicated at the time he gave the statement, which was one of counsel's primary goals in arguing the motion to suppress. Although the Bryce Hospital reports may have provided additional support to the petitioner's argument that he was intoxicated and that he was beginning to suffer the onset of *delirium tremens* at the time of his statement, it is not clear that the omission was so unreasonable as to violate the Sixth Amendment. This is especially true in view of trial counsel's common-sense approach to the voluntariness argument.

At the hearing on the motion to suppress, trial counsel attempted to show that the statement was involuntary because the petitioner was drunk or suffering the onset of *delirium tremens* when he made and signed the statement. (R. 1536-40). They presented substantial evidence on the following: (1) the petitioner had been drinking a good deal on the morning of Ms. Montgomery's death; (2) most of the witnesses had testified he smelled of alcohol; (3) a liquor bottle was confiscated from him at the crime scene that morning; (4) he (allegedly due to intoxication) showed police officers the contents of his wallet and insisted he was "no bum"; (5) he was shaky and unsteady; (6) he apparently had difficulty signing the statement; (7) he asked for alcohol to "steady his nerves"; and, (8) the police officer inappropriately allowed him to drink alcohol just before he signed his statement. (*Id.*). Trial counsel argued that this evidence showed that the petitioner was too intoxicated or too close to the onset of *delirium tremens* to give or sign any statement voluntarily. (*Id.*).

Under the circumstances, the court cannot conclude that the failure to focus on the Bryce Hospital records concerning the petitioner's alcoholism was so unreasonable as to

violate the petitioner's Sixth Amendment rights. The petitioner thus fails to meet the first prong of *Strickland* as to this claim.

Even if the petitioner met the first *Strickland* prong as to this claim, he could not meet the second. First, there is no reasonable probability that the trial court would have granted the motion to suppress the statement even if trial counsel had pointed out the Bryce Hospital records. In 1982, when the petitioner's second trial was conducted, the Alabama Court of Criminal Appeals had already established the state law applicable to a claim that alcohol use rendered a confession or statement involuntary:

> Statements made while under the influence of alcohol are not rendered involuntary by intoxication "short of mania or such an impairment of the will and mind as to make the person confessing unconscious of the meaning of his words." *Stewart v. State, supra; Anderson v. State*, 45 Ala.App. 653, 235 So.2d 902, *cert. denied*, 285 Ala. 756, 235 So.2d 906 (1969).

*Myers v. State*, 431 So. 2d 1342 (Ala. Crim. App. 1982), *cert. dismissed sub nom Ex parte Myers*, 431 So. 2d 1346 (Ala. 1983).

In *Myers*, the appellant argued that he was suffering withdrawal symptoms from his epilepsy medicine when he made his statement. Witnesses testified that when Myers missed doses of the medicine "he became irritable, had memory lapses, and suffered a loss of 'will power and resistance to pressure.'" *Id*. at 1345. The police officer who took the statement testified that appellant appeared to be rational and to understand what he was doing; that he did not appear to be under the influence of intoxicants or to be suffering from an emotional or physical problem. No one told the officer that appellant needed medication or was suffering from withdrawal. The interview lasted between an hour to an hour and fifteen minutes. *Id*. at 1345-46. The court affirmed admission of the statement

because the trial court could have concluded from this evidence that the appellant was not so impaired as to render him unconscious of the meaning of his words. *Id.* at 1346; *see also Campbell v. State*, 444 So. 2d 913 (Ala. Crim. App. 1984)(statement admitted although appellant was intoxicated and where he said he remembered only the hallucinations he had during an episode of *delirium tremens* in jail and that there had been a bottle of liquor in the room where he was questioned; witnesses said he was coherent, responsive to questions and did not fall or lose consciousness).[23]

In view of contemporary Alabama law upholding the admission of statements by those under the influence of alcohol, drugs or the withdrawal therefrom, and the heavy burden Alabama law imposes on those who wish to suppress a statement due to alcohol or drug use, there is not a reasonable probability that, but for counsel's failure to present Bryce Hospital records on the petitioner's alcoholism in support of the motion to suppress the statement, the court would have suppressed the petitioner's statement. There is no record evidence that the petitioner was suffering "such an impairment of the will and mind as to make [him] unconscious of the meaning of his words." *Myers*, 431 So. 2d at 1346.

Second, as discussed previously, there is no reasonable likelihood that the outcome of the proceeding would have been different even if the court had granted the motion to

---

[23] Other Alabama cases decided around the time of the petitioner's trial affirm the admission of statements taken from persons who had been drinking before the statement was taken. *See Fields v. State*, 494 So. 2d 477 (Ala. Crim. App. 1986)(appellant's statement admitted although he had just been in a car wreck, was injured, combative, disoriented, and, at times, could not appropriately answer questions); *O'Dell v. State*, 482 So. 2d 1341 (Ala. Crim. App. 1985)(statement admitted although appellant claimed he had been drinking and taking drugs, where police smelled alcohol on his breath but said he did not appear intoxicated or "under the influence"); *Fears v. State*, 451 So. 2d 385 (Ala. Crim. App. 1984)(statement admitted where police officer taking the statement smelled alcohol on appellant's breath, but believed him to be sober and able to understand and respond appropriately); *Bufford v. State*, 382 So. 2d 1162 (Ala. Crim. App. 1980), *cert. denied*, 382 So. 2d 1175 (Ala. 1980) (statement admitted, in spite of appellant's intoxication, where police officers said he did not appear to be drunk and answered questions intelligently).

suppress the petitioner's statement. As the petitioner cannot meet either prong of *Strickland*, this claim fails.

### (3)    Failure to use state hospital records on low I.Q.

The petitioner also implicitly argues that trial counsel should have used the Bryce Hospital records showing his low I.Q. scores[24] in support of the motion to suppress his statement.[25] Because the voluntariness of a statement may be affected by the intelligence of the person making it, *see Connelly*, 479 U.S. at 163 n. 1, it is theoretically possible that the I.Q. results could have supported the petitioner's argument that the statement was involuntary.[26]

The petitioner cannot meet the first prong of *Strickland* as to this claim. As set forth above, trial counsel presented substantial evidence and argument in support of the motion to suppress. Their failure to refer specifically to the petitioner's I.Q. records in arguing the motion to suppress was not so unreasonable as to violate the petitioner's Sixth Amendment rights.

Even if the petitioner were able to meet the first prong of *Strickland* as to this claim, he could not meet the second prong by showing a reasonable probability that, but for counsel's failure to point out the petitioner's I.Q. scores, the result of the proceeding would

---

[24]These records indicate that the petitioner has a verbal I.Q. of 77 and a full scale I.Q. of 80, both of which are in the borderline mentally retarded range, and a performance I.Q. of 86, which is within the low average range.

[25]The petitioner raises the issue of whether counsel should have used the I.Q. scores to support the motion to suppress by stating that "[h]ow [the petitioner], an alcoholic with, as the Bryce Hospital records state, a borderline mentally retarded I.Q., would be physiologically and psychologically affected by the consumption of alcohol during the stress of police interrogation goes directly to the issue of whether his statement should have been admitted at trial." (Petition for Habeas Corpus at ¶ 82).

[26]As noted above, the trial court had access to the Bryce Hospital records and was likely aware of their existence, if not their contents.

have been different. Contrary to the petitioner's assertion, it is not clear that the trial court "quite probably" would have suppressed the statement if counsel had offered the I.Q. evidence. In fact, the law and evidence indicate otherwise.

The Supreme Court has held that "[t]he fact that a defendant may suffer from a mental impairment or low intelligence will not, without other evidence, render a confession involuntary." *Baker v. State*, 557 So. 2d 851 (Ala. Crim. App. 1990) (citing *Connelly*, 479 U.S. 157 and *Singleton v. Thigpen*, 847 F.2d 668 (11th Cir. 1988)). Furthermore, in Alabama, "the presence of a diminished mental capacity, coupled with use of alcohol or drugs, will not warrant a finding that the confessions were not voluntary. Having a low I.Q. will not invalidate the statement unless the I.Q. is so very low that the person making the statement absolutely cannot understand his *Miranda* rights." *Arnold v. State*, 448 So. 2d 489, 490 (Ala. Crim. App. 1984).

The record fails to support the petitioner's argument that he was so lacking in intelligence that he could not understand his *Miranda* rights. As trial counsel testified, the petitioner was heavily involved in the preparation of his case and always seemed competent. Also, the report of the petitioner's Lunacy Commission stated that he did not "appear to be suffering from any mental disease or defect, which would affect his present criminal responsibility or his criminal responsibility at the time of the commission of the crime," and that he appeared to "understand the charges against him and to cooperate in and assist in the conduct of his defense." (R 735).

Both before and after the petitioner's 1982 trial, Alabama courts have often held the confessions of mentally retarded people to be voluntary.[27] The Eleventh Circuit has also found the statements of people with low intelligence to be voluntary.[28]

Given the heavy burden Alabama law places on those alleging that a statement is involuntary due to low intelligence, and given that Alabama courts have often found voluntary the statements of those with low I.Q. scores (even where the I.Q. is significantly lower than that of the petitioner in this case), and given that the record evidence and state court findings overwhelmingly indicate that the petitioner's statement was voluntary, the court cannot conclude that the trial court in this case would have suppressed the statement if counsel had referred to the petitioner's low I.Q. scores while arguing the motion to suppress. Neither can the court conclude, as is explained above, that there is a reasonable probability that the result of the proceeding would have been different even if the court had granted the motion to suppress. Therefore, this claim fails.

---

[27] *Hogan v. State*, 663 So. 2d 1017 (Ala. Crim. App. 1994) (defendant I.Q. between 69 and 73); *Parker v. State*, 587 So. 2d 1072, 1088 (Ala. Crim. App. 1991), *aff'd*, 610 So. 2d 1181 (Ala. 1982), *cert. denied*, 509 U.S. 929, 113 S. Ct. 3053, 125 L. Ed. 2d 737 (1993) (petitioner had I.Q. of 78 and was under the influence of marijuana and alcohol when the statement was made); *Jackson v. State*, 516 So. 2d 726, 746 (Ala. Crim. App. 1985) (confession voluntary despite petitioner's youth and I.Q. of between 70 and 85); *Johnston v. State*, 455 So. 2d 152, 156 (Ala. Crim. App. 1984)(borderline mentally retarded I.Q. of 67); *Ellis v. State*, 398 So. 2d 402, 403 (Ala. Crim. App. 1981)(confession voluntary despite educable mentally retarded I.Q. of 59 and presence of family friend at arrest who urged petitioner that it would "go more easy" for him if he told the truth); *Jackson v. State*, 375 So. 2d 1271, 1274 (Ala. Crim. App. 1979), *cert. denied*, 375 So. 2d 1274 (Ala. 1979) (petitioner was "functionally illiterate" and had a mildly mentally retarded I.Q. of 69); *Jones v. State*, 362 So. 2d 1303, 1314-15 (Ala. Crim. App. 1978) (I.Q. indicating mild mental retardation).

[28] *Moore v. Dugger*, 856 F.2d 129, 132 (11th Cir. 1988) (confession voluntary in absence of police coercion, although petitioner had I.Q. of 62, functioned at the intellectual level of an eleven-year old, was classified as educable mentally handicapped and claimed that he had been without food or sleep for twenty-five hours to thirty hours prior to confession); *Corn v. Zant*, 708 F.2d 549, 567 (11th Cir. 1983), *cert. denied*, 467 U.S. 1220, 104 S. Ct. 23, 82 L. Ed. 2d 917 (1984) (petitioner's statement held voluntary despite below-average intelligence where he was familiar with the criminal process and understood police statements to him).

### 6.   Ineffective assistance of counsel at trial.

The petitioner also claims that he received ineffective assistance of counsel at trial in violation of his rights under the Sixth Amendment.

#### a.   Failure to investigate the petitioner's competency to stand trial.

The petitioner claims that his trial counsel rendered him ineffective assistance by failing to investigate whether he was competent to stand trial. He cites the Bryce Hospital reports detailing his low I.Q. and the environmental factors that allegedly depressed his cognitive abilities, arguing that this information suggested he was unable to assist counsel. Trial counsel, according to the petitioner, should have had him retested before his second trial in 1982.

The petitioner waived this claim during the Rule 20 proceedings. He clearly waived the claim in paragraph 1a.(ii) in the Rule 20 petition, and the Rule 20 court therefore disposed of it without addressing its merits.[29] (Rule 20 Transcript at 63-64; *Hubbard*, 584 So. 2d at 916). That claim states that the petitioner received ineffective assistance of counsel because "[t]rial counsel failed to request the assistance of state-funded experts to: . . . (ii) evaluate the competency of petitioner at the time of trial." Although the claim set forth in paragraph 1(a)(ii) of the Rule 20 petition may be stated differently than the claim asserted here, the two claims are substantionally similar because, in order to investigate the competency of the petitioner to stand trial, counsel would have had to engage an expert with state funds, which they did not do.

---

[29] The petitioner was represented during the Rule 20 proceedings by Alan D. Rose, who also represents him on this habeas action.

65

Since the petitioner waived this claim at the Rule 20 stage, it should be barred in these proceedings as well, but the respondent did not raise the procedural bar. In accord with the decision of the Eleventh Circuit in *Esslinger v. Davis*, 44 F.3d 1515 (11th Cir. 1995), the court must address the merits of this claim, strange though it may be in a case where the petitioner previously and affirmatively waived it.[30]

As the petitioner had waived this claim at the Rule 20 hearing, he did not present a factual basis for it at that stage. Even so, the Rule 20 court did make, in connection with unwaived claims, some factual findings relevant to the resolution of this claim. It found that "[trial counsel] Hendrix, based on his conversations with petitioner, had no reason to think petitioner was incompetent as petitioner never indicated any type of mental problem. Petitioner assisted trial counsel and was active in the defense of his case." *Hubbard*, 584 So. 2d at 902. The Rule 20 court also found that the petitioner demanded that his attorneys not raise issues related to his sanity. *Id.* These findings are supported by the record and are presumed to be correct.

In addition, the report of the petitioner's Lunacy Commission from 1977 stated that he did not "appear to be suffering from any mental disease or defect, which would affect his present criminal responsibility or his criminal responsibility at the time of the commission of the crime," and that he appeared to "understand the charges against him and to cooperate in and assist in the conduct of his defense." *Id.*; (R 735). Although this

---

[30] In *Esslinger*, the court held that federal district courts may not *sua sponte* raise a procedural bar to a habeas claim where invoking the bar serves no important federal interest. Because the state waived the default in that case, the court held that invoking the bar served no important interest. The state can waive the procedural bar by merely failing to assert it, as did the respondent in this case. *Esslinger*, 44 F.3d at 1524, n. 32. It would appear that *Esslinger* has been overruled by passage of the Anti-Terrorism and Effective Death Penalty Act of 1996, at least as to death penalty habeas petitions filed after the effective date of the act.

report was issued in June, 1977, almost five years before the petitioner's second trial, it adds credibility to trial counsels' belief that the petitioner was competent to stand trial and to their compliance with the petitioner's wishes that claims related to his sanity not be raised.

The petitioner cannot prevail because he has not met either prong of *Strickland*. He has not shown that it was professionally unreasonable for trial counsel not to have pursued a strategy based upon his incompetency to stand trial. He has also failed to show that there is a reasonable probability that, had trial counsel investigated his competence to stand trial, the investigation would have yielded any information which would have persuaded the court that he was incompetent or changed the results of the proceeding. This claim thus fails.

### b. Failure to object to police misconduct.

#### (1) Interrogation of the petitioner.

The petitioner claims that his trial counsel were ineffective because they failed to object to his interrogation by police. He argues that counsel should have objected to the admissibility of his statement on grounds of police misconduct, rather than simply challenging the voluntariness of the statement. By doing so, he claims, counsel would have created a reasonable probability that the court would have excluded the statement. (Petition for Writ of Habeas Corpus at ¶ 89). The petitioner has not stated specifically how this omission was constitutionally unreasonable or that, but for the omission, the outcome of the proceeding would have been different.

In disputing the voluntariness of the statement, trial counsel did assert that the petitioner's due process rights had been violated. Under the "totality of the circumstances" approach used in the voluntariness analysis, *see Connelly*, 479 U.S. at 163, n. 1, counsel argued that Officer Marcum inappropriately used alcohol to extract a statement from the petitioner, and that this, combined with petitioner's alleged intoxication, alcoholism, and/or *delirium tremens* rendered the statement coercive and involuntary.

The petitioner apparently means to argue that the petitioner's counsel should have argued that Marcum's conduct was so coercive and offensive that the confession was inadmissible due to this factor alone, without considering any other factors under the "totality of circumstances" approach. The difference between what trial counsel did and what the petitioner claims they should have done thus seems to be one in emphasis, rather than the actual omission of an alternate claim.

Even assuming that the petitioner is correct in arguing that trial counsel simply failed to assert an alternate claim to exclude the statement, he cannot prevail. As the Supreme Court has stated, "[e]very trial presents a myriad of possible claims." *Engle v. Isaac*, 456 U.S. 107, 133, 102 S. Ct. 1558, 1575, 71 L. Ed. 2d 783, 804 (1982). The *Engle* court also stated:

> We have long recognized, however, that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim. Where the basis of a constitutional claim is available, and other defense counsel have perceived and litigated that claim, the demands of comity and finality counsel against labeling alleged unawareness of the objection as cause for a procedural default.

*Engle*, 456 U.S. at 134 (quoted in part in *Pelmer v. White*, 877 F.2d 1518, 1522 (11th Cir. 1989)).

In this case, a reasonable lawyer might have concluded that the police conduct did not rise to the level of that previously found to directly violate Due Process[31] or that it was sufficient to focus on the voluntariness of the statement under a "totality of the circumstances" approach, arguably a "more obvious avenue[ ] of defense." *Pelmer*, 877 F.2d at 1522. Trial counsel therefore do not appear to have acted in such a way as to satisfy the first prong of *Strickland*.

Nor would this conduct meet *Strickland*'s second prong. There is no suggestion in the record that the trial court would have excluded Hubbard's statement if counsel had raised the claim that police misconduct had directly violated his due process rights. The trial court was not persuaded that the police misconduct had rendered the statement involuntary even considering the alleged intoxication and *delirium tremens*, much less standing alone. The petitioner has not met either prong of *Strickland* with respect to this claim and it fails.

---

[31] In *Connelly*, 479 U.S. 157 (1986), the court stated that "coercive police conduct is a necessary predicate to the finding that a confession is not 'voluntary' and thus inadmissible under the Due Process Clause of the Fourteenth Amendment." *Connelly*, 479 U.S. at 167. "Even where there is causal connection between police misconduct and a defendant's confession, it does not automatically follow that there has been a violation of the Due Process Clause." *Id.* at 165, n.2. (citation omitted). The *Connelly* court described cases in which police conduct violated the Due Process rights of confessing defendants. This conduct included brutal torture; the 4-hour interrogation of an incapacitated, sedated defendant in an intensive-care unit; an 18-hour interrogation, without food or sleep, of a defendant on medication; holding a gun to defendant's head; a 16-day interrogation using coercive tactics, in a windowless cell with limited food; holding a prisoner for four days with inadequate food and medical attention; repeated questioning for five days, using coercive tactics; holding a defendant incommunicado for three days with little food; police telling defendant they were preparing to admit lynch mob torture; 36-hour interrogation of prisoner by relays of officers with no opportunity for sleep; coercive interrogation of mentally disturbed defendant for 8 or 9 hours in a tiny room occasionally filled with police officers; and the extraction of a confession after police gave defendant a drug with truth-serum properties. *Id.* at 164-65, n.2. The police conduct here challenged does not approach the oppressive, coercive quality of these examples.

### (2) Failure to object to claimed police tampering with evidence.

The petitioner claims that his trial counsel rendered ineffective assistance by failing to object to the State's introduction of evidence with which the police had allegedly tampered. Specifically, the petitioner complains that counsel should have objected to the introduction of the bottle of alcohol from which Officer Marcum allowed him to drink. On this issue, the Rule 20 court found:

> In paragraph 32b of the amendment to his petition, the petitioner alleged that trial and appellate counsel failed to object to the inclusion of evidence or otherwise raise the issue that petitioner was denied his rights to due process and a fair trial on the ground that the police illegally tampered with evidence in the case by giving alcohol to petitioner from a bottle that had been seized as evidence at the scene of the crime. [trial counsel] Hendrix testified that the defense used the evidence allegedly "tampered with" to petitioner's advantage. The fact that they could establish that petitioner was given whiskey at the time he made his statement was one of the best points in petitioner's case. Had he objected and kept the bottle out of evidence, it would have deprived petitioner of the opportunity to show the jury how much had been drunk. Stilson felt it was important to show the jury the bottle and it was to petitioner's advantage to show the jury how much petitioner had to drink.

*Hubbard*, 584 So. 2d at 908-09.

Trial counsel thus had sound strategic reasons not to object to the introduction of this evidence because it supported one of the petitioner's strongest arguments. Indeed, the petitioner relies heavily in this very proceeding on claims related to his ingestion of alcohol before he signed his statement. The "tampered with" bottle is evidence of that ingestion. Failure to object to the introduction of the bottle therefore could not meet the *Strickland* performance prong. Also, there is no showing of prejudice. The petitioner has

failed to show a reasonable probability that the outcome of the proceeding would have been different had the bottle been excluded as evidence.

### (3)    Failure to raise issue regarding failure of police to administer an intoximeter test.

The petitioner claims that trial counsel rendered ineffective assistance by failing to object to the failure of police to give him an intoximeter test. On this issue, the Rule 20 court stated:

> In paragraph 32c of his amendment to his petition, petitioner alleged that trial and appellate counsel were ineffective in failing to claim that petitioner was denied his rights to due process and a fair trial because the prosecution suppressed evidence favorable to the defense, or which would have been admissible in mitigation of punishment, by failing to take an intoximeter test or other test designed to demonstrate the percentage of alcohol in petitioner's blood at the time of his arrest and at the time of taking petitioner's statement. Petitioner's trial counsel was able to utilize the fact the petitioner was not tested during cross-examination of prosecution witnesses and closing argument to their advantage. Hendrix felt it was better that no intoximeter test had been administered, because a test might have shown that petitioner was not in fact intoxicated and petitioner would have lost this tactical point to argue. Stilson noted that there was no statutory authority to require the State to take an intoximeter test of petitioner.
>
> There was no evidence presented that the prosecution [suppressed] any evidence favorable to the defense or which would have been admissible as mitigation. The State was not required to administer any form of test to establish the percentage of alcohol in petitioner's blood. Trial counsel would not have had any ground for such an objection nor would appellate counsel have had grounds to raise this issue on appeal.

*Hubbard*, 584 So. 2d at 909.

Clearly then, trial counsel had a sound strategic basis for the decision not to object to the lack of an intoximeter test. This conduct does not fall outside the wide range of reasonable professional assistance required under the first prong of *Strickland*. The petitioner has also failed to show that there is a reasonable probability that the results of

the proceeding would have been different but for counsel's failure to object to the lack of an intoximeter test. He does not even show that the test was available to give to the petitioner or that the results would have been admissible if it had been given. This claim fails.

### (4) Failure to procure state-funded psychiatric assistance.

The petitioner claims that his trial counsel rendered ineffective assistance by failing to procure a state-funded psychiatric expert to support the petitioner's defense "by substantiating the arguments contained in [the petitioner's] motion to suppress and providing evidence of mitigation at sentencing." (Petition for Writ of Habeas Corpus at ¶ 93).

The respondent contends that this claim, insofar as it relates to the failure to procure such an expert for mitigation purposes, is procedurally defaulted for failure to raise it in state court. Where a habeas petitioner defaults on a claim by failing to raise it on direct appeal or in a petition under current Ala. R. Crim. P. 32.2(c), the habeas court is not required to dismiss the claim as unexhausted because the default is apparent and it would be futile to send the petitioner back to state court only to be faced with the default. *Waldrop*, 857 F. Supp. at 897. That is not the case, here, however, because the petitioner appears to have presented this claim, as it relates to mitigation, to the state court.

To exhaust a federal claim, a petitioner must have "fairly presented" it to the state courts. *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 512, 30 L. Ed. 2d 438, 443 (1971). "A claim is not 'fairly presented' unless *all* of the essential factual elements *and* the same legal theories are raised in state court, giving the state court an opportunity to apply the

72

controlling legal principles to the facts." *Waldrop*, 857 F. Supp. at 897 (citing *Picard*, 404 U.S. at 275; *Bunch v. Thompson*, 949 F.2d 1354 (4th Cir. 1991), *cert. denied* 505 U.S. 1230, 112 S. Ct. 3056, 120 L. Ed. 2d 922 (1992)).

In his Rule 20 petition, the petitioner made certain claims that could be construed to constitute a fair presentation of the claim that counsel was ineffective for failing to procure state-funded expert assistance to provide mitigation evidence. He claimed that counsel failed to request state-funded expert assistance to evaluate whether he was competent at the time of the offense and at the time of trial and whether he was suffering a mental disease or defect at the time of the offense and at the time of trial. (Rule 20 Transcript at 167). He also claimed that counsel failed to request state-funded experts "to challenge the state's physical evidence and to assist in the defense, and . . . to rebut the testimony of the state's expert witnesses." *Id*. at 168. He claimed that counsel "presented a defense of intoxication" without properly investigating the claim of intoxication and without presenting available corroborating evidence of the intoxication defense. *Id*. 168-69. He claimed that counsel "failed to investigate or pursue a defense of insanity, or mental disease or defect, or diminished mental capacity even though petitioner was exhibiting behavior that should have led counsel to investigate and pursue such defenses." *Id*. at 169. He complained that "trial counsel failed to present any evidence whatsoever at the sentencing hearing before the jury." *Id*. at 170.

In his brief, the petitioner stated his intention to develop the facts related to his ineffective assistance claims at the Rule 20 hearing, including the claims that his counsel "erred by failing to obtain psychiatric, medical and other experts to testify for defendant"

and "by failing to present any evidence at the sentencing hearing." (Rule 20 Transcript at 221).

During the Rule 20 proceedings, the petitioner's counsel asked Hendrix and Stilson why no psychiatrist or psychologist testified as to the petitioner's alcoholism. Some of these questions referred to the sentencing context, although most of them focused on the Motion to Suppress. (See Rule 20 Transcript at 27, 36, 50-54). Hendrix was also asked why a state-funded expert was not requested to testify as to issues such as the petitioner's alcoholism. (R. 38-40). In view of the claims raised in the Rule 20 petition, the statements in the petitioner's Rule 20 brief and the questions asked during the Rule 20 proceedings, the court concludes that the petitioner fairly presented this claim to the state courts.[32] As the petitioner does not appear to have defaulted this claim, as it relates to mitigation, by failing to raise it during the state court proceedings, the court will address it on the merits.

The Rule 20 court made the following findings relevant to the claim that trial counsel did not ask for a state-funded psychiatric expert to assist with respect to the motion to suppress or the presentation of mitigating factors at sentencing:

> Given the evidence in the case, Hendrix was of the opinion that other expert witnesses would not have assisted the defense. At trial, Stilson was able to utilize expert testimony from the toxicologist and pathologist who were called by the prosecution. Stilson did not believe that the statute allowed for state-funded expert witnesses at the time of petitioner's trial.

---

[32] In its previously issued Memorandum Opinion and Order denying the petitioner's Motion for an Evidentiary Hearing, Motion for the Appointment of Investigator and Motion for the Appointment of Expert Witnesses, the court stated that it appeared this mitigation claim had not been raised in state court. Although the court has reconsidered and found that the claim was fairly presented below, this does not change the court's previous ruling. The petitioner is still not entitled to an evidentiary hearing or to funds for expert or investigative assistance.

Trial counsel were not deficient for failing to request state-funded expert witnesses. Trial counsel were able to use expert testimony concerning the physical evidence from Dr. Santina and Jim Britton.

This court notes that Stilson testified that he would have made a motion for expert witnesses if state funds had been available at the time of trial.

Further, petitioner has failed to introduce or proffer any evidence that trial counsel could have presented in 1982 concerning the physical evidence in the case.

584 So. 2d at 904.

Trial counsel did not act unreasonably in failing to procure a state-funded psychiatric expert to support the motion to suppress and to provide mitigation evidence at sentencing. The court has essentially addressed the issues raised in these claims in section III.B.5.b.(1) above (failure to present expert testimony in support of the motion to suppress) and in section III.B.7.b. below (failure to introduce mitigation evidence).

As is set forth in section III.B.5.b.(1), trial counsel's failure to obtain expert assistance, whether state-funded or not, did not amount to constitutionally deficient performance under the performance prong of *Strickland*. In addition, the petitioner has not met the second prong of *Strickland* by showing that he was prejudiced by the lack of such testimony.

As is set forth in section III.B.7.b., trial counsel's failure to obtain expert psychiatric testimony, state funded or not, for mitigation purposes, was not constitutionally deficient performance under the first prong of *Strickland*. In addition, the petitioner has not met the second prong of *Strickland* by showing that he was prejudiced by the lack of such testimony.

75

The failure to obtain expert psychiatric assistance, state-funded or not, to support the motion to suppress or as mitigation evidence, was therefore not ineffective assistance of counsel. This conclusion is not changed by Stilson's testimony that he would have asked the state to provide expert assistance if he had believed the law provided it. He did not testify that he thought such testimony was necessary to the petitioner's defense. Also, Hendrix, the more experienced of the trial counsel, (Rule 20 Transcript at 8, 55-57, 390-91), did not believe expert testimony would have assisted the petitioner's case.

Furthermore, the petitioner has not shown that state-funded psychiatric expert assistance would have been granted if it had been requested, which prevents him from satisfying the second prong of *Strickland*. Neither state nor federal law clearly support the contention that the petitioner was entitled to such assistance.

Under *Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S. Ct. 1087, 1097, 84 L. Ed. 2d 53 (1985), the fundamental fairness guarantee of the Due Process Clause is implicated "when [an indigent] defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." Thereafter, "the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake*, 470 U.S. at 83. In *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985), a plurality of the Court concluded that because "petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial, [there was] no deprivation of due process." *Caldwell*, 472 U.S. at 324 n. 1, 105 S. Ct. at 2637 n. 1 (citation omitted). The Eleventh Circuit has said that

76

> *Ake* and *Caldwell*, taken together, hold that a defendant must demonstrate
> something more than a mere possibility of assistance from a requested
> expert; [footnote omitted] due process does not require the government
> automatically to provide indigent defendants with expert assistance upon
> demand. Rather, a fair reading of these precedents is that a defendant must
> show the trial court that there exists a reasonable probability both that an
> expert would be of assistance to the defense [footnote omitted] and that
> denial of expert assistance would result in a fundamentally unfair trial.

*Moore v. Kemp*, 809 F.2d 702, 712 (11th Cir. 1987), *cert. denied*, 481 U.S. 1054, 107 S. Ct.

2192, 95 L. Ed. 2d 847 (1987) (cited in *Dubose v. State*, 662 So. 2d 1189, 1192 (Ala. 1995)).

It is not likely that the petitioner could have made the required showing of need. Such

expert assistance was unnecessary because the petitioner's arguments as to the effects of

alcohol, alcoholism and alcohol withdrawal on the voluntariness of his statement and on

his culpability could have easily been understood by most adults without the assistance of

an expert. An expert was not required to interpret the facts for the jurors or to give them

scientific or medical explanations of the petitioner's arguments; common sense and life

experience in the community was sufficient to understand these contentions. Also, the

Bryce Hospital records, in which the petitioner was diagnosed as an alcoholic, were

already in the court record, along with other evidence indicating that he drank chronically.

Thus, the petitioner would not have been able to make the threshold showing under *Ake*

because his lack of a state-funded psychiatric expert did not result in a fundamentally

unfair trial; an expert was not necessary to his case.

It is likewise unlikely that the petitioner would have been entitled to a state-funded

expert. In *Fisher v. State*, 587 So. 2d 1027, (Ala. Crim. App. 1991), *cert. denied*, 587 So. 2d

1039 (Ala. 1991), *cert. denied*, 503 U.S. 941, 112 S. Ct. 1486, 117 L. Ed .2d 628 (1992), the

court affirmed the denial of the capital murder defendant's request for funds to engage a

psychiatric expert to support his intoxication defense and to evaluate his mental state. In

so holding, the court stated that, on the same day the trial court denied funds for a

psychiatrist, it

> ordered that the appellant be admitted to Taylor Hardin Secure Medical
> Facility for examination to determine his competency to stand trial. The
> Lunacy Commission concluded that the appellant had no psychological
> abnormalities at the time of the crime and, further, that he was competent to
> stand trial. Thereafter, defense counsel filed a motion to provide funds for
> expert assistance, alleging that assistance was needed to review the report
> from the Lunacy Commission, to explain and interpret the report, and to
> advise counsel as to the appropriateness of the evaluations performed.
> Defense counsel also indicated that the expert assistance was needed for
> other reasons. A hearing was held on the matter, and the trial court denied
> the appellant's motion.

>> "Although § 15-12-21(d) authorizes payment of court-approved
>> expenses, '"[t]he trial judge must find some reasonable basis
>> for the expenditure of state funds before he may authorize"'
>> payment under the statute, *Wiggins v. State*, 440 So.2d 1164,
>> 1167 (Ala.Cr.App.1983) (emphasis added). Once the defendant
>> has been found competent to stand trial and sane at the time
>> of the offense, the trial court's conclusion that there is no
>> '"reasonable basis"' for further state-authorized psychiatric
>> expenses is proper. *See Whisenhant v. State*, 482 So.2d 1225,
>> 1229 (Ala.Cr.App.1982), *aff'd in part and remanded in part, Ex
>> parte Whisenhant*, 482 So.2d 1241 (Ala.1983), *on remand,
>> Whisenhant v. State*, 482 So.2d 1246 (Ala.Cr.App.1983),
>> *reversed on other grounds, Ex parte Whisenhant*, 482 So.2d
>> 1247 (Ala.1984). '"Common sense, as well as sound legal
>> authority, dictates that the trial judge not grant a psychiatric
>> examination at state expense unless there is some reason to
>> believe the accused was incompetent or insane.' *Bailey v.
>> State*, 421 So.2d 1364, 1367 (Ala.Cr.App.1982)."

> *Whittle v. State*, 518 So.2d 793, 794 (Ala.Cr.App.1987). There is no indication
> that the trial court erred in determining that there was no reasonable basis
> for such an expenditure by the State.

*Fisher*, 587 So. 2d at 1031-32. Like the defendant in *Fisher*, the petitioner was examined by

a Lunacy Commission which found that he had no mental disease or defect affecting his

criminal responsibility at the time of the crime and that he was competent to stand trial. It is also noteworthy that trial counsel felt Hubbard was competent and able to assist them and that he had forbidden them to raise issues related to his sanity.

The petitioner is also unable to satisfy the second prong of *Strickland* because he has not shown that he would not have been convicted of first-degree murder or sentenced to death if he had received state-funded psychiatric expert assistance. As is explained in section III.B.5.b.(1) above, it is not clear that the trial court would have suppressed the statement if an expert had testified, or that the result of the proceeding would have been different if the statement had been suppressed. Likewise, as is explained in section III.B.7.b., below, there is no reasonable probability that the petitioner would have escaped the death penalty if a psychiatric expert had testified as to mitigation factors during sentencing. This claim also fails.

### (5) Failure to pursue suicide claim.

The petitioner claims that trial counsel rendered him ineffective assistance when they did not argue and present evidence that the victim committed suicide. He complains that trial counsel "failed to bring out" the findings of a state criminologist that there was gunpowder residue on Ms. Montgomery's hands.[33] (Petition for Writ of Habeas Corpus at ¶ 96). He likewise complains that counsel failed to interview the State's witnesses, to investigate Ms. Montgomery's alcoholism or to introduce expert testimony as to Ms.

---

[33]Testimony about the gunpowder residue was presented at the petitioner's 1977 trial and was not ultimately favorable to his case. The testimony reflects that gunpowder residue was found on both of the petitioner's hands and on Ms. Montgomery's right hand (tests were not possible as to residue on her left hand). The testimony also reflects, however, that Ms. Montgomery could have gotten the residue on her hands if she had been standing in front of the gun, in close proximity, when it was fired. (R. 456-58).

Montgomery's alcoholism and treatment with Librium, which, he argues, resulted in the exclusion of most of her medical records. *Id.* at ¶¶ 97-98.

As the Rule 20 court found, trial counsel did present a suicide defense at trial, as well as evidence that Ms. Montgomery was an alcoholic. *Hubbard*, 584 So. 2d at 905. Trial counsel also elicited lay witness testimony that Ms. Montgomery was sick and despondent in the period before her death. They tried to have her extensive medical records admitted into evidence, but on relevancy grounds, the court excluded all but the most recent records. *Id.*

Counsel's performance was not deficient under the first prong of *Strickland*. They were in a difficult position because their client insisted he was innocent, yet his statement about Ms. Montgomery's suicide was obviously false. He also refused to allow an insanity defense, which counsel thought the jury would reject, anyway. *Hubbard*, 584 So. 2d at 902. Counsel had little choice but to arrange a defense around the petitioner's dubious story, which required them to tread a narrow path between Hubbard's story about how Ms. Montgomery died and the physical evidence which demonstrated its falsity. A sharp focus on the evidence and arguments supporting the suicide defense would almost surely have highlighted the absurdity of Hubbard's story that Ms. Montgomery had killed herself, given that she was shot once in the shoulder and *twice* in the face. It was not unreasonable for counsel "to stay pretty well away and not constantly remind the jury of the way the lady died," as Hendrix testified at the Rule 20 hearing. (Rule 20 transcript at 79).

Even if counsel had emphasized that gun residue was found on Ms. Montgomery's hands and had presented further evidence that Ms. Montgomery was depressed and

suffered from alcoholism,[34] there is no reasonable probability that the outcome of the trial or sentencing would have been different because it is so unlikely that Ms. Montgomery could have shot herself twice in the face and once in the shoulder. For that reason, this claim also fails the second prong of *Strickland*.

The petitioner can satisfy neither prong of *Strickland* with respect to this claim. It must fail.

### (6)   Failure to object to pecuniary gain argument.

The petitioner claims that his trial counsel rendered ineffective assistance by failing to object to the allegedly unsupported argument that the victim was killed for pecuniary gain. He argues that trial counsel "failed to challenge, at any point in the trial, the State's use of 'killing for pecuniary gain' as an aggravating circumstance." (Petition for Habeas Corpus at ¶ 100). As the Rule 20 court found, however:

> Hendrix argued before the jury that pecuniary gain was not a motive for the killing, i.e., "why should petitioner kill the goose that laid the golden egg." Hendrix argued that Lillian Montgomery was supporting petitioner and he had no motive to kill her. The record indicates that Hendrix argued that there was no sufficient evidence to find this aggravating circumstance (R. 2448), and Stilson argued likewise at the punishment stage. (R. 2486).

*Hubbard*, 584 So. 2d at 911.

These findings of fact, which are supported by the record and presumed to be correct, show that trial counsel's performance was not deficient. Contrary to the petitioner's assertions, counsel did vigorously challenge the state's pecuniary gain arguments before

---

[34] Counsel also was concerned that focusing on the victim's alcoholism and mental health could backfire if the jury interpreted it as putting the victim on trial. (Rule 20 Transcript at 88-89).

the jury, attempting to show that there was no logical motive for the petitioner to have murdered Ms. Montgomery.

Further, the petitioner cannot meet the second prong of *Strickland*. He has not shown a reasonable probability that, but for a stronger challenge to the pecuniary gain arguments, he would have escaped the death sentence. On the contrary, the Alabama Court of Criminal Appeals found on direct appeal that "[t]he evidence strongly supports the conclusion that the present crime was committed for pecuniary gain." *Hubbard*, 500 So. 2d at 1227 (quoted in *Hubbard*, 584 So. 2d at 911). Two other aggravating factors weighing in favor of the death penalty were also found to exist, even absent the pecuniary gain factor. This claim fails.

### (7)   Failure to present the "real culprit" defense.

The petitioner claims that his trial counsel were ineffective because they failed to investigate or present a defense that another person committed the crime. Before trial, Hubbard informed his counsel that, contrary to his prior statement, Eugene Schultz had killed Ms. Montgomery and that Schultz had threatened to kill him if he told. He complains that counsel failed to investigate Schultz or to present this defense at trial. The Rule 20 court stated that

> [p]etitioner told his lawyers that he wanted to call Schultz as a witness to get him to admit he killed Ms. Montgomery, but Hendrix felt that such a tactic would have been inconsistent with petitioner's three prior statements that Ms. Montgomery's death was a suicide. Hendrix felt that the prosecution would have had a field day with the Schultz theory had it been presented at trial without any evidence to support it except petitioner's testimony. Hendrix thought that the defense theory used at trial, that the victim committed suicide, was the best available defense.

> Petitioner failed to establish that trial counsel had any available evidence, other than the possible testimony of petitioner, that Schultz killed Lillian Montgomery.

*Hubbard*, 584 So. 2d at 904. These factual findings are supported by the record and presumed to be correct.

The state court findings demonstrate that counsel's failure to assert the "real culprit" defense was prudent trial strategy and certainly not outside the wide range of reasonable professional assistance such as to satisfy the first prong of *Strickland*. The petitioner has not shown otherwise. Neither has the petitioner shown that counsel's conduct satisfies the second prong of *Strickland*. On the contrary, it appears that the petitioner's case would have been damaged if counsel had accused Mr. Schultz at that late date, without corroborating evidence and in contravention of the petitioner's prior statements.

### (8)    Failure to object to the testimony of Judge Nicol.

The petitioner claims that his trial counsel rendered ineffective assistance of counsel by failing to object to the testimony of Judge Nicol. As the respondent points out, however, the petitioner waived this claim during the Rule 20 hearing. Rule 20 Transcript at 100-01, *Hubbard*, 584 So. 2d at 916. This deprived the state court of an opportunity to hear and decide the claim.  It was not fairly presented to the state court for exhaustion purposes, and the petitioner would now be barred from presenting the claim in state court by the time limitation set forth in current Rule 32.2(c), which disallows a collateral attack more than two years after a conviction becomes final. Dismissing the claim to allow the petitioner to pursue it in state court would therefore be futile. Because this claim is procedurally barred

in state court, it is procedurally barred in this proceeding as well. *Waldrop*, 857 F. Supp. at 897 (citations omitted).

**(9)     Failure to lay foundation for medical records.**

The petitioner claims that his trial counsel rendered ineffective assistance by failing to lay a sufficient foundation to admit Ms. Montgomery's medical records into evidence. The petitioner argues that these records showed that Ms. Montgomery considered herself to be his wife, which would have rebutted the claim that the killing was for pecuniary gain. (Petition for Writ of Habeas Corpus at ¶ 105). With respect to this complaint, the Rule 20 court stated as follows:

> In paragraph 1n of his petition, petitioner alleged that trial counsel were ineffective in failing to bring to the jury's attention the fact that in the victim's hospital admission on January 5, 1977, she was listed as "Lillian Hubbard," that is to say, petitioner's wife. Petitioner presented no evidence in support of this claim.
>
> The January 5, 1977, hospitalization records were admitted into evidence and the jury was able to see this particular reference. Witnesses testified that petitioner and the victim were living together as husband and wife. (R. 2303) This relationship was brought before the jury in both testimony and argument as it tended to show that petitioner had no motive to kill the victim. Stilson recalled arguing to the jury the fact that the hospital records listed the victim's name as Lillian Hubbard.
>
> Trial counsel clearly brought to the jury's attention the fact that petitioner and the victim were living together as husband and wife. Trial counsel's performance therefore was not deficient.

*Hubbard*, 584 So. 2d at 906.[35]

---

[35] These findings appear to be supported by the record, except that the court has been unable to confirm Stilson's recollection that he argued to the jury that the hospital records listed Ms. Montgomery as Lillian Hubbard. Even so, trial counsel attempted to disprove motive by arguing that Ms. Montgomery and the petitioner lived together harmoniously as man and wife.

These findings indicate that trial counsel's failure to persuade the court to admit all of Ms. Montgomery's medical records was not outside the wide range of reasonable professional assistance so as to meet the first prong of *Strickland*. Nor is it apparent that this failure prejudiced the petitioner, since the records indicating that Ms. Montgomery had taken Hubbard's name were admitted into evidence and because counsel used other evidence to argue that the petitioner and Ms. Montgomery lived together as husband and wife. The petitioner has not shown that there is a reasonable probability that, but for the failure to have all of Ms. Montgomery's records admitted, that the result of the proceeding would have been different. As the petitioner cannot meet either prong of *Strickland*, this claim fails.

### (10)   Failure to object to malice instruction.

The petitioner claims that his trial counsel rendered ineffective assistance by failing to object to the trial court's instruction on malice, which, according to him, had the effect of shifting the burden of proof to him in violation of the rule in *Sandstrom v. Montana*, 442 U.S. 510 (1979). The court's instruction on malice was as follows:

> Malice may arise on the instant and from the use of a deadly weapon whereby one intentionally takes the life of another. The law raises a prima facie presumption that the killing was done maliciously unless the circumstances of the killing disprove malice. The intentional and unjustifiable use of a deadly weapon in a deadly manner raises the presumption of malice. This prima facie presumption prevails unless the circumstances instant to the killing rebut the presumption. . . .

> If one person intentionally shoots another with a gun...and death ensues, the law implies or presumes malice. And imposes upon the slayer the burden of rebutting this presumption by other proof unless the evidence which proves the killing rebuts the presumption.

(R. 2419, repeated on 2421-22).

85

This particular type of instruction is a "mandatory rebuttable presumption" because it "does not remove the presumed element from the case but nevertheless requires the jury to find the presumed element unless the defendant persuades the jury that such a finding is unwarranted." *Francis v. Franklin*, 471 U.S. 307, 314 at n. 2, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985). Such an instruction violates the Due Process Clause of the Fourteenth Amendment because it relieves the state of proving malice, an essential element of the crime for which the petitioner was convicted. *Sandstrom*, 442 U.S. at 520.[38]

The Rule 20 court found that, even if the malice instructions did violate *Sandstrom*, the error was harmless error. The court thus refused to find the petitioner's trial counsel ineffective for failing to lodge a *Sandstrom* objection. The court stated that

> [a]t trial, petitioner's defense was that he was not a participant in Lillian Montgomery's death and was not present when she was shot to death. While petitioner did not take the stand to establish this defense, it was detailed in his statement to the police and presented as his defense by his trial lawyers. Such an alibi defense essentially concedes the element of intent and, thus, malice. See, *McClesky v. Kemp*, 753 F.2d 877, 904 (11th Cir.1985) (en banc), *aff'd on other grounds*, 481 U.S. 279, 107 S. Ct. [1756] [95 L. Ed. 2d 262] (1987). At petitioner's trial, whether Lillian Montgomery was killed intentionally without legal excuse, justification, or mitigation was not contested. The cited instruction had no bearing on the case and petitioner's counsel were not deficient in failing to object.
>
> Further, petitioner was not prejudiced by this instruction because, based on the evidence at trial, any error in the trial judge's malice instruction was harmless. A burden shifting instruction is harmless where the evidence of guilt on the element covered by the instruction was overwhelming or the

---

[38] The Rule 20 court erred in finding, pursuant to *Sims v. State*, 386 So. 2d 767 (Ala. Crim. App. 1980), *cert. denied*, 386 So. 2d 770 (Ala. 1980), that the defective instructions were cured by instructions on the presumption of innocence and the state's burden to prove all facts necessary for a conviction. *Hubbard*, 584 So. 2d at 913. ". . . [T]he Supreme Court held in *Sandstrom* and reaffirmed in *Franklin* that such general instructions on the presumption of innocence and the state's burden of persuasion do not cure these infirm charges as they are 'not rhetorically inconsistent with a conclusive or burden-shifting presumption.'" *Lancaster v. Newsome*, 880 F.2d 362, 366 at n.1 (11th Cir. 1989) (quoting *Sandstrom*, 442 U.S. at 518-19, n.7).

instruction concerned an element not at issue at trial. *Williams v. Kemp*, 846 F.2d 1276, 1283-84 (11th Cir.1988), *cert. denied*, [---] U.S. [----,] 110 S. Ct. 1836 [108 L. Ed. 2d 965] (1990); ... *Davis v. Kemp*, 752 F.2d 1515, 1521 (11th Cir.) (en banc), *cert. denied*, 471 U.S. 1143 [105 S. Ct. 2689, 86 L. Ed. 2d 707] (1985). As noted above, petitioner's defense of alibi effectively conceded malice, the element covered by the cited instruction.

There was ample evidence that Lillian Montgomery was intentionally killed without legal excuse, justification, or mitigation, the element covered by the cited instruction. Lillian Montgomery was shot three times with a .38 caliber pistol. She was shot in the left shoulder, in the mouth and jaw, and in the head. The shot to her mouth shattered her jaw and severed her tongue. The last penetrated her skull and brain, causing her death. This evidence clearly establishes a strong case of killing with malice. *Cf., Collins v. Francis*, 728 F.2d 1322, 1330-31 (11th Cir. 1984) (evidence overwhelming where victim killed by a blow to the head from a jack handle); *Davis v. Kemp, supra*, at 1521 (evidence overwhelming where victim was shot in the head with a .22 caliber pistol, had been tied with clothing, and jaw and bones in face had been fractured).

Thus, any deficiency in petitioner's lawyers' performance did not prejudice him because any error in the cited instruction was harmless. There is no reasonable probability that but for their failure to object to a harmless instruction, the outcome of petitioner's trial would have been different.

*Hubbard*, 584 So. 2d at 913-14. The respondent cites these findings and further argues that

*Sandstrom* is distinguishable because the defendant in that case admitted to the crime,

arguing that his lack of intent made him guilty of a lesser crime than that with which he was

charged. The court is not persuaded by this distinction. The respondent cites no support

for the proposition that *Sandstrom* is so limited. The respondent also argues, consistent

with the state court's conclusions, that the challenged instruction was harmless not only

because the element of malice had been conceded but also because of the overwhelming

evidence of guilt on the issue of malice.

In determining whether trial counsel rendered ineffective assistance by failing to

object to the erroneous instruction, the court must again rely on the two-prong *Strickland*

test, focusing first on the quality of counsel's performance. Trial counsel's failure to object appears to constitute deficient performance under *Strickland*. The failure does not appear to have been based upon any legal strategy. Neither Stilson nor Hendrix could give any reason for failing to object to the instruction. (Rule 20 Transcript at 41-48, 411-414). In fact, during the Rule 20 proceedings, neither appeared to find the instruction objectionable or to be familiar with the principles set forth in *Sandstrom*, which was issued almost three years before the petitioner's trial. (*Id.*)

Assuming that counsel's failure to object to the instruction satisfies the first prong of *Strickland*, the petitioner must still satisfy the second or prejudice prong of *Strickland* by showing that, but for the failure to object, the result of the proceeding would have been different. The petitioner cannot make this showing if the instruction was harmless error. As is explained below, an error is harmless in the habeas context if it does not actually prejudice the petitioner. A federal habeas petitioner who demonstrates only that his trial attorney failed to object to an erroneous, but non-prejudicial instruction, would not meet the *Strickland* prejudice prong.

In *Rose v. Clark*, 478 U.S. 570, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986), the Court found that *Sandstrom* violations may be harmless under the test set forth in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), *reh'g denied*, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967) (whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 386 U.S. at 24).[37] The

---

[37] Certain types of errors, such as a deprivation of the right to counsel, are "structural defects" in the trial mechanism, requiring automatic reversal. *Brecht*, 507 U.S. at 629-30. A "trial error," on the other hand, "'occur[s] during the presentation of the case to the jury,' and is amenable to harmless error analysis because it 'may...be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the

Court later rejected the *Chapman* standard in evaluating harmless error on collateral review. *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993), *reh'g denied*, 507 U.S. 968, 113 S. Ct. 2951, 124 L. Ed. 2d 698 (1993). Instead, the Court adopted the less exacting standard set forth in *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253, 90 L. Ed. 1557 (1946). *Brecht*, 507 U.S. at 637. Under the *Kotteakos* standard, the court must determine whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos*, 328 U.S. at 776. In other words, the error must have resulted in "actual prejudice." *Brecht*, 507 U.S. at 637. The Eleventh Circuit explained the necessary analysis under this standard as follows:

> It does not require a showing that but for the error the jury would have rendered a verdict in favor of the defendant. *Kotteakos*, 328 U.S. at 763, 66 S. Ct. at 1247 (admonishing that reviewing court should not "speculate upon probable reconviction"); *see Brecht*, 507 U.S. at ----, 113 S. Ct. at 1724 (Stevens, J., concurring); *McKinney v. Rees*, 993 F.2d 1378, 1385-86 (9th Cir.1993). Nor is it relevant whether the reviewing court is persuaded that the defendant is guilty. *Kotteakos*, 328 U.S. at 763, 66 S. Ct. at 1247.
>
> > "[It is not the appellate court's function to determine guilt or innocence." *Id*. As Justice Rutledge explained in *Kotteakos*, the issue is not were [the jurors] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men [or women], not on one's own, in the total setting.
> >
> > \*          \*          \*
> >
> > ...[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the

trial].'" *Id*. at 630 (quoting *Fulminante*, 499 U.S. 279, 307-08, 111 S. Ct. 1246, 1263, 113 L. Ed. 2d 302 (1991)). *Sandstrom* errors, such as that at issue here, have been characterized as trial errors by the Supreme Court, subject to a harmless error analysis. *Id*. at 307 (citing *Rose*, 478 U.S. 570).

error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Id.* at 764-65, 66 S. Ct. at 1247-48, quoted in part in *Brecht*, 507 U.S. at ----, 113 S. Ct. at 1724 (Stevens, J., concurring), and in *Lane*, 474 U.S. at 449, 106 S. Ct. at 732 (citations omitted) (emphasis added). The essential question is: Did the constitutional error "substantially influence" the verdict, or, at least, does a "grave doubt" exist as to whether it did? *See, e.g., Bank of Nova Scotia v. United States*, 487 U.S. 250, 256, 108 S. Ct. 2369, 2374, 101 L. Ed. 2d 228 (1988); *United States v. Mechanik*, 475 U.S. 66, 78, 106 S. Ct. 938, 945, 89 L. Ed. 2d 50 (1986) (O'Connor, J., concurring). If so, then the petitioner is entitled to habeas relief.

*Duest v. Singletary*, 997 F.2d 1336, 1338-39 (11th Cir. 1993), *cert. denied*, 510 U.S. 1141, 114 S. Ct. 1126, 127 L. Ed. 2d 434 (1994).

The court further instructed that harmless error issues are mixed questions of law and fact subject to de novo review and that, to determine the harmlessness of an error, the court must examine the entire record using the principles set forth above. *Duest*, 997 F.2d at 1339 (citing *Jackson v. Dugger*, 931 F.2d 712, 717 (11th Cir. 1991), *cert. denied*, 502 U.S. 973, 112 S. Ct. 452, 116 L. Ed. 2d 470 (1991)).

If the court is "in grave doubt about the likely effect of an error on the jury's verdict," the petitioner must prevail in the harmless error analysis. *O'Neal v. McAninch*, 513 U.S. 432, 435, 115 S. Ct. 992, 994, 130 L. Ed. 2d 947, 951 (1995). "In grave doubt" means that "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.*

Before *Brecht* was decided, the Eleventh Circuit adopted the harmless error analysis of *Sandstrom* error set forth in *Yates v. Evatt*, 500 U.S. 391, 403-04, 111 S. Ct. 1884, 114 L.

90

Ed. 2d 432 (1991), *disapproved on other grounds, Estelle v. McGuire*, 502 U.S. 62, 112 S.

Ct. 475, n.4, 116 L. Ed. 2d 385 (1991). The court stated that

> The *Yates* Court . . . set forth the two distinct steps that a reviewing court
> must follow in performing [the harmless error analysis that must be applied
> to *Sandstrom* errors]. [Footnote omitted].
>
>> The first step set forth in *Yates* requires a court to "ask what
>> evidence the jury actually considered in reaching its verdict."
>> *Id*. The court must then analyze the jury instructions, applying
>> "that customary presumption that jurors follow instructions and,
>> specifically, that they consider relevant evidence on a point in
>> issue when they are told to do so." *Id*. The court then enters
>> the second step of the *Yates* analysis, weighing the probative
>> force of the evidence actually considered by the jury against
>> "the probative force of the presumption standing alone." *Id*.

In recognizing the situations where *Sandstrom* errors may be harmless, the
pre-*Yates* decisions of this circuit have stated the following:

>> In applying harmless error analysis to *Sandstrom* violations,
>> this court has identified two situations where the harmless error
>> doctrine can be invoked: (1) where the erroneous instruction
>> was applied to an element of the crime that was not at issue in
>> the trial, or (2) where the evidence as to the defendant's guilt
>> was overwhelming.

*Bowen v. Kemp*, 832 F.2d 546, 548 (11th Cir.1987) (en banc), *cert. denied*, 485
U.S. 940, 108 S. Ct. 1120, 99 L. Ed. 2d 281 and *cert. denied*, 485 U.S. 970, 108
S. Ct. 1247, 99 L. Ed. 2d 445 (1988); *see also Stephens v. Kemp*, 846 F.2d 642,
659 (11th Cir.), *cert. denied*, 488 U.S. 872, 109 S. Ct. 189, 102 L. Ed. 2d 158
(1988); *Drake v. Kemp*, 762 F.2d 1449, 1453 (11th Cir.1985) (en banc), *cert.
denied*, 478 U.S. 1020, 106 S. Ct. 3333, 92 L. Ed. 2d 738 (1986). After *Yates*,
however, the *Sandstrom* errors subject to harmless error findings are
somewhat different. For example, it is now clear that conclusions of harmless
error are not appropriate simply because there is overwhelming evidence as
to the defendant's guilt. The overwhelming evidence as to the defendant's
guilt must actually have been considered by the jury. Thus, a reviewing court
must determine "whether the force of the evidence presumably considered
by the jury in accordance with the instructions is so overwhelming as to leave
it beyond reasonable doubt that the verdict resting on that evidence would
have been the same in the absence of the presumption." *Yates*, 111 S. Ct. at
1893-94. Yet, where *Sandstrom* errors have occurred, the two situations

> identified by this circuit continue to identify instances where harmless error
> analysis is appropriate.

*Stevens*, 968 F.2d at 1086. Although *Yates* was decided using the *Chapman* standard, which

has since been abandoned in cases involving collateral review, the Fourth Circuit recently

found that the *Yates* analysis is still valid in post-*Brecht* collateral review cases for the

purpose of "determining whether actual prejudice was caused by a jury instruction that

unconstitutionally shifted a burden of proof from the prosecution to the defendant." *Arnold*

*v. Evatt*, 113 F.3d 1352, 1357, n.10 (11th Cir. 1997), *cert. denied*, --- S. Ct. ---, 1998 WL 584█

(Jan. 12, 1998) (citing *Yates*, 500 U.S. at 403-04, 111 S. Ct. 1884, 114 L. Ed. 2d 432 (1991)).

The respondent first argues that the petitioner conceded the malice issue and

thereby removed it from the jury's consideration, rendering the challenged instruction

harmless. The petitioner argues that he never conceded intent by merely using an alibi

defense and argues that the *Sandstrom* error prejudiced him because the evidence of

malice was unclear and the jury could have found that he was too intoxicated to have

entertained malice. It appears that the issue of malice did indeed remain before the jury.

Although the petitioner relied almost exclusively on his alibi defense at trial and he

used evidence of his intoxication primarily to argue that his statements were involuntary,

it is apparent that the prosecutor and the trial judge understood that malice remained an

issue in the trial, as their statements to the jury reveal. In closing, the prosecutor stated:

> J. B. Hubbard is charged with Murder in either the First or Second Degree
> after having been convicted of murder in the last twenty years. Ladies and
> gentlemen, he's guilty of that or he's guilty of nothing. He's not guilty of
> manslaughter. There's no evidence that he was so drunk that he didn't know
> what he was doing.

(R. 2411). He then argued that the evidence showed that the petitioner may have had some alcohol, but that he was not intoxicated. He argued that "having one or two or three drinks of liquor is not sufficient to keep a man from being punished for what he's guilty of." (R. 2412).

Afterwards, the court charged the jury not only on the murder counts in the indictment, but also on the lesser included offenses of manslaughter in the first and second degrees, neither of which requires proof of malice. (R. 2423-25). The court also charged the jury as to the effect intoxication would have on the petitioner's guilt. It stated:

> Now partial intoxication will not avail to disprove the specific intent or malice. It must be of such character and extent as to enable the accused incompable--incapable of consciousness that he committed a crime. Incapable of discriminating between right and wrong. A stupification of the reasoning faculties. Proof of the commission of the offense without more is insufficient.

> Now, in order for drunkenness to reduce the degree of the crime when the question of malice or intent or premeditation is involved, the drunkenness must be such as to render a person incapable of volition. That is of willing or choosing it must be such as to render a person incapable of voluntarily doing anything. Incapable of forming or entertaining malice. And incapable of forming a purpose to do a voluntary act. Then if these exist the highest offense for which he could be convicted would be manslaughter in the second degree. The reason for this is that drunkenness is no defense to a charge of manslaughter, because this offense does not involve a specific intent as does murder in the first degree.

>       \*          \*          \*          \*

> Drunkenness on the part of the person committing the homicide may as I told you be sufficient to reduce the offense from murder to manslaughter if shown to have been so excessive as to render the person incapable of forming the design to take life but, of course, if a person resolves to commit a crime and then drinks to intoxication and commits the act, the fact of intoxication cannot lessen the degree of the offense.

(R. 2425-26).

Although it appears that the petitioner did not argue that intoxication rendered him incapable of malice, the prosecutor by his argument and the court by its charges demonstrated that malice remained an issue in the case. They acknowledged that the jury could have found the petitioner guilty of manslaughter on the basis of the evidence presented as to his alcohol consumption.

Because malice remained an issue in the case, the court must therefore turn to the respondent's second argument: that the error was harmless due to the overwhelming evidence of malice presented at trial and considered by the jury. As set forth above, the court must ask "what effect the error had or reasonably may be taken to have had upon the jury's decision." *Kotteakos*, 328 U.S. at 764. As *Yates* instructs, the court must also (1) ask what evidence the jury actually considered in reaching its verdict; and (2) weigh the probative force of that evidence as against the probative force of the erroneous presumption standing alone. *Yates*, 500 U.S. at 403-04. Moreover, the court must ask "whether the force of the evidence presumably considered by the jury . . . is so overwhelming as to leave it beyond reasonable doubt that the verdict . . . would have been the same in the absence of the presumption." *Stevens*, 968 F.2d at 1086 (quoting *Yates*, 111 S. Ct. At 1893-94).

The erroneous presumption at issue here shifted the burden of proof to the petitioner. It did not remove that issue from the jury's consideration or prevent the jury from considering evidence favorable to the petitioner, as would a "mandatory conclusive presumption." On the contrary, the court effectively directed the jury to consider all the evidence of malice. Although the instruction included the erroneous presumption, it clearly

94

informed the jury that other circumstances surrounding the murder could rebut the presumption. The court also emphasized that the state had the burden of proving the existence of malice and the other elements of the crime beyond a reasonable doubt. (R. 2418). The court also instructed the jurors that intoxication can render a person incapable of entertaining malice, thus requiring them to consider that evidence as well. Such instructions leave the jury "free to look beyond the unlawful presumption and consider all the evidence on malice." *Arnold*, 113 F.3d at 1357 (quoting *Yates*, 500 U.S. at 408).

The state presented overwhelming evidence of malice, defined in the homicide context as "an intent unlawfully to take the life of another without legal excuse, justification or mitigation." (Tr. 2419). Ms. Montgomery was shot three times--in the shoulder, then in the mouth, then in the forehead. There was enough time between the mouth wound and the fatal forehead wound for Ms. Montgomery to have lost several pints of blood from her mouth. She apparently had time to pull a piece of broken denture as well as a whole denture out of her mouth before suffering the final shot. The murder weapon was fired at a distance of between fifteen and thirty-nine inches from her body.

Furthermore, the state presented evidence, which was not refuted, that the petitioner was not intoxicated on the morning of the killing, although he apparently had consumed alcohol before the ambulance attendants and police arrived. The state presented abundant evidence showing that the petitioner was not so affected by alcohol as to be unable to form the intent to unlawfully take the life of Ms. Montgomery without legal excuse, justification or mitigation. On the contrary, the evidence showed him to be capable of calling several of Ms. Montgomery's friends, to reload the gun, to summon an ambulance and to direct

medical personnel to Ms. Montgomery's body. He was able to coherently communicate with the ambulance attendants and police officers at the crime scene.

There was little evidence favorable to the petitioner on the issue of malice. He had the opportunity to and did present evidence that he had consumed alcohol before and around the time of the killing. He obtained testimony from witnesses at the scene that they smelled alcohol on him or that it appeared that he had been drinking, although no witness testified that he seemed intoxicated. In fact, each of the witnesses who saw him on the morning of the killing testified that he did not appear to be intoxicated. In his statement to police, the petitioner stated that he had consumed alcohol before the killing. Yet his statement to police and the other evidence strongly suggest that Mr. Hubbard was not so intoxicated that he was incapable of forming the intent to unlawfully take the life of Ms. Montgomery without legal excuse, justification or mitigation.

It is clear that the probative force of the evidence considered by the jury on the issue of malice vastly outweighed the probative force of the erroneous malice instruction. The instruction therefore constituted harmless error, which did not actually prejudice the petitioner. The court is left with no "grave doubt" about whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *O'Neal*, 115 S. Ct. at 994. As the instruction did not actually prejudice the petitioner, the failure of his trial counsel to object to it does not satisfy the prejudice prong of *Strickland*.

Even absent a formal harmless error analysis, this claim fails under *Strickland*'s second prong, which allows the court to ask whether the result of the proceeding would have been different if counsel had objected to the malice instruction. Had counsel objected

to the malice instruction, and had the trial court adequately cured the error with other instructions, the result would have been the same because, as set forth above, the evidence that petitioner killed Ms. Montgomery and that he did so with malice was overwhelming. The evidence showed that he was not intoxicated, or at least not so intoxicated as to be incapable of killing with malice under Alabama law. There is no reasonable probability that the result of the proceeding would have been different but for the *Sandstrom* error. This ineffective assistance claim must fail.

### (11)   Counsel's reference to the petitioner's first trial.

The petitioner claims that his trial counsel rendered ineffective assistance and improperly prejudiced him by referring to his first trial in front of the jury. In paragraph 1r of his Rule 20 petition, petitioner alleged that his trial counsel were ineffective for stating in the presence of potential jurors that petitioner's trial "shouldn't be much longer than the last time," thereby informing the jury of petitioner's prior trial.

With respect to this claim, the Rule 20 court found:

> The record shows that during voir dire of the venire, the trial judge excused the venire members and asked certain potential jurors to remain for further examination. (R. 1661) It was the practice in 1982 to send the venire out of the courtroom and . . . individual members were called back inside. Individual members were brought up to the bench outside the hearing of the rest of the venire. The record indicates the trial court outlined the procedure to question venire members outside the hearing of others. (R. 1543) The record clearly indicates that the trial judge asked everyone else to wait outside the courtroom while they were called in one at a time. (R. 1662)

> Potential juror Lyda was asked to come in the courtroom, (R. 1666), and she stated that she would have a hardship in serving on a sequestered jury through the trial week. The trial judge asked how long the case would run and Stilson replied, "I think it shouldn't be much longer than the last time." (R. 1668) Potential juror Lyda was then excused from service by agreement

of the defense and prosecution. After the challenges for cause were heard, a jury was selected for petitioner's trial. (R. 1669)

Based on the record, and Stilson's testimony, Stilson's reply to the trial judge was not heard by the jury which sat on petitioner's trial. As such, trial counsel's performance was certainly not deficient nor has petitioner established that he was prejudiced in any manner on this point.

*Hubbard*, 584 So. 2d at 907-08. From these findings, the Rule 20 court omitted the fact that Lyda left the courtroom and that prospective juror Camp then entered before counsel made the reference to the prior trial.

The trial court's practice during individual voir dire was to bring the jurors into the courtroom one at a time only for the duration of their individual questioning. (R. 1662-69). In fact, before beginning individual voir dire, the judge said to the potential jurors, "let me ask everyone else to wait outside and we will call you one at the time." (R. 1662). After she entered the courtroom, Camp was briefly questioned about why sequestration might impose a hardship on her. (R. 1667). It appears that Camp's questioning was completed and that she had left the courtroom before the challenged statement was made. (R. 1667-68). After Mrs. Camp was questioned, the judge and attorneys proceeded to discuss among themselves the composition of the jury and the timing of the case. (R. 1667-69). It was during this discussion that counsel made the challenged statement. There is no indication, however, that Ms. Camp stayed in the courtroom after she was questioned so as to be able to hear this remark. If she had, it would have been completely inconsistent with the procedure by which the court otherwise conducted the individual questioning.

With the addition of the facts set forth above, the findings are supported by the record and are entitled to a presumption of correctness. These facts reveal that trial

98

counsel's reference to the petitioner's prior trial was heard by none of the jurors. For counsel to make the challenged comment outside the presence of the jury would not be to fall below that standard for reasonably effective counsel. Even if the court were to assume that trial counsel performed inadequately in making such a reference, there could be no prejudice if none of the jurors heard it. This claim fails.

### (12)   Failure to challenge the composition of the jury.

The petitioner claims that his trial and appellate counsel[38] rendered him ineffective assistance of counsel by failing to challenge the composition of the jury pursuant to *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), *reh'g denied*, 393 U.S. 898, 89 S. Ct. 67, 21 L. Ed. 2d 186 (1968), which held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon*, 391 U.S. at 522. The *Witherspoon* Court stated that

> [t]he most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings.

>    \*   \*   \*   \*

> We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the

---

[38]During Rule 20 proceedings, the petitioner raised this claim only as to appellate counsel. Since the respondent does not raise procedural default with respect to the claim against trial counsel, the court will address that claim on the merits. *Esslinger*, 44 F.3d at 1524, n.32.

imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*.

*Id.* at 522, n.21 (emphasis in original).

In complaining of his counsel's failure to invoke *Witherspoon*, the petitioner apparently refers to the exclusion of prospective jurors Cringoli and Scott for cause. (R. 1668-69). During voir dire, prospective jurors Cringoli, Scott, Teacher, Smelly, Watts and Walker all stated general objections to the death penalty. (R. 1641-42, 1646-47). Of these only Cringoli and Scott acknowledged that they were "totally committed" to vote against the death penalty regardless of the facts and circumstances that might emerge at trial.[39] (R. 1643). They were thus excludable under *Witherspoon*.

Even so, petitioner's counsel made several *Witherspoon*-type objections during jury selection.[40] Counsel objected to two prosecution questions regarding the likelihood that potential jurors might impose the death penalty.[41] (R. 1647-48). Later, when the state challenged potential jurors Cringoli and Scott for cause, trial counsel objected to their exclusion "on the bases [sic] that there [sic] being opposed to capital punishment should not be a bases [sic] for challenge for cause in this case, [sic] this case does include lessor

---

[39] A vague question asked by the trial court, combined with typographical errors in the trial transcript, make it unclear whether Cringoli and Scott acknowledged that their views on capital punishment would prevent them from rendering an impartial decision as to the petitioner's guilt. (R. 1642-43).

[40] The petitioner argues that, during the Rule 20 proceedings, attorney Stilson, who served as his trial and appellate counsel knew of *Witherspoon* and acknowledged that he was remiss in not raising a *Witherspoon* claim. Although Stilson did admit being aware of *Witherspoon*, it appears that he did not admit any error in failing to raise a claim under that case. (Rule 20 Transcript at 440).

[41] The first question asked jurors if they preferred a sentence of life without parole to a death sentence; the second asked jurors if their feelings about the death penalty would prevent them from imposing it, even before hearing the facts of the case. (R. 1647-48). The court disallowed the first question, but allowed the second over the petitioner's objection.

[sic] included offenses and is a bierficated [sic] case." (R. 1668). The judge overruled this objection because Cringoli and Scott "stated that they were totally opposed to [the death penalty] even before hearing any of the facts and evidence. . . ." (R. 1668).

Petitioner's trial counsel thus did make objections under the principles set forth in *Witherspoon*, although it appears that such objections were meritless with respect to Cringoli and Scott. Over counsel's objections, Cringoli and Scott were excluded from the jury because they acknowledged to the court that they would not consider imposing the death penalty, regardless of what occurred during trial. Their exclusion was consistent with *Witherspoon*. This claim is factually meritless and fails to satisfy the first prong of *Strickland*. The petitioner has not shown that trial counsel's performance regarding *Witherspoon* issues was professionally unreasonable or that he was prejudiced by counsel's performance in this regard. This claim fails with respect to trial counsel.

Petitioner's counsel made no *Witherspoon* claim on appeal. Given the law set forth in *Witherspoon* and in other controlling cases at the time of petitioner's appeal, however, such a claim regarding the exclusion of Cringoli and Scott would have been meritless.[42] "[I]t is axiomatic that the failure to raise non-meritorious issues does not constitute ineffective assistance." *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994), *cert. denied*, 513

---

[42]The Rule 20 court found this claim to be meritless under *Lockhart v. McCree*, 476 U.S. 162, 106 S. Ct. 1758, [90 L. Ed. 2d 137] (1986). *Hubbard*, 584 So. 2d at 911. In *Lockhart*, the Court upheld "the removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial[.]" *Lockhart*, 476 U.S. at 165. The *Lockhart* court upheld the exclusion of eight prospective jurors who stated that "they could not under any circumstances vote for the imposition of the death penalty." *Id*. at 166. The *Lockhart* court noted that its decision resolved a split among the Circuits in favor of the position adopted by the Fifth and Eleventh Circuits. *Id*. It is also clear, under *Lockhart* that the exclusion of Cringoli and Scott was proper at the time of trial and appeal. They stated that they would not impose the death penalty, regardless of what occurred during trial. Other prospective jurors opposed to the death penalty were not excluded; they indicated that their beliefs would not prevent them from performing their duties during sentencing.

U.S. 1022, 115 S. Ct. 589, 130 L. Ed. 2d 502 (1994)(citing *King v. Dugger*, 555 So. 2d 355, 359

(Fla.1990)). This ineffective assistance claim also fails with respect to appellate counsel.

### 7.    Ineffective assistance of counsel at sentencing.

The petitioner complains that he received ineffective assistance of counsel at the

sentencing phase of his trial. Ineffective assistance claims relating to the penalty phase of

a capital punishment trial are like other such claims, subject to the two-prong *Strickland*

test. *Waldrop*, 857 F. Supp. at 914. Whether a defendant was prejudiced during the penalty

phase of a capital trial, depends upon whether "the sentencer . . . would have concluded

that the balance of aggravating and mitigating circumstances did not warrant death."

*Stevens*, 968 F.2d at 1081 (quoting *Strickland*, 466 U.S. at 69).

### a.    Failure to request a continuance.

The petitioner claims that his trial counsel rendered ineffective assistance by failing,

at the conclusion of the guilt phase of the trial, to request a continuance for the sentencing

phase. The respondent argues that this claim is procedurally barred because it was not

raised in the Rule 20 proceedings. In fact, this claim has never been presented to any state

court; it is raised for the first time in these proceedings. When a habeas claim has never

been presented to a state court and there no longer exists any remedial vehicle by which

the state courts may consider the claim, the United States Supreme Court has held that it is

procedurally defaulted. *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334

(1989), *reh'g denied*, 490 U.S. 1031, 109 S. Ct. 1771, 104 L. Ed. 2d 206 (1989).

The petitioner defaulted on the claim here asserted by failing to raise it on direct

appeal or in a petition under current Ala. R. Crim. P. 32 within the two-year limitations period

established by Rule 32.2(c). The court is not required to dismiss the claims as unexhausted because the defaults are apparent and it would be futile to send petitioner back to state court only to be faced with the defaults. Because the claim is barred in state court, it is barred in this proceeding as well. *Waldrop*, 857 F. Supp. at 897 (citations omitted).

As is explained in section III.B.3. above, the petitioner cannot avoid the procedural bar because he has not made a showing of cause and prejudice or that a fundamental miscarriage of justice would result if the court did not consider the merits of the claim. Therefore, this claim fails.

### b. Failure to introduce evidence in mitigation.

#### (1) General.

The petitioner claims that his trial counsel rendered ineffective assistance by failing to conduct a reasonable investigation to uncover mitigating evidence and by failing to present available mitigating evidence at the sentencing phase of the trial. Specifically, the petitioner claims he was prejudiced by trial counsel's allegedly unreasonable failure to present mitigating evidence regarding his alcoholism, his low I.Q. scores and his successful adjustment to prison life. He complains that counsel offered no mitigating evidence at the sentencing hearing before the jury, simply obtaining instead a stipulation from the prosecution that, at the time of his arrest, he had been drinking and he had been arguing with Ms. Montgomery. (R. 2440).

Failure to present mitigating evidence during the penalty stage of a capital trial is not ineffective *per se*. *Waldrop*, 857 F. Supp. at 914-15. Counsel does, however, have "a duty to conduct a reasonable investigation, including an investigation of the defendant's

background, for possible mitigating evidence." *Middleton v. Dugger*, 849 F.2d 491, 493 (11th

Cir. 1988) (citing *Thompson v. Wainwright*, 787 F.2d 1447, 1451 (11th Cir. 1986), *cert.*

*denied sub nom*, *Thompson v. Dugger*, 481 U.S. 1042, 107 S. Ct. 1986, 95 L. Ed. 2d 825

(1987)). In addition, "counsel has a duty to make reasonable investigations or to make a

reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S.

at 691. "In any ineffectiveness case, a particular decision not to investigate must be directly

assessed for reasonableness in all the circumstances, applying a heavy measure of

deference to counsel's judgment." *Id.*

The Eleventh Circuit has established a three-step test for determining whether

counsel's failure to present mitigating evidence constitutes ineffective assistance of counsel.

> The first step of the analysis is a determination whether there existed, in fact, mitigating evidence that a reasonable investigation would have uncovered. . . . The attorney's duty under the Sixth Amendment is to conduct a reasonable investigation, not such an exhaustive investigation that all conceivable mitigating evidence is necessarily uncovered. . . .
>
> The second question presented by the analysis is whether the failure to present existing mitigating evidence was the product of an informed tactical decision or due to oversight. *See Middleton v. Dugger, supra.* While the reasonableness of a decision is a question of law for the habeas court, whether a decision constituted a tactical decision is a question of fact to which the presumption of correctness applies. *See Stevens v. Zant, supra; Horton v. Zant*, 941 F.2d 1449 (11th Cir.1991); *Bundy v. Wainwright*, 808 F.2d 1410 (11th Cir.1987).
>
> Finally, if it is determined that counsel failed to present reasonably available mitigating evidence due to error or oversight, and not due to a tactical or strategic decision, ineffectiveness of counsel is established only if the petitioner also shows that the oversight caused actual prejudice. There must be a reasonable probability that the outcome of the sentencing proceeding would have been different if the mitigating evidence had been presented. Stated another way, there must be a reasonable probability that the sentencer, if presented with the mitigating evidence, would have determined that the

balance of aggravating and mitigating circumstances leaned against imposition of the death penalty. *See Stevens v. Zant, supra.*

*Waldrop*, 857 F. Supp. at 915-16.

With respect to the lack of mitigating evidence presented at the sentencing hearing, the Rule 20 court found:

> Petitioner had only been out of prison for a few months and had been living with the victim. Thus, the local people petitioner knew who could have been called to testify, were friends of the victim. No witnesses came forward to testify on behalf of petitioner. Hendrix also testified that the prosecution had witnesses that could have been called to testify on behalf of petitioner. Hendrix also testified that the prosecution had witnesses that could have been called to testify in rebuttal to any defense witnesses at sentencing. Stilson testified that trial counsel discussed calling witnesses, but did not call anyone. Petitioner did not provide trial counsel with the names of any witnesses who could testify at sentencing before the jury. No member of petitioner's family even attended the trial.

> Petitioner's current counsel has not shown what evidence . . . he alleges trial counsel should have presented at the sentencing hearing before the jury.

*Hubbard*, 584 So. 2d at 912-13.[43] The Rule 20 court also found that, even if the Bryce Hospital records as to the petitioner's alcoholism had been admitted at trial, "they would have been more than offset by the Lunacy Commission report which stated petitioner was not suffering from any mental disease or defect that would have affected his criminal responsibility at the time of the offense." *Id.* at 902-03. The Rule 20 court noted that trial counsel did not believe expert testimony would have assisted the defense. *Id.* at 904. These findings are supported by the record and are presumed to be correct.

---

[43]For the Rule 20 court's findings as to the failure to obtain expert witnesses, see section III.B.5.b.(1) above.

### (2)    Evidence of the petitioner's alcoholism.

The petitioner claims that counsel for the sentencing phase of his trial were ineffective because they failed to present expert or lay testimony regarding his alcoholism, although he claims that "alcoholism was central to [his] defense." (Petitioner's Brief on the Merits at 60).

It appears that trial counsel knew of the petitioner's alcoholism.[44] (Rule 20 transcript at 24, 64-65, 401). Stilson also recalled that he became aware as he worked on the case that the petitioner had a reputation for drinking in the community. (Rule 20 transcript at 408). Trial counsel were aware of the Bryce Hospital reports, which included a diagnosis of alcoholism. It is thus apparent that trial counsel knew that the petitioner was an alcoholic and could have further investigated it and presented such evidence at the sentencing hearing had they wished.

### (3)    Evidence of the petitioner's mental retardation.

The petitioner next complains that trial counsel failed to present available evidence at the sentencing hearing of his low I.Q. scores. He argues that counsel should have presented the Bryce Hospital records contained in his court file indicating that he had a verbal I.Q. of 77 and a full scale I.Q. of 80, both of which are in the borderline mentally retarded range, and a performance I.Q. of 86, which is within the low average range. Because trial counsel were aware of the Bryce Hospital records, they could have presented

---

[44]As is explained in section III.B.5.b.(2) above, counsel apparently knew about the Bryce Hospital records. Although neither trial counsel could recall, during the Rule 20 proceedings, whether or not they had seen the Bryce Hospital records specifically, Stilson did recall that, before trial, he reviewed some of the petitioner's psychiatric or psychological reports that had been subpoenaed in June, 1977 by the counsel who represented the petitioner in his 1977 trial. (Rule 20 Transcript at 401-05). There is no indication that these could have been any records other than the Bryce Hospital records, which had been subpoenaed in 1977.

the I.Q. information at sentencing, but did not. Trial counsel stated, however, that during their extensive dealings with the petitioner, he seemed quite competent and fully participated in his defense. They did not believe that he was mentally impaired or incompetent.

### (4)    Evidence of good prison adjustment.

The petitioner also claims that counsel were ineffective for not presenting evidence of his successful adjustment to prison life. It is not apparent that the petitioner actually did adjust successfully to prison life because that information is not part of the record and it was not discussed at the Rule 20 hearing. There is record evidence, however, that the petitioner escaped from prison four times while serving his sentence on the 1957 murder conviction.[45] (R. 2558). The court cannot deem counsel's performance deficient for failing to present a mitigating circumstance for which there is no evidentiary support. This particular claim must fail.

### (5)    Prejudice from want of mitigation evidence.

Hendrix and Stilson testified that the decision not to present available mitigating evidence or to further investigate possible mitigating factors was consistent with the overall defense strategy upon which the petitioner insisted; that is to show that he did not kill Ms. Montgomery, but rather to show that Ms. Montgomery committed suicide. Hendrix was concerned about the effect of presenting mitigation evidence when the defense theory used

---

[45]Although the petitioner suggests that counsel should have obtained prison records or testimony from prison officials, he presents no evidence that such records were available or that there were any such officials willing to give testimony favorable to him. The petitioner also protests that counsel did not adequately investigate the possibility of having friends or family testify as to his character. Yet, the Rule 20 court found that no such witnesses came forward and no member of his family even attended his trial. *Hubbard*, 584 So. 2d at 912-13.

throughout the guilt phase had been that the petitioner did not commit the crime. (Rule 20 transcript at 71-72, 92).

"[I]f an attorney is aware of a line of defense and makes a conscious decision to reject it, rather than failing to raise it simply because he was unaware that it existed, it is more likely that the failure to raise the defense was reasonable." *Gates v. Zant*, 863 F.2d 1492, 1498 (11th Cir. 1989), *cert. denied*, 493 U.S. 945, 110 S. Ct. 353, 107 L. Ed. 2d 340 (1989). An attorney may reasonably decide to avoid presenting evidence that he believes will do more harm than good. *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir. 1989), *cert. denied*, 493 U.S. 1011, 110 S. Ct. 573, 107 L. Ed. 2d 568 (1989).

At the sentencing hearing before the jury, counsel presented evidence already heard at trial regarding the petitioner's habitual drinking and his intoxication at the time of the killing. They argued that this information mitigated his offense, and they also attacked the state's evidence of aggravating factors. (R. 2446-50). Rather than presenting new evidence as to mitigating factors, counsel used evidence already presented at trial to stress that drinking had become "a way of life" for petitioner and Ms. Montgomery, and that the petitioner was intoxicated at the time of the killing. They argued that this could have led him to do things he would not have otherwise done. They also argued that there was no evidence this was a murder for pecuniary gain and that it was not cruel, heinous and atrocious. They also pointed out that a sentence of life without parole would have just as much a deterrent effect as the death penalty.

At the sentencing hearing before the judge, counsel presented testimony and argument in an attempt to convince the judge not to heavily weigh the 1957 murder

conviction as an aggravating circumstance, and also argued that the evidence simply did not support a finding of other aggravating factors or that the killing was deliberate and premeditated. They argued, based upon evidence already presented at trial, that the petitioner had been intoxicated and may have begun to experience *delirium tremens* during police questioning.

The court does not find unreasonable counsel's decision to approach the sentencing phase the way they did, rather than to present extensive additional evidence in an effort to explain or mitigate conduct that the petitioner insisted he never committed.

In *Buenoano v. Singletary*, 74 F.3d 1078, 1084-85 (11th Cir. 1996), *cert. denied*, --- U.S. ---, 117 S. Ct. 520, 136 L. Ed. 2d 408 (1996), the court found that if counsel had presented mitigating evidence of their client's mental problems, it "could leave the jury with the impression that [the petitioner] admitted committing the crime and was seeking sympathy or excuse because of her background or mental state," in contravention of trial strategy. *See also Nelson v. Nagle*, 995 F.2d 1549, 1554 (11th Cir. 1993), *reh'g denied*, 7 F.3d 242 (11th Cir. 1993) (trial counsel not ineffective for failing to present evidence of voluntary intoxication where intoxication defense was inconsistent with his factual innocence claim).

Given the tactical difficulties of this case, counsel did not act unreasonably. They were faced with a petitioner who had tried to exculpate himself with an untenable statement, who continued to insist that he was innocent, and who refused to allow a defense based upon any claim of insanity. Once the petitioner's statement was admitted, counsel were forced to adopt his unlikely story. After the jurors rejected the petitioner's story and convicted him, counsel had to take into account their skepticism, as well as that of the trial

judge, in presenting a sentencing argument on the very day the jury had rendered its verdict as to the petitioner's guilt. The presentation of new evidence explaining why the petitioner had committed the act, following on the heels of his protestations of innocence, would likely have underscored his deceit and strained counsel's credibility.[46] As Hendrix testified at the Rule 20 hearing, "how can I mitigate something that my defendant said he didn't do? . . . am I going to get him on the stand and get him to confess and say I am sorry, I did various things like that, when he in effect did not do it?" (Rule 20 transcript at 92). Counsel's choice to rely on evidence already heard at trial to show there were mitigating circumstances and to strongly question the existence, weight and relevance of aggravating circumstances was not so unreasonable as to violate the petitioner's right to the effective assistance of counsel.

Furthermore, even if the court were to find counsel's failure to present additional mitigation evidence unreasonable, the petitioner could not meet the second prong of *Strickland* by showing prejudice. There is no reasonable probability that the sentencing outcome would have been different if counsel had presented the mitigation evidence the petitioner contends they should have presented.

There is not a reasonable probability that the sentencing outcome would have differed if counsel had presented alcoholism evidence; such evidence would not have been ultimately mitigating in nature. Alcoholism does not serve to explain why the petitioner shot his girlfriend and benefactress three times, stole money from her cash register, stole her prized wristwatch, and then lied repeatedly not only to avoid responsibility for his conduct

---

[46]The presentation of new mitigation evidence may have prompted the state to introduce the Lunacy Commission report, which included a finding that the petitioner had no mental disease or defect that would affect his criminal responsibility at the time of the commission of the crime.

but also to try to obtain a substantial portion of Ms. Montgomery's property under the pretense that her dying wish was that he receive her property. The court is not persuaded that there is a reasonable probability that the jurors would have made a more lenient sentencing decision had they heard expert or lay testimony that the petitioner abused alcohol. *See Waldrop*, 857 F. Supp. at 919 ("[it] is hard for the court to seriously consider petitioner's argument that, if his attorneys had presented evidence to the jury during the sentencing phase to show that petitioner routinely drank until he passed out and used all manner of illicit drugs, the jury would have concluded that he should not receive the death penalty.") Any alcoholism evidence would also have been far outweighed by aggravating factors: that this was the petitioner's second murder conviction within twenty years, that the murder was committed for pecuniary gain, and that it was committed in a heinous, atrocious and cruel manner. Because the petitioner is unable to show that the failure to present mitigating evidence of his alcoholism actually prejudiced him, this claim fails.

Neither has the petitioner shown that there is a reasonable probability that his sentence would have been different had the jury known of his I.Q. scores. There is not a reasonable probability that the jury would have found that evidence of these scores would have outweighed the aggravating factors in the case. The record shows that the petitioner was intelligent enough to contrive a story which, if believed, would have allowed him to avoid responsibility for the murder and to perhaps obtain a portion of Ms. Montgomery's estate. Mr. Hubbard evidently perceived and understood that consequences would likely follow the murder of Ms. Montgomery, and he attempted to influence those consequences to his benefit. Given such facts, the court cannot conclude there is any reasonable

probability that the jury would have sentenced the petitioner more leniently had it known of the petitioner's I.Q. scores.

Similarly, even assuming that record evidence existed showing that the petitioner had successfully adjusted to prison life and was behaving as a model prisoner, there is still not a reasonable probability that the sentencing outcome would have been different. Such deportment, though commendable if true, would not likely outweigh the aggravating factors in the case.

As the petitioner cannot meet either prong of *Strickland*, this claim must fail.

### c.   Failure to object to sentencing arguments.

The petitioner claims that his trial counsel rendered ineffective assistance by failing to object to certain allegedly improper arguments made by the prosecutor at the sentencing hearing before the jury. Specifically, the petitioner complains that counsel failed to object to the following statements by the prosecutor:

(1)   that "as soon as [the petitioner] had the opportunity he killed again and given the opportunity, he would kill again." (R. 2444);

(2)   "[A]s you can tell this is not something we've done before. Under these conditions in one sense it's something a little bit new to me." (R. 2443);[47]

(3)   "[I]f anyone anywhere ever deserved the death sentence, [the petitioner] deserves the death sentence." (R. 2446).

---

[47]In context, this remark apparently refers not to the number of times the prosecutor has sought the death penalty but to the court's use of the then-new procedure required for sentencing under *Beck v. Alabama*, 447 U.S. 625 (1980). This explains the prosecutor's remarks. He stated that ". . . this is not something that we've done before. Under these conditions in one sense it's something a little bit new to me, although I have been involved in a case very similar to this not too long ago. The Judge will allow both sides to argue what are known as aggravating [sic] and mitigating circumstances." (R. 2443). He also remarked that this was "a relatively new type of case." (R. 2444-45).

(4)     "People have different feelings about capital punishment, I myself have felt strongly for it, very strongly against it at different times of my life. I know how strong impressions can be. . . . the death penalty is a valid means of punishment." (R. 2444).[48]

(5)     The prosecutor's promise that he would view the petitioner's execution if the jury returned a capital sentence. (R. 2446).

With respect to this claim, the Rule 20 court found:

In paragraphs 1p and 1h of his petition, petitioner alleged that trial counsel were ineffective in failing to object to remarks made by the prosecution during closing argument at the sentencing phase before the jury. In support of this allegation, petitioner relied upon the testimony of trial counsel and the record.

Hendrix testified that his general approach to closing argument was to not "jump up and down" objecting to the prosecution's closing. Hendrix felt that constant interruptions annoy juries and that his courtesy casts the prosecution in an unfavorable light when the state objected to his closing remarks. Hendrix saves his objections for important or prejudicial remarks by the prosecution. This approach to closing argument is based on Hendrix's years of arguing cases before juries.

Stilson feels that the prosecution's argument in this case was not very effective. In Stilson's opinion, the prosecutor was not very good at closing argument. According to Stilson, there are times a defense attorney does not want to make objections to certain points because it's simply not good argument. Stilson felt that in these instances an objection would only have informed the jury that the defense did not like what the prosecution was saying.

---

[48] The ellipses represents the record text omitted by the petitioner in his brief. The court notes that the language following the ellipses misrepresents the garbled passage of which it is only a part. That passage, starting with the material omitted by the petitioner reads as follows:

Right now the State of Alabama the law is that if you commit murder with other factors involved certain things, certain circumstances make is a capital case that's why I wanted to know if you had any reservations. I hope that you all looked in your heart when I asked you that question originally, you can impose that death penalty if you feel it is required under these circumstances that you will not now go back and say, "Well, we did what we could but life without parole is enough". Ladies and gentleman, life without parole is not enough in this case. If you believe in the death penalty the death penalty is a valid means of punishment and [the petitioner] deserves it, he's killed once and as soon as he had the opportunity he killed again and given the opportunity, he would kill again.

(R. 2444). In context, the prosecutor's comments have a different character, more focused on the feelings and beliefs of the jurors, than the truncated version quoted by the petitioner.

Trial counsel had sound strategic grounds for not objecting to the cited remarks made by the prosecution during closing argument. The decision was based on trial counsel's experience and their opinion that the prosecution argument was not persuasive. Petitioner has failed to meet his burden of establishing that his trial counsel were constitutionally deficient in their performance. Petitioner has failed to overcome the strong presumption that trial counsel rendered effective assistance and used reasonable professional judgment on this issue. Additionally, petitioner has failed to meet his burden of proving that there was a reasonable probability that, but for trial counsel's failures, the outcome of petitioner's trial would have been different.

*Hubbard*, 584 So. 2d at 906-907.

The state court's factual findings are supported by the record and are presumed ██████

be correct. These findings reveal that trial counsel had good strategic reasons not to object to the individual remarks complained of by the petitioner. The court cannot conclude that counsel's failure to object to these remarks was so unreasonable as to violate the Sixth Amendment, especially given the court's doubts, reflected above, as to whether certain of the remarks were actually improper. Neither can the court conclude that such an omission prejudiced the petitioner. There is no reasonable probability that the sentencing would have turned out differently if counsel had only objected to the remarks about which the petitioner now complains. Such objections may have, in fact, done little except to reflect poorly upon the petitioner's trial counsel.[49]

---

[49] In his brief, the petitioner appears to raise an independent claim that the prosecutor's allegedly improper remarks, set forth above, constituted prosecutorial misconduct serious enough to warrant a reversal of his sentence. Two of the remarks, however, do not appear to be improper at all. To the extent any of them are improper, they would not entitle the petitioner to relief because they did not "render [ ] his sentencing proceeding fundamentally unfair." *Williams v. Kemp*, 846 F.2d 1276, 1283 (11th Cir. 1988), *cert. dismissed*, 489 U.S. 1094, 109 S. Ct. 1579, 103 L. Ed. 2d 931 (1989), *cert. denied*, 494 U.S. 1090, 110 S. Ct. 1836, 108 L. Ed. 2d 965 (1990) (citations omitted). To make such a showing, the petitioner must demonstrate that there was a reasonable probability that "in the absence of the offending remarks, the sentencing outcome would have been different." *Id.* The petitioner has not made such a showing, and the court is unable to find support for such a showing in the record, especially since the evidence against the petitioner was overwhelming. Also, the lack of an objection during the prosecutor's argument supports a finding that there was no impropriety serious enough in any of these comments to render the sentencing hearing fundamentally unfair. *Id.*

As the petitioner cannot meet either prong of *Strickland*, this claim must fail.

### d.   Failure to object to claimed mandatory death sentence instruction.

The petitioner claims that his trial counsel rendered ineffective assistance by failing

to object to what he claims to be a mandatory death sentence instruction. The instruction

in question was:

> To fix punishment at death in this case the jury must find beyond a reasonable
> doubt and to a moral certainty that this aggravating circumstance is present.
> By your verdict finding the defendant guilty of the capital offense charged in
> the indictment you have found the existence of the aggravating circumstance
> beyond a reasonable doubt and to a moral certainty.

(R. 2451). The petitioner argues that, although it was not framed in mandatory language, this

instruction effectively told the jurors that, because they had found the petitioner guilty of the

crime as stated in the indictment, they had therefore found the aggravating circumstance

and were required to impose the death sentence. The petitioner complains that this

instruction was effectively a mandatory instruction to the jury that it was required to impose

the death penalty.

With respect to this claim, the Rule 20 court made the following findings:

> [P]etitioner alleged that his trial and appellate lawyers were ineffective in
> failing to challenge the trial judge's punishment stage instruction on the
> finding of the aggravating circumstance that petitioner had previously been
> convicted of a violent felony, the 1957 murder. In his punishment stage
> instructions, the trial judge instructed the jury that, by its verdict finding
> petitioner guilty of murdering Lillian Montgomery within twenty years of a
> previous murder, it had already found that the Code of Alabama 1975, §
> 13-11-6(2) aggravating circumstance existed beyond a reasonable doubt. (R.
> 2451)

> Petitioner's lawyers were not ineffective in failing to make this claim because
> the trial judge's instruction was manifestly correct. In finding petitioner guilty
> of the charged capital offense, the jury had necessarily found that he had

115

been convicted for murder in 1957. Thus, the jury had in fact found beyond a
reasonable doubt and to a moral certainty that petitioner had been "previously
convicted of . . . a felony involving the use of threat of violence to the person,"
i.e., murder. Petitioner's counsel were not obliged to raise frivolous
contentions or meritless objections.

Petitioner's contention that this instruction had the effect of mandating a death
sentence overlooks the trial judge's instructions on mitigation (R. 2452-54),
and weighing mitigation and aggravation in arriving at a sentence (R. 2452,
2454). The trial judge's instruction does not contain a suggestion that death
is the presumed or mandated punishment simply because one aggravating
· circumstance has been shown to exist.

*Hubbard*, 584 So. 2d at 907-08. These findings are supported by the record and presumed

to be correct.

Plaintext This instruction did not mandate the death penalty, even though it stated that, by

convicting the petitioner, the jury had found the existence of an aggravating circumstance.

As the Rule 20 court found, the court's other instructions made it clear that the death penalty

was not mandated.

Plaintext Trial counsel was not unreasonable in failing to object to an instruction for which

there was no legitimate basis for objection. Neither can the court conclude that, but for their

failure to object, the petitioner would not have been sentenced to death. It is quite doubtful

that the court would have changed or corrected the instruction in response to a baseless

objection. Even if it had changed the instruction somewhat, requiring the jurors to

independently determine that the aggravating circumstance existed (even though it was an

element of the indictment on which they had just convicted Hubbard), there is nothing to

indicate that they would not have found the existence of this aggravating circumstance or

that they would not have sentenced him to death, particularly when two other aggravating

circumstances existed.

116

As the petitioner cannot meet either prong of *Strickland*, this claim fails.

### e.   Failure to object to pecuniary gain arguments.

The petitioner claims that his trial counsel rendered ineffective assistance by failing to object to the use of the theory that he killed Ms. Montgomery for pecuniary gain as an aggravating circumstance at sentencing. He argues that, because Officer Marcum testified that he did not believe robbery to be a motive for the crime, the argument about pecuniary gain was unsupported and improper. The Rule 20 court found as follows:

> In paragraph 32j of his amendment to the petition, petitioner alleged that trial and appellate counsel were ineffective in failing to claim that there was insufficient evidence to permit a finding of the aggravating circumstance that the killing was for pecuniary gain. At the evidentiary hearing, petitioner's current counsel stated that he had intended to allege that there was no motion for a directed verdict made as to this aggravating circumstance. Petitioner did not attempt to amend the pleadings to reflect any such intent.

> Hendrix argued before the jury that pecuniary gain was not a motive for the killing, i.e., "why should petitioner kill the goose that laid the golden egg." Hendrix argued that Lillian Montgomery was supporting petitioner and he had no motive to kill her. The record indicates that Hendrix argued that there was not sufficient evidence to find this aggravating circumstance (R. 2448), and Stilson argued likewise at the punishment stage. (R. 2486) The Alabama Court of Criminal Appeals found: "The evidence strongly supports the conclusion that the present crime was committed for pecuniary gain." *Hubbard v. State*, 500 So.2d 1204, 1227 (Ala.Crim.App.1986).

> Trial and appellate counsel's performance was not deficient and petitioner has failed to overcome the presumption that counsel rendered effective assistance. Additionally, petitioner has failed to meet his burden of proving that but for trial and appellate counsel's failure to raise this issue, the outcome of petitioner's trial and appeal would have been different.

*Hubbard*, 584 So. 2d at 911.  These findings, which are supported by the record and presumed correct, show that trial counsel did forcefully argue throughout the sentencing stage that there was no support for the theory that the killing was committed for pecuniary

gain and that there was no logical reason the petitioner should have wanted to kill Ms. Montgomery.

As the Alabama Court of Criminal Appeals found, however, the record actually reflects that there was strong evidence that the crime was committed for pecuniary gain, including the petitioner's possession of Ms. Montgomery's property at the crime scene and his statements claiming that she said, after she had been shot in the shoulder, mouth and forehead, that she wanted him to have some of her property. In addition, there was evidence that Ms. Montgomery was growing weary of spending money on the petitioner.

The petitioner has not shown that trial counsel acted unreasonably in simply arguing to the jury that this theory was not supported by logic or evidence.  Neither has he shown that, but for the failure of counsel to take further actions to argue against or exclude consideration of this aggravating factor, that he would not have received the death penalty. As the petitioner cannot meet either *Strickland* prong, this claim fails.

### 8.   Ineffective assistance of counsel on direct appeal.

The petitioner claims that his counsel on direct appeal, Joseph G. Pierce and Charles Michael Stilson, rendered him constitutionally ineffective assistance of counsel.

The petitioner argues that appellate counsel (1) should have argued that the evidence did not support the court's sentencing findings that the killing was committed for pecuniary gain because "defendant was without money on the night before the crime" and the watch was "torn" from Ms. Montgomery, (2) erroneously prepared the appeal from a transcript with missing pages, (3) failed to raise claims related to (a) the allegedly improper exclusion of Ms. Montgomery's pre-January 5, 1977, medical records, (b) the trial court's

alleged denial of the opportunity for trial counsel to fully cross-examine witness Dr. Santina, and (c) the allegedly hearsay testimony of Jimmy Montgomery, and (4) failed to raise the issue of an Eighth Amendment violation. (Petition for Writ of Habeas Corpus at ¶¶ 128-32).

The petitioner does not explain any of these claims or support them with citations and references to the record, however. As the respondent argues, these claims appear to be "conclusory" allegations, the dismissal of which are authorized by the decision in *United States v. Jones*, 614 F.2d 80 (5th Cir. 1980), *cert. denied sub. nom, Jones v. United States*, 446 U.S. 945 (1980).

To establish an ineffective assistance claim against appellate counsel, it is necessary to show that appellate counsel's representation fell below an objective standard of reasonableness for attorneys and that specific errors resulted in actual prejudice to the defense. *Waldrop*, 857 F. Supp. at 922, (citing *Williams v. Weldon*, 826 F.2d 1018 (11th Cir. 1987), *cert. denied*, 485 U.S. 964, 108 S. Ct. 1231, 99 L. Ed. 2d 431 (1988)). Insofar as the petitioner argues that his attorney was ineffective for failing to raise and assert certain appellate issues, the test is whether those issues not raised "contain sufficient merit that appellate counsel can be faulted for not having raised them." *Id.*

The scant information provided by the petitioner makes it difficult for the court to analyze the above claims according to these standards. The petitioner has not shown why counsel was unreasonable in failing to raise these claims on appeal. He has not shown in any way that they "contain sufficient merit" to fault counsel for failing to raise them. Nor has he shown that, if counsel had raised these claims on appeal, the result of the proceeding would have been different.

Because the petitioner has failed to state these claims with specificity and to support them with record references, citations to relevant cases, or meaningful argument, they must fail. *Jones*, 614 F.2d at 82.

### 9.    Failure to administer intoximeter test.

The petitioner claims that the police violated his constitutional rights by failing to administer an intoximeter test to check the alcohol level in his body. The respondent argues that this claim is procedurally barred because the petitioner did not raise it at trial or on appeal, and because it was held to be barred during post-conviction proceedings.

This claim was held procedurally defaulted by the Alabama Court of Criminal Appeals. *Hubbard*, 584 So. 2d at 899, 916. The procedural default doctrine bars federal review of a habeas claim if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, *Harris*, 489 U.S. at 263, and that bar provides an adequate and independent state ground for denying relief. *See Id.* at 262, 109 S. Ct. at 1042-43; *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S. Ct. 1981, 1987, 100 L. Ed. 2d 575 (1988). *See also Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991), *cert. denied*, 506 U.S. 930, 113 S. Ct. 361, 121 L. Ed. 2d 274 (1992).

The Court of Criminal Appeals stated that each of the petitioner's defaulted claims was barred on one of three grounds, including the ground on which this claim is barred; that is because it was not raised at trial or on direct appeal. This ground, which is codified at Ala. R. Crim. P. (Temporary) 20.2(a)(3)&(5), is an independent and adequate state bar to relief. *Waldrop*, 77 F.3d at 1314-15; *Hill*, 81 F.3d at, 1023. Because the last state court reviewing this claim clearly and expressly rested its judgment on a procedural bar, federal

120

habeas review is barred under the procedural default rule. The petitioner cannot avoid the procedural bar of this claim because, as is explained in section III.B.3. above, he has failed to make the required showing of cause and prejudice or that a fundamental miscarriage of justice would result if the court did not consider the merits of the claim. Therefore, this claim fails.

###### 10.    Claimed exclusion of mitigating factors.

The petitioner claims that the trial court violated his constitutional rights by improperly excluding all mitigating factors from its sentencing decision. The respondent argues that this claim is procedurally barred because the petitioner never presented it to any state court. When a habeas claim has never been presented to a state court and there no longer exists any remedial vehicle by which the state courts may consider the claim, the United States Supreme Court has held that it is procedurally defaulted. *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989).

The petitioner defaulted on this claim by failing to raise it on direct appeal or in a petition under current Ala. R. Crim. P. 32 within the two-year limitations period established by that rule. The court is not required to dismiss the claim as unexhausted because the default is apparent and it would be futile to send petitioner back to state court only to be faced with the default. Because this claim is barred in state court, it is barred in this proceeding as well. *Waldrop*, 857 F. Supp. at 897 (citations omitted). The petitioner has not overcome the procedural bar by showing cause and prejudice for the default, or that a fundamental miscarriage of justice would occur if the court did not consider the merits of the claim.

11.   **Reliance upon allegedly inapplicable aggravating factors.**

The petitioner claims that the trial court, in sentencing him to death, impermissibly relied on inapplicable aggravating factors. Specifically, the petitioner complains that the court considered as aggravating factors (1) his 1957 conviction, which he claims was invalid, (2) the murder was committed for pecuniary gain, although such a finding was not supported by the evidence and (3) that the court found that the murder was committed in a heinous, atrocious and cruel manner, although such a finding was allegedly, according to the petitioner, not supported by the evidence. The State argues that this claim is procedurally barred because the petitioner has never presented it to any state court.[50]

As to the first of these factors, the petitioner did raise on direct appeal a general claim that his 1957 conviction should not have been used against him. (Brief of Appellant at 20-37). In his Rule 20 brief, the petitioner complained that the state should not have used his 1957 conviction as an aggravating factor on the capital charge. It appears that the petitioner "fairly presented" this claim below so as to avoid the procedural default of this claim. *Picard*, 404 U.S. at 275.

The petitioner claims specifically that the 1957 conviction is invalid and should not have been used as an aggravating factor because, as set forth in section III.B.2. above, the petitioner's 1957 counsel was allegedly laboring under a conflict of interest and because the failure of his 1957 counsel to procure a free transcript prevented the petitioner from appealing the 1957 conviction. As is set forth in section III.B.2., the evidence does not show

---

[50]In its previously issued Memorandum Opinion and Order denying certain of the petitioner's subsidiary motions, the court stated that it appeared this claim was procedurally defaulted. Upon further consideration, the court now concludes that the claim is defaulted only in part, as is explained below.

122

that the petitioner's 1957 counsel was laboring under an impermissible conflict of interest or that he rendered ineffective assistance of counsel in failing to procure a free transcript of the trial. He therefore did not violate the petitioner's Sixth Amendment rights. This claim must fail because it depends upon the petitioner's ineffective assistance claims against his 1957 counsel and he has not demonstrated that his lawyer in the 1957 proceeding was ineffective.

As to the second of these aggravating factors, that the murder was committed for pecuniary gain, the petitioner apparently did raise this issue in paragraphs 17 and 19 of its Rule 20 petition, claiming that there was insufficient evidence to find the aggravating circumstance that the murder was committed for pecuniary gain and that certain of the court's sentencing findings on this issue were not supported by the evidence. (Rule 20 Transcript at 179-80). The Rule 20 court found these claims to be procedurally defaulted, *Hubbard*, 584 So. 2d at 916, apparently on the basis that they had not been raised at trial or on direct appeal, which is an independent and adequate state ground that now prevents this court from considering the claim. *See* Ala. R. Crim. P. (Temporary) 20.2(a)(3)&(5); *Waldrop*, 77 F.3d at 1314-15 (Rule 32.2(a)(5) is "adequate and independent" state ground for denial of relief); *Hill*, 81 F.3d at 1023 ("firmly established and regularly followed" state procedural rules may bar federal habeas claims). Because the last state court reviewing this claim clearly and expressly rested its judgment on a procedural bar, federal habeas review is barred under the procedural default rule. *Harris*, 489 U.S. at 262-63; *Johnson*, 486 U.S. at 587. *See also Johnson*, 938 F.2d at 1173. Neither has the petitioner overcome the procedural bar

by showing cause and prejudice or that a fundamental miscarriage of justice would occur if the court did not consider the merits of the claim.

As to the third of these aggravating factors, it appears that the petitioner did not raise this claim in state court. The petitioner thus defaulted on this claim by failing to raise it on direct appeal or in a petition under current Ala. R. Crim. P. 32 within the two-year limitation established by current Rule 32.2(c). The Court need not dismiss the claim as unexhausted because the defaults are apparent and it would be futile to send petitioner back to state court only to be faced with the defaults. Because this claim is procedurally barred in state court, it is procedurally barred in this proceeding as well. *Waldrop*, 857 F. Supp. at 897 (citations omitted).

The petitioner cannot avoid the procedural bar of this claim because, as set forth in section III.B.3 above, he has failed to make the required showing of cause and prejudice, or that a fundamental miscarriage of justice would occur if the court did not consider the merits of the claim.

### 12.   Admission of testimony of Judge Nicol.

The petitioner claims that the trial court denied him due process of law under the Fifth and Fourteenth Amendments to the United States Constitution by improperly admitting the allegedly irrelevant and inflammatory testimony of Judge Nicol, who had assisted in the prosecution of the petitioner at his 1957 murder trial. Judge Nicol's testimony helped establish the existence of petitioner's 1957 murder conviction, which was an element of the charge. The respondent argues that this claim is procedurally barred because the petitioner never presented it to any state court.

124

This claim was not included in the petitioner's original Rule 20 petition. Nor was it included in his amendment to the Rule 20 petition.[51] The petitioner did raise this issue in his Rule 20 brief, however. He alleged that Judge Nicol's testimony "created undue influence upon the jury and an atmosphere of ineradicable bias and prejudice toward [the petitioner] in violation of the Fifth and Fourteenth Amendments of the United States Constitution . . . ." (Rule 20 Transcript at 221-22).[52] The petitioner also included this claim in his appeal of the denial of Rule 20 relief. The Rule 20 court and the Court of Criminal Appeals both ignored this issue, as did the State in its arguments opposing the Rule 20 petition and the appeal of the denial thereof.   In *Smith v. Digmon*, 434 U.S. 332, 98 S. Ct. 597, 54 L. Ed. 2d 582 (1978), the court wrote that

> [it] is too obvious to merit extended discussion that whether the exhaustion requirement of 28 U.S.C. § 2254(b) has been satisfied cannot turn upon whether a state appellate court chooses to ignore in its opinion a federal constitutional claim squarely raised in petitioner's brief in state court, and indeed, in this case vigorously opposed in the State's brief. It is equally obvious that a district court commits plain error in assuming that a habeas petitioner must have failed to raise in the state courts a meritorious claim that he is incarcerated in violation of the Constitution in the state appellate court's opinion contains no reference to the claim.

*Digmon*, 434 U.S. at 333.

This court cannot assume that the petitioner failed to properly raise this claim, even though he did not include it in his Rule 20 petition or his amendment to it, and even though

---

[51]In this amendment, the petitioner did assert an ineffective assistance claim based upon the failure of counsel to object to the testimony of Judge Nicol, but not a direct claim based upon the impropriety of the court allowing Judge Nicol to testify.

[52]It is not clear why the petitioner failed to include this claim in his amendment to the petition, which was filed several weeks after submission of the brief.

the state courts ignored it. The court will treat this claim as if it had been properly raised below.

The petitioner claims that Judge Nicol's testimony was inflammatory and unnecessary, and that the information he provided regarding the petitioner's 1957 murder conviction could have been established through public documents or the testimony of a court clerk. (Petition for Writ of Habeas Corpus ¶¶ 142-44).

"In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S. Ct. 2597, 2608, 115 L. Ed. 2d 720, 735 (1991), *reh'g denied*, 501 U.S. 1277, 112 S. Ct. 28, 115 L. Ed. 2d 1110 (1991) (discussing victim impact evidence in the sentencing context) (citing *Darden v. Wainwright*, 477 U.S. 168, 179-83, 106 S. Ct. 2464, 2470-72, 91 L. Ed. 2d 144 (1986)). The judge's testimony does not, in any way, meet this standard. His testimony helped to establish an element of the indictment and he said little more than that he was a circuit judge, that he had helped try the 1957 murder case against J.B. Hubbard, and that Hubbard had been convicted. (R. 1677-82). He did not disparage the petitioner or comment on the case, other than saying he remembered it well. The testimony thus appears to have been neither irrelevant nor inflammatory. Although the state may have indeed been able to establish the petitioner's conviction without calling Judge Nicol, the petitioner has called the court's attention to any authority holding that due process requires the elements of an indictment be proven using evidence that is, from the petitioner's viewpoint, as benign as possible. It thus appears that Judge Nicol's testimony did not violate the petitioner's due process rights.

### 13.    Denial of motion to quash the indictment.

The petitioner claims that the trial court erred in denying his motion to quash the

indictment. Specifically, the petitioner complains that because his indictment included his

1957 murder conviction and because the jury knew of that conviction during the guilt phase

of the trial, the jury could not remain impartial and the petitioner was deprived of due

process. He also alleges that the additional use of the conviction as an aggravating factor

during the proceedings violated his right to be free of twice being placed in jeopardy for

the same offense.

The Alabama Court of Criminal Appeals rejected this claim, stating that

the Alabama Death Penalty Statute requires that the aggravating
circumstances be alleged in the indictment when the death penalty is sought.
§ § 13-11-1 and -2. The obvious purpose of this requirement is to ensure that
the accused is fully advised and informed of the nature and extent of the
offense for which he stands charged. *Arthur v. State*, 472 So.2d 650
(Ala.Cr.App.1984), *rev'd on other grounds*, 472 So.2d 665 (Ala.1985); *Julius v.
State*, 407 So.2d 141 (Ala.Cr.App.1980), *rev'd on other grounds*, 407 So.2d 152
(Ala.1981); *Wilson v. State*, 371 So.2d 932 (Ala.Cr.App.1978), *aff'd*, 371 So.2d
943 (Ala.1979), *vacated on other grounds*, 448 U.S. 903, 100 S. Ct. 3042, 65 L.
Ed. 2d 1133 (1980), *rev'd on other grounds*, 405 So.2d 696 (Ala.1981). The
aggravating circumstance is a statutory element of the crime which must be
alleged and proven. The jury must find the existence of the aggravating
circumstance even though the enhanced punishment is left to be imposed by
the trial judge. *Arthur v. State, supra; Hubbard v. State, supra; Wilson v.
State, supra.*

Appellant suggests that we adopt an approach whereby the prior conviction
would be omitted from the indictment, withheld from the jury during the guilt
phase, and considered only at the sentencing phase of the trial. To this
suggestion, we quote what the Alabama Supreme Court stated when
addressing a similar suggestion in *Williams v. State*, 239 Ala. 296, 297, 195 So.
213 (1940): "This suggestion should be addressed to the Legislature rather
than the courts." The United States Supreme Court, in considering a similar
issue, held in *Spencer v. Texas*, 385 U.S. 554, 87 S. Ct. 648, 17 L. Ed. 2d 606
(1967), that the Texas procedure for enforcing its habitual criminal statute was
not rendered unconstitutional under the due process clause because of the

possibility of some collateral prejudice to the defendant. By that Texas procedure, prior offenses were alleged in the indictment and proof respecting past convictions was introduced with a charge by the trial court that such prior convictions were not to be taken into account in assessing a defendant's guilt or innocence under the current indictment. The Supreme Court also held in *Spencer v. Texas*, in reference to a suggestion that a two-stage jury trial would be preferable, that the due process clause of the Fourteenth Amendment does not require two-stage jury trials. In the instant case, the trial court, at the request of appellant, properly instructed the jury that it should not consider the prior conviction as any evidence of appellant's guilt on the charge of the murder of Ms. Montgomery.

*Hubbard*, 500 So. 2d at 1215.

The U.S. Supreme Court has repeatedly upheld recidivist statutes such as that under

which the petitioner was indicted. The Court has stated:

> States have a valid interest in deterring and segregating habitual criminals. *See Rummel v. Estelle*, 445 U.S. 263, 284, 100 S. Ct. 1133, 1144, 63 L. Ed. 2d 382 (1980). We have said before that a charge under a recidivism statute does not state a separate offense, but goes to punishment only. *See Oyler v. Boles*, 368 U.S. 448, 452, 82 S. Ct. 501, 503, 7 L. Ed. 2d 446 (1962); *Graham, supra*, 224 U.S. at 623-624, 32 S. Ct. at 585; *McDonald v. Massachusetts*, 180 U.S. 311, 313, 21 S. Ct. 389, 390, 45 L. Ed. 542 (1901). And we have repeatedly upheld recidivism statutes "against contentions that they violate constitutional strictures dealing with double jeopardy, ex post facto laws, cruel and unusual punishment, due process, equal protection, and privileges and immunities." *Spencer v. Texas*, 385 U.S. 554, 560, 87 S. Ct. 648, 651, 17 L. Ed. 2d 606 (1967) (*citing Oyler, supra; Gryger v. Burke*, 334 U.S. 728, 68 S. Ct. 1256, 92 L. Ed. 1683 (1948); *Graham, supra; McDonald, supra; Moore v. Missouri*, 159 U.S. 673, 16 S. Ct. 179, 40 L. Ed. 301 (1895)). *But see Solem v. Helm*, 463 U.S. 277, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983) (life sentence without parole imposed under recidivism statute violated Eighth Amendment when current conviction was for passing a bad check and prior offenses were similarly minor).
>
> The States' freedom to define the types of convictions that may be used for sentence enhancement is not unlimited. In *Burgett v. Texas*, 389 U.S. 109, 88 S. Ct. 258, 19 L. Ed. 2d 319 (1967), we held that uncounseled convictions cannot be used "against a person either to support guilt or enhance punishment for another offense." *Id.*, at 115, 88 S. Ct. at 262. This Court has nevertheless also expressed a willingness to uphold, under the Due Process Clause, a variety of state procedures for implementing otherwise valid recidivism statutes. See *Spencer, supra* (due process allows government to

introduce proof of past convictions before jury has rendered guilt determination for current offense); *Oyler, supra* (due process does not require advance notice that trial for substantive offense will be followed by habitual-criminal accusation). As Justice Harlan observed 25 years ago in *Spencer*, the Court is not "a rule-making organ for the promulgation of state rules of criminal procedure." 385 U.S., at 564, 87 S. Ct., at 654. "Tolerance for a spectrum of state procedures dealing with [recidivism] is especially appropriate" given the high rate of recidivism and the diversity of approaches that States have developed for addressing it. *Id.*, at 566, 87 S. Ct., at 655. We think this reasoning remains persuasive today; studies suggest that as many as two-thirds of those arrested have prior criminal records, often from other jurisdictions. [Citations omitted].

*Parke v. Raley*, 506 U.S. 20, 27-28, 113 S. Ct. 517, 522, 121 L. Ed. 2d 391, 402-03 (1992).

The Supreme Court has also specifically held that double jeopardy concerns are not implicated by recidivism statutes in which prior convictions are used to enhance punishment. The Court stated that

we have made clear in other cases, which involved a defendant's background more generally and not conduct arising out of the same criminal transaction as the offense of which the defendant was convicted, that "[e]nhancement statutes, whether in the nature of criminal history provisions such as those contained in the Sentencing Guidelines, or recidivist statutes which are common place in state criminal laws, do not change the penalty imposed for the earlier conviction." *Nichols*, 511 U.S., at ----, 114 S. Ct., at 1927 (approving consideration of a defendant's previous uncounseled misdemeanor conviction in sentencing him for a subsequent offense). In repeatedly upholding such recidivism statutes, we have rejected double jeopardy challenges because the enhanced punishment imposed for the later offense "is not to be viewed as either a new jeopardy or additional penalty for the earlier crimes," but instead as "a stiffened penalty for the latest crime, which is considered to be an aggravated offense because it is a repetitive one." *Gryger v. Burke*, 334 U.S. 728, 732, 68 S. Ct. 1256, 1258, 92 L. Ed. 1683 (1948). See also *Spencer v. Texas*, 385 U.S. 554, 560, 87 S. Ct. 648, 651-652, 17 L. Ed. 2d 606 (1967); *Oyler v. Boles*, 368 U.S. 448, 451, 82 S. Ct. 501, 503, 7 L. Ed. 2d 446 (1962); *Moore v. Missouri*, 159 U.S. 673, 677, 16 S. Ct. 179, 181, 40 L. Ed. 301 (1895) (under a recidivist statute, "the accused is not again punished for the first offence" because " 'the punishment is for the last offence committed, and it is rendered more severe in consequence of the situation into which the party had previously brought himself' ").

*Witte v. United States*, 515 U.S. 389, 115 S. Ct. 2199, 132 L. Ed. 2d 351 (1995).

The petitioner cites no authority supporting his contention that denial of the motion to quash deprived him of due process or raised double jeopardy concerns. In view of the relevant Supreme Court authority, it is clear that denial of the motion to quash did not violate the petitioner's rights.

### 14.   Claimed failure to give *Miranda* warnings before interrogation.

The petitioner claims that the police subjected him to a custodial interrogation before giving him the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), thereby necessitating the reversal of his conviction and sentence. He argues that, on the morning of Ms. Montgomery's death, Officer Manley approached him outside of Ms. Montgomery's residence and questioned him about the shooting. The petitioner argues that he was effectively in custody at that time, whether or not he had been formally arrested.

Whether the plaintiff was "in custody" is a mixed question of law and fact for the federal habeas court to decide, basing its decision on the facts as found by the state court. The Supreme Court has said:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, [footnote omitted] would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520, 77 L. Ed. 2d 1275 (1983) (per curiam) (quoting *Mathiason*, 429 U.S., at 495, 97 S. Ct., at 714). The first inquiry, all agree, is distinctly factual. State-court findings on these scene-and-action-setting questions attract a presumption of correctness under 28 U.S.C. § 2254(d). The second inquiry, however, calls for

130

application of the controlling legal standard to the historical facts. This ultimate determination, we hold, presents a "mixed question of law and fact" qualifying for independent review.

*Thompson v. Keohane*, --- U.S. ---, 116 S. Ct. 457, 465, 133 L. Ed. 2d 383, 394 (1995).

On direct appeal in this case, the Alabama Court of Civil Appeals made the following

findings with respect to this claim:

> Officers Manley and Stephens had been dispatched to the scene to investigate a report of a possible suicide. Upon arriving at the scene, they were given the key to the locked store-residence by appellant and they went inside, where they observed the scene and body of the victim. When the officers went back outside, Manley spoke with appellant, who had been waiting outside with the ambulance attendants. Officer Manley testified as follows:
>
> "Q. All right. And at that point, what, if anything, did you do?
>
> "A. I walked back outside to the patrol car and called for homicide, and the coroner.
>
> "Q. And at any time did you have any conversation ... with the defendant, J.B. Hubbard?
>
> "A. Yes.
>
> "Q. And when and where was this?
>
> "A. It was after I came back outside and called homicide, and asked Mr. Hubbard what happened.[53] And he stated to me that he had, that he and Mrs. Montgomery had been arguing upstairs in the bedroom, and that she had went downstairs, and he had heard what he thought were two shots.
>
> "Q. All right, sir. Now, when he stated that they were arguing, did he put any time reference to it or time frame as to when these arguments were taking place?

---

[53] Other portions of Manley's testimony reflects that he did not call for a homicide investigator until after he spoke with the petitioner. (R. 1734-36).

"A. Yes, sir, he stated that they were approximately seven o'clock that morning.

"Q. All right, sir.

"A. Shortly thereafter is when he heard the shots.

\*　　　\*　　　\*　　　\*

"Q. Did he make any statements to you concerning any firearms?

"A. Well, after he told me that Mrs. Montgomery had been shot, I asked him where the gun was, and he told me that he had it on him.

"Q. All right, sir. And at that point, what did you do?

"A. I frisked Mr. Hubbard and found the pistol in his right, back pocket.

"Q. And did you find anything else?

"A. Yes, a box, a half a box of .38 cartridges and a pint bottle of Cabin Hollow whiskey.

"Q. Okay. Now, at that time, what, if anything, did you do?

"A. I read Mr. Hubbard his rights."

After appellant had been read his Miranda rights and had acknowledged that he understood them, he repeated what he had previously told Manley. The record shows the following:

"Q. Did he make any statements to you after that, after you read him his rights?

"A. The only--Yes, sir, he said that he and Mrs. Montgomery had been arguing the night before, and they had gotten up this morning, January 10, and were arguing, and she went downstairs and he heard what he thought were two shots, and he went down to check on her, and either called a friend or a relative and asked them what to do, that she was bleeding real badly. And I asked him why he waited so long to call the police or the ambulance. And he stated that he didn't know what to do, and that he had tried to call around.

132

"Q. All right, sir. Now, did he make any statement to you concerning his actions before the ambulance attendants arrived on what he did after the shots were fired and before you all got there?

      \*            \*            \*            \*

"A. Only that he had tried to call a friend or relative to find out what to do. She was bleeding real bad, and that she had shot herself."

On cross-examination, Manley testified as follows:

"Q. Now, when you went back out, you went directly to where Mr. Hubbard was standing, is that correct?

"A. Yes.

"Q. And you spoke with him, is that correct?

"A. Yes.

"Q. Now, at that time had he been read his rights?

"A. No, sir.

"Q. And you got a statement from him about an argument at approximately seven o'clock that morning and Mrs. Montgomery leaving the bedroom and going downstairs, is that correct?

"A. Yes, sir.

"Q. Officer Manley, was Mr. Hubbard free to leave at that time?

"A. No, sir.

"Q. If he had tried to leave, what would you have done?

"A. I would have detained him.

"Q. All right. Now, after he made that initial statement to you at the ambulance, what, if anything, did you do?

"A. I asked him where the gun was, and he told me that he had it on him, and I searched him and got the gun and the shells and the whiskey, and I read him Miranda."

133

*Hubbard*, 500 So. 2d at 1223-24. The Court of Criminal Appeals also found:

> It is clear that the focus of the investigation had not centered on appellant when the initial questions were asked. Appellant initiated the call for the police and the ambulance and had given the key to the officers so they could enter the house. He had given every indication of forthrightness and cooperation with the officers. When making the initial statements in question, he had no reason to believe that he was under any restraint or about to be arrested. Nothing had happened up to that point which would put him on notice that he was under suspicion or the object of an investigation.

*Hubbard*, 500 So. 2d at 1225.[54] These factual findings are supported by the record and are

presumed to be correct.

Using these findings, the court must determine whether there was "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Thompson*, 116 S. Ct. at 465 (quoting *Beheler*, 463 U.S. at 1125). The petitioner cites no authority, but as evidence that he was "in custody," he points to Officer Manley's statement that he was not free to leave and that Manley would have detained him if he had tried to leave. Yet, it is clear that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323, 114 S. Ct. 1526, 1528, 128 L. Ed. 2d 293 (1994). The *Stansbury* court stated that

> a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*. See F. Inbau, J. Reid, & J. Buckley, *Criminal Interrogation and Confessions* 232, 236, 297-298 (3d ed. 1986).

---

[54] The questions Manley asked of the petitioner constituted an interrogation for *Miranda* purposes. "*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689, 64 L. Ed. 2d 297 (1980).

\*           \*           \*           \*

An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. Cf. *Michigan v. Chesternut*, 486 U.S. 567, 575, n. 7, 108 S. Ct. 1975, 1980, n. 7, 100 L. Ed. 2d 565 (1988) (citing *United States v. Mendenhall*, 446 U.S. 544, 554, n. 6, 100 S. Ct. 1870, 1877, n. 6, 64 L. Ed. 2d 497 (1980) (opinion of Stewart, J.)). Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her " 'freedom of action.' " *Berkemer*, [468 U.S] at 440, 104 S. Ct. [at 3150].

*Stansbury*, 114 S. Ct. at 1529-30.

In this case, there is no objective indication in the record that the petitioner's freedom was restrained. The petitioner had made an emergency call to police about a suicide at his residence. He was at the crime scene to assist emergency workers and police authorities when they arrived. As the authorities arrived and began to gather information, any reasonable person in the petitioner's situation would have expected to be generally questioned about the shooting, simply as a matter of routine police investigation. The record reflects that he was not a suspect or the focus of the investigation when police arrived or when Officer Manley asked him the questions that are now challenged.

When he arrived at the scene, Officer Manley made his initial inspection of Ms. Montgomery's residence. Then Manley approached the petitioner, who was standing outside, and asked him what had happened and where the gun was. The record does not reflect that Manley had any physical contact with the petitioner or that he behaved coercively or threateningly toward the petitioner until after these questions were asked and answered. There is no indication these initial inquiries were anything other than general investigative questions, which are permitted under *Miranda*. In addition, the question

135

regarding the gun's location falls within the "public safety" exception to *Miranda* established in *New York v. Quarles*, 467 U.S. 649, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984).[55]

Even if Manley intended to detain the petitioner if he tried to leave, there is nothing in the record to suggest that he communicated that intent to Hubbard either by word or deed. In short, there was nothing from which a reasonable person in the place of Hubbard would have concluded that his freedom of movement had been restrained.

In *United States v. Torkington*, 874 F. 2d 1441 (1989), the court reversed the district court finding that the defendant was "in custody" while authorities executed a civil seizure order at his flea market booth. The court noted that the defendant was free to move about or leave the area during this time. The court stated that

> [a]lthough Torkington may have felt uncomfortable leaving his booth for an extended period while the seizure was taking place, his hesitation in leaving the area did not result from the exercise of direct or implied coercive restraint by agents of the government. A reasonable person in Torkington's position would not have considered himself under arrest or subject to governmental restraint on his freedom of movement equivalent to that involved in a formal arrest. *See generally Berkemer v. McCarty, supra* (questioning during traffic stop not custodial interrogation); *United States v. Rioseco, supra* (questioning during Coast Guard boarding of vessel not custodian interrogation); *United States v. Phillips, supra* (statement at police station prior to being put under arrest not made during custodial interrogation).

*Torkington*, 874 F. 2d at 1445-46 (1989).

---

[55]The *Quarles* court held that "the doctrinal underpinnings of *Miranda* [do not] require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety." *Quarles*, 467 U.S. at 656. The court held that it was error to exclude the defendant's statement that "[t]he gun is over there," where he was responding to the arresting officer's question as to the gun's location after the officer found an empty holster on the defendant. *Id.* at 652, 656. Like the officer in *Quarles*, Manley knew that there was a gun in the vicinity, as one had been used recently in Ms. Montgomery's residence, but he did not know its location. He had good reason to be concerned about the location of the gun, for his own safety, the safety of the other officers or officials on the scene, and the private citizens or children who might have been in the area.

Similarly, Hubbard was free to move about. He may have been hesitant to leave the general area because a reasonable person in his situation would know that authorities would likely require his assistance in gathering information about the incident he had reported.

In *United States v. Roark*, 753 F. 2d 991, 993 (11th Cir. 1985), *reh'g denied*, 761 F.2d 698 (11th Cir. 1985), the court found that the defendant bank teller was not "in custody" when questioned. She had reported being robbed and the investigating officers had no reason to suspect her of complicity during their initial questioning. She was not even a suspect until making inculpatory statements. The court noted that the defendant was interviewed at her place of employment, was not placed under arrest or told not to leave, and was not threatened or coerced in any manner. Similarly, the petitioner was at his residence when questioned. There is no indication he was then a suspect. The *Roark* court noted that "[t]he police are to be commended for fully checking out all leads rather than arriving at a premature conclusion of guilt . . . . They should not be placed in the position of practically being required to accuse every person they interview who has any close knowledge of a crime." *Id.* (quoting *United States v. Thompson*, 463 F.2d at 1259-60.)

The petitioner was clearly not "in custody" when Manley first questioned him, so his *Miranda* rights were not violated. This claim fails.

137

15.    **The statute as violative of the Equal Protection Clause of the Fourteenth Amendment.**

The petitioner claims that he has been denied equal protection of the law under § 13-11-2(a)(13)[58] because the statute arbitrarily establishes a twenty-year period between murders for a defendant to be eligible for the death penalty. That section stated as follows:

> [i]f the jury finds the defendant guilty, it shall fix the punishment at death when the defendant is charged by indictment with any of the following offenses and with aggravation, which must also be averred in the indictment, and which offenses so charged with said aggravation shall not include any lesser offenses: . . . (13) Any murder committed by a defendant who has been convicted of murder in the first or second degree in the twenty years preceding the crime.



Ala. Code § 13-11-2(a)(13)(1975).

On direct appeal, the Alabama Court of Criminal Appeals made the following findings with respect to this claim:

> Appellant contends that § 13-11-2(a)(13) is unconstitutional on the ground that it constitutes a denial of equal protection of the law because the twenty-year period used in the statute is arbitrary. We addressed this exact issue on appellant's first appeal and ruled that the twenty-year classification is not unreasonable or arbitrary. *Hubbard*, 382 So.2d at 588-90. The Alabama supreme court [sic] agreed. *Hubbard*, 382 So.2d at 597. We adhere to our former ruling, as stated in *Hubbard*, 382 So.2d at 589:
>
> The statute was obviously enacted with a view to the protection of society from a certain class of criminal with the belief that a hardened criminal needed more severe punishment than a first offender. Such statutes which enhance sentence are not violative of the due process clause, *Graham v. West Virginia*, 224 U.S. 616 [32 S. Ct. 583, 56 L. Ed. 917] ... (1912); *Moore v. Missouri*, 159 U.S. 673 [16 S. Ct. 179, 40 L. Ed. 301] ... (1895), and do not create an unreasonable classification. *McDonald v. Massachusetts*, 180 U.S. 311 [21 S. Ct. 389, 45 L. Ed. 542] ... [1901]. Generally see 58 A.L.R. 20 (1929);

---

[58] *Ala. Code* § 13-11-2 (1975) was transferred into Title 13 at § 13A-5-31. See volume 12 of the Code of Alabama, Table II at p.4. It was then repealed in 1981 and replaced by § 13A-5-40(a)(13).

82 A.L.R. 345 (1933); 116 A.L.R. 209 (1938); 132 A.L.R. 91 (1941); 139 A.L.R. 673 (1942).

*          *          *          *

The essence of the theory of equal protection of the laws is that all similarly situated be treated alike. *City of Hueytown v. Jiffy Chek Co. of Alabama*, 342 So.2d 761 (Ala.1977). Classification of subjects in a statute is not arbitrary and invalid if based on some difference which bears a reasonable and just relation to the attempted classification. *Board of Com'rs of City of Mobile v. Orr*, 181 Ala. 308, 61 So. 920 (1913).

We do not think it unreasonable to suggest that the legislature, faced with enacting the death penalty laws for this state, reasoned that it is not every prior conviction for murder which upon a subsequent conviction should be subject to the death penalty but only those which occur within a limited period of time. Indeed it could be argued that the very act of instituting the twenty year period was an affirmative and reasoned approach rather than merely including any prior conviction. Considering society's right to be protected from the depravity of the criminally inclined and the duty of the government to secure to its citizens the enjoyment of their lives and property against the unlawful aggression of the criminal class, we conclude that the classification is not unreasonable or arbitrary. Merely because the legislature could have created a different classification does not make the present one arbitrary.

We find no merit in this contention of appellant.

*Hubbard*, 500 So. 2d at 1215-16.

The Supreme Court has generally upheld recidivism laws, such as the one at issue here, against many types of constitutional attacks, including those based upon the Equal Protection clause, *Spencer v. Texas*, 385 U.S. 554, 560, 87 S. Ct. 648, 651, 17 L. Ed. 2d 606 (1967), acknowledging that "[s]tates have a valid interest in deterring and segregating habitual criminals." *Parke*, 506 U.S. at 27, 113 S. Ct. at 522, 121 L. Ed. 2d at 402-03 (1992)(citing *Rummel v. Estelle*, 445 U.S. 263, 284, 100 S. Ct. 1133, 1144, 63 L. Ed. 2d 382 (1980)).

139

"The Equal Protection Clause provides a basis for challenging legislative classifications that treat one group of persons as inferior or superior to others." *Jones v. Helms*, 452 U.S. 412, 423-24, 101 S. Ct. 2434, 2442, 69 L. Ed. 2d 118 (1981). In analyzing an equal protection claim, "unless the case involves a suspect class or a fundamental right, the Equal Protection Clause requires only that the classification be rationally related to a legitimate state interest." *Panama City Med. Diagnostic Ltd. v. Williams*, 13 F.3d 1541, 1545 (11th Cir. 1994), *cert. denied sub nom, Panama City Med. Diagnostic Ltd. v. Stuart*, 513 U.S. 826, n. 115 S. Ct. 93, 130 L. Ed. 2d 44 (1994). The petitioner does not argue that § 13-11-2(a)(13) violated any fundamental right. He argues merely that the provision arbitrarily drew a classification between those who are convicted of murder within twenty years of a prior murder conviction and those who are convicted of murder without such a prior conviction. This does not involve any suspect or quasi-suspect class, as would one based upon race or national origin.[57] *See Schweiker v. Wilson*, 450 U.S. 221, 229, 101 S. Ct. 1074, 1080, 67 L. Ed. 2d 186 (1981). Resolution of this issue turns upon whether this classification is rationally related to a legitimate state interest.

As the petitioner argues, it is possible that two people whose prior murder convictions were but a short time apart could have been treated very differently under § 13-

---

[57] In determining whether a classification comprised of parents, children, and siblings was suspect or quasi-suspect, the Supreme Court stated as follows:

> [c]lose relatives are not a "suspect" or "quasi-suspect" class. As a historical matter, they have not been subjected to discrimination; they do not exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group; and they are not a minority or politically powerless. *See, e.g., Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 313-314, 96 S. Ct. 2562, 2566-2567, 49 L. Ed. 2d 520 (1976) (per curiam).

*Long v. Castillo*, 477 U.S. 635, 638, 106 S. Ct. 2727, 2729, 91 L. Ed. 2d 527 (1986). Under these factors, the challenged classification would not be suspect or quasi-suspect.

11-2(a)(13). Yet, it is apparent that the legislature, in an effort to prevent convicted murderers from repeating their crimes, clearly chose to impose harsher penalties on killers with prior murder convictions, but deemed that the severest penalty of all, death, is not warranted where the seriousness of the prior conviction is sufficiently attenuated by the passage of time. The legislature seemingly reasoned that benign behavior for a period of at least twenty years is indicative that one who has previously committed a murder presents a lesser threat to the public than does one who commits two murders within a twenty-year period. The legislature's judgment was that the passage of twenty years was a reasonable time after which the penalty of death would not be imposed.

The petitioner complains that the choice of a twenty-year time period by the Alabama legislature was "irrational, arbitrary and unjust." (Petition for Habeas Corpus at ¶ 156). In making such an exception to the statute, however, the legislature had to draw the line at some point. The fact that it chose a time period of twenty years instead of five, ten, fifteen or twenty-five is not relevant to this court. What is relevant is that the provision provided stiffer penalties for second-time murderers, except for those whose prior murder conviction was far enough in the past to demonstrate a reduced risk of recidivism. The classification is rationally related to the legitimate state interest in preventing murders generally and deterring those convicted of murder from committing another one, without unduly punishing people who are less likely to be intractable recidivists.

As the challenged provision creates a non-suspect classification rationally related to the legitimate state interest in preventing murders and deterring murders by convicted

murderers, it does not violate the petitioner's rights under the Equal Protection Clause. This claim must fail.

### 16.   Challenge to the statute on proportionality grounds.

The petitioner claims that the trial court erred by overruling his motion to quash the indictment on the grounds that Ala. Code § 13-11-2(a)(13)(1975)[58] is unconstitutional under the Eighth and Fourteenth Amendments.

Under former § 13-11-2(a)(13), "any murder" by a person convicted of "murder in the first or second degrees" within twenty years of a prior murder conviction was a capital crime. The petitioner complains that this provision "takes a crime that was not subject to capital punishment [second-degree murder] and allows an aggregation to a new capital crime." (Petition for Habeas Corpus at ¶ 157). He complains that it was theoretically possible under this provision for someone to receive the death penalty for second-degree murder, even if his prior conviction was for second-degree murder, thereby creating the possibility that a capital felony would be created from two non-capital felonies. According to the petitioner, such a penalty would be grossly out of proportion to the severity of the crime. *Id.* at ¶ 158. He argues, in effect, that the death penalty is constitutionally disproportionate to the crime of second-degree murder as it was defined in Alabama,[59] and that the statute was thus overbroad.

---

[58] This provision, which is set forth in section III.B.15. above, was repealed in 1981 and replaced by § 13A-5-40(a)(13).

[59] The current Alabama Criminal Code does not distinguish between first and second degree murder. *See* § 13A-6-2 and Commentary.

For a number of reasons, this claim must fail. The petitioner cites only *Coker v. Georgia*, 433 U.S. 584, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977), which held that imposition of the death penalty for the rape of an adult woman was disproportionately harsh. At the time of the petitioner's offense and trial, however, the U.S. Constitution clearly permitted states to impose the death sentence for the crime of murder. *Gregg v. Georgia*, 428 U.S. 153, 187, 96 S. Ct. 2909, 2931-32, 49 L. Ed. 2d 859, 882 (1976). In *Gregg*, the court held that "[w]hen a life has been taken deliberately by the offender [footnote omitted], we cannot say that the punishment is invariably disproportionate to the crime." *Id*.

Soon after the petitioner's trial, the Supreme Court found the death penalty to be disproportionate as applied to a minor participant in a felony who did not kill or intend to kill. *Enmund v. Florida*, 458 U.S. 782, 801, 102 S. Ct. 3368, 3377, 73 L. Ed. 2d 1140, 1154 (1982). A few years later, the Court held that the execution of a major participant in a felony who did not kill anyone is permitted by the Eighth Amendment. The court stated that

> the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

*Tison v. Arizona*, 481 U.S. 137, 157-58, 107 S. Ct. 1676, 1688, 95 L. Ed. 2d 127, 144 (1987), *reh'g denied*, 482 U.S. 137, 107 S. Ct. 1182, 89 L. Ed. 2d 127 (1987).[80]

---

[80] *Tison* was issued nearly a month after the petitioner's conviction became final on March 23, 1987, when the Supreme Court denied his petition for the writ for certiorari after his direct appeal. As such, it would normally be considered a "new rule" under *Teague v. Lane*, 489 U.S. 288 (1989), and no habeas relief could be based upon it. *Tison*, however, would most likely fall under the exception to *Teague* for new rules placing certain classes of persons beyond the state's power to punish by death. *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989).

At the time of Ms. Montgomery's death, Alabama law defined murder in the second

degree as the unlawful killing of a human being with malice, but without deliberation or

premeditation. *Harris v. State*, 56 Ala. App. 301, 321 So. 2d 267 (Ala. Crim. App. 1975). In

1981, the Alabama Court of Criminal Appeals summarized the mental culpability required

for second-degree murder as follows:

> 'It is not necessary that there was an intent to kill to constitute murder in the second degree. It is sufficient if the defendant voluntarily set in motion or applied an unlawful force from which death ensued, however free the action may be from actual purpose to kill.' *Smith v. State*, 154 Ala. 31 at 34, 45 So. 626 at 627 (1908).

> Nor is it necessary that the defendant should have entertained the intent to do an unlawful act or that he should have his mind fixed upon the unlawful quality of the act he intended to do. 'It was enough that he intended to do what he did, if that was unlawful.' *Tucker v. State*, 202 Ala. 5 at 6, 79 So. 303 at 304 (1918).

> Murder in the second degree includes those cases which are not accompanied with the intent to take life but are committed by gross carelessness.

> A killing may also be reckless, without evincing a purpose to take the life of any particular human being, and without evincing the degree of depravity shown in the illustrations we have mentioned. There may be no purpose to do mischief, as if one from a house-top recklessly throws down a billet of wood upon the sidewalk, where persons are constantly passing, and it fall upon a person passing by and kill him. *Moore v. State*, 18 Ala. 532. *Fields v. State*, 52 Ala. 348 at 354 (1975).

>     *           *           *           *

> It was a settled principle of common law that where death ensues from an act done without lawful purpose, dangerous to life, malice is implied. *Clarke v. State*, 117 Ala. 1, 8, 23 So. 671 (1898).

*Jolly v. State*, 395 So. 2d 1135, 1139-40 (Ala. Crim. App. 1981).

144

In its instructions to the jury in this case, the trial court stated that malice was an element of second-degree murder and defined it as

> any unlawful act wilfully done without just cause or legal excuse. It is that state of mind or mental condition which prompts the doing of an unlawful act without legal justification or extenuation. Legal malice as applied to homicide is an intent unlawfully to take the life of another without legal excuse, justification or mitigation.

(R. 2418-19). Alabama law thus provided a broad definition of second-degree murder at the time of the petitioner's offense and trial. Yet, neither *Gregg* nor *Coker*, which had been decided before the trial court denied Hubbard's motion to quash, held that the minimum level of mental culpability sufficient for second-degree murder ("gross carelessness" or "recklessness," as in throwing heavy objects onto a crowded street below) was constitutionally insufficient for imposition of the death penalty. *Enmund*, decided after the trial court's ruling, likewise did not mandate such a conclusion by the Alabama appellate courts in their review of the trial court's ruling; unlike this case, *Enmund* involved a felony murder and did not define "intent." *Emmund*, 458 U.S. 782. *Tison*, decided soon after the petitioner's conviction became final, does not dictate such a conclusion, either; not only is *Tison* a felony murder case, but also "gross carelessness" is not clearly and materially different from the level of culpability *Tison* held to be sufficient for imposition of the death penalty. *Tison*, 481 U.S. at 157-58 ("the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death [even where the defendant did not actually kill]").

Thus, the trial court did not err in failing to quash the indictment on the basis that § 13-11-2(a)(13) was unconstitutional due to the theoretical possibility that, under it, someone

145

could receive the death penalty for second-degree murder. Nor did the appellate courts err in rejecting the petitioner's claims in this regard. Even now, there is no clear authority mandating such a conclusion. The petitioner has raised no proportionality concerns in this proceeding substantial enough to convince the court that the provision should be struck as unconstitutional or that the indictment should have been quashed on such a basis.

This claim must fail for another reason. Even if § 13-11-2(a)(13) was unconstitutional as applied to defendants convicted of second-degree murder, the petitioner has no standing to raise such claim. In *County Court of Ulster County v. Allen*, 442 U.S. 140, 154, 99 S. Ct. 2213, 2223, 60 L. Ed. 2d 777 (1979), the court held that "(a) party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations . . . ." *Allen*, 442 U.S. at 154, 99 S. Ct. at 2213.

In *Harris v. Evans*, 20 F.3d 1118 (11th Cir. 1994), *cert. denied*, 513 U.S. 1045, 115 S. Ct. 641, 130 L. Ed. 2d 546 (1994), the court found that a prisoner lacked standing to challenge a prison policy "under the general principle that a litigant must assert his own legal rights and interests and may not ordinarily rely on the rights and interests of third parties." *Harris*, 20 F.3d at 1121. *See also Broadrick v. Oklahoma*, 413 U.S. 601, 610, 93 S. Ct. 2908, 2915, 37 L. Ed. 2d 830 (1973)("a person to whom a statute may constitutionally be

applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in situations not before the Court.").[81]

The petitioner was convicted of first-degree murder at his 1982 trial. The evidence presented fully supported a finding that he intentionally killed Ms. Montgomery, with malice and deliberation. As the statute was applied to the petitioner, constitutional proportionality concerns are therefore not implicated. Under *Gregg, supra*, the imposition of the death penalty for a deliberate murder is not constitutionally disproportionate. The petitioner thus clearly fell within the provision's constitutional ambit, which leaves him without standing to raise any overbroadness claim with respect to third parties who may have been convicted of second-degree murder and sentenced to death in violation of the Eighth Amendment, if there are any such parties.

This claim must fail for yet another reason. Even if the petitioner is correct that § 13-11-2(a)(13) was overbroad as to those convicted of second-degree murder, even if he could have arguably raised such a challenge in his motion to quash, and even if he had prevailed on his challenge, the outcome of the proceeding against him would not have been different. The remedy for such a defect would have been to invalidate the unconstitutional portion of the statute. *See Beck v. State*, 396 So. 2d 645, 657-59 (Ala. 1981) (court held that unconstitutional provision of death penalty statute [under which this

---

[81]In certain cases, this third-party standing prohibition may be relaxed or removed, such as where the challenged statute may chill the free speech of third parties or where the litigant shows that (1) he suffered an "injury-in-fact," (2) he has a close relationship to the third party and (3) there is some hindrance to the third party's ability to protect his or her own interests. *Harris*, 20 F.3d at 1121-22, 1122 n.5. There appears to be no reason to allow the petitioner to overcome the prohibition in order to assert this challenge to the constitutionality of § 13-11-2(a)(13).

petitioner was convicted] could be severed so as to uphold the valid portions of statute; court cited cases favoring severability and noted the presence of a severability clause).

Under the approach used in *Beck*, only that part of the provision referring to "any murder" would have become invalid, insofar as it referred to second-degree murders. That reference could have been struck and replaced by a reference to murder in the first degree. The petitioner would not have benefitted from such a change; his ultimate first-degree murder conviction would have placed him squarely within the surviving and constitutionally permissible reach of the statute.

### 17.   Evidence from warrantless searches.

The petitioner claims that the trial court improperly admitted evidence seized during the warrantless and allegedly nonconsensual searches of the residence where he had been living with Ms. Montgomery, which occurred on the day of the killing. He also argues that, even if he did consent to the first such search, he did not consent to any subsequent searches.

In *Stone v. Powell*, 428 U.S. 465, 482, 96 S. Ct. 3037, L. Ed. 2d 1067 (1976), the Court said:

> [W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

*Stone*, 428 U.S. at 482. Federal courts will not honor this bar, however, unless the state courts fully and fairly "considered" the Fourth Amendment claims. *Tukes v. Dugger*, 911 F.2d 508, 513-14 (11th Cir. 1990), *cert. denied sub nom*, *Singletary v. Tukes*, 502 U.S. 898, 112 S. Ct. 273, 116 L. Ed. 2d 225 (1991). The *Tukes* court stated that "where there are facts

148

in dispute, full and fair consideration requires consideration by the fact-finding court, and at least the availability of meaningful appellate review by a higher state court." *Tukes*, 911 F.2d at 514 (quoting *Morgan v. Estelle*, 588 F.2d 934, 941 (5th Cir. 1979)).

The State provided an opportunity for full and fair litigation of the petitioner's Fourth Amendment claims. The trial court held a hearing on the petitioner's motion to suppress, during which it heard testimony[82] and argument, and the trial court ultimately denied the motion. (R. 1533-36, 2825). The trial court apparently did not make any explicit findings of fact concerning the Motion to Suppress. On direct appeal, however, the Alabama Court of Criminal Appeals thoroughly addressed the Fourth Amendment issues raised by the motion to suppress. The court stated:

> Appellant contends that reversible error was committed by the trial court in its admission of evidence obtained as a result of a search of Ms. Montgomery's residence, where appellant lived. We fully addressed this issue in our opinion on appellant's first appeal and decided the issue adversely to appellant. *Hubbard*, 382 So. 2d at 591-92. The Alabama supreme court [sic] agreed. *Hubbard*, 382 So. 2d at 597.

> Appellant argues that there is no evidence in the record that he invited the police into the residence and thereby consented to its search. He argues that the evidence shows that he did not voluntarily, intelligently, and knowingly consent to the search of the residence. No question is raised as to appellant's having an existing claim to possession of the premises. He was living at the store-residence with the victim and, for the purposes of this opinion, we will assume that he had standing to raise the issue. Therefore, if the search in this case is to be held valid, it must have been conducted with appellant's consent, for no other exception to the warrant requirement is applicable.

> A person may waive his Fourth Amendment protection by consenting to a warrantless search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). To introduce the evidence obtained in a consent

---

[82] The court heard testimony from Coroner Mitchell, Officer Stephens, Officer Manley and Officer Marcum. (R. 925-967)

search, the prosecution must establish that consent was fully and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968). Under the Fourth Amendment, courts must examine the totality of the circumstances to determine the voluntariness of the consent. *United States v. Mendenhall*, 446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980); *Schneckloth v. Bustamonte, supra; United States v. Alegria*, 721 F.2d 758 (11th Cir.1983). Factors relevent [sic] to this determination include the defendant's performance of cooperative acts, his age and intelligence, and the nature of the police behavior. *United States v. Horton*, 488 F.2d 374 (5th Cir.1973), *cert. denied*, 416 U.S. 993, 94 S. Ct. 2405, 40 L. Ed. 2d 772 (1974).

The facts in the instant case are not in dispute. According to appellant's statement, he telephoned three people shortly after the shooting. He told each "what Lillian had done," and each told him to call an ambulance, and one told him to call the police. One of these people was his mother. After making those three calls, he called the telephone operator. In his statement, he tells of the conversation as follows:

> "Then I called the operator and she told me to call the police headquarters and she dialed them for me. I told her it was an emergency, the police department answered and said they would send the ambulance right on out there."

When the ambulance arrived at the scene, appellant was standing in the back door of the store-residence, motioning to the ambulance attendants. The attendants entered the store-residence and discovered Ms. Montgomery dead on the kitchen floor. One of the attendants asked appellant if he had touched anything, and he told them that he had "carried the gun upstairs." Appellant then voluntarily accompanied the ambulance personnel to the ambulance, and remained seated in the ambulance until the police arrived. When the ambulance attendants left the store, the door locked. When the police arrived shortly thereafter and found the door locked, they asked the whereabouts of the key. Appellant stated that he had the key and handed it to Officer Manley. Manley unlocked the door, and he and Officer Stephens went inside and saw the body of Ms. Montgomery. Shortly thereafter, Investigator Marcum, Coroner Mitchell, and State Toxicologist Britton entered the premises and conducted a search. Among other items, two empty shell casings were found in a wastepaper basket upstairs. That afternoon, after appellant had given a statement and an autopsy had revealed that the victim had been shot three times instead of twice, as the police had originally been led to believe, Marcum returned to the store-residence and retrieved a third empty shell casing from the upstairs wastepaper basket.

At the time of the homicide, appellant was approximately forty-six years old.

150

In discussing this issue in our opinion on the first appeal, we stated:

> "At the outset we recognize that there is no 'murder scene' exception to the rule that all searches without a valid warrant are unreasonable. *Mincey v. Arizona*, 437 U.S. 385 [98 S. Ct. 2408, 57 L. Ed. 2d 290] ... (1978).

> "The question of whether a consent to search is voluntary or the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 2047-2048 [36 L. Ed. 2d 854] ... (1973). Examining the facts in this case we conclude that the defendant did, in fact, consent to the search and that the search was not unreasonable. The totality of the circumstances indicates more than a mere submission to police authority which would be insufficient to establishing the requisite voluntariness for consenting to a search. *Herriott v. State*, 337 So. 2d 165 (Ala.Cr.App.), *cert. denied*, 337 So. 2d 171 (Ala.1976).

> "At the pretrial hearing the defendant presented no evidence that his consent was involuntary. The evidence revealed that although he had been drinking he was not drunk. The defendant voluntarily gave the keys to the police and never once protested the search or his treatment at the scene. There is absolutely no evidence of deception or coercion exercised by the police in obtaining the keys. There is not even any evidence that the police demanded the keys but only that Officer Manley asked the defendant where the keys were. The defendant made several statements at the scene and made another statement at police headquarters. He freely admitted possession of the murder weapon (although he claimed that Mrs. Montgomery had shot herself) and the fact that he had taken the pistol upstairs after the shooting and removed 'two empty shells out of and put two more bullets in it'. He told the police that he had placed the empty shells in the trash. Following the homicide, the defendant gave every appearance of cooperating with the police though claiming that the killing was suicide.

> \*          \*          \*          \*

> "The whole tenor of the defendant's conduct is one of cooperation with the willingness to aid the police. When the

151

defendant gave the keys to Officer Manley he had previously told an ambulance attendant that he had carried the pistol upstairs. When Officer Manley first arrived he talked with the attendant in the defendant's presence. Under these circumstances, and in the absence of any conflicting evidence, it is reasonable to conclude that when the defendant handed the keys to the police officer he voluntarily relinquished all expectation of privacy. Although the case of *Knight v. State*, 50 Ala. App. 39, 276 So. 2d 624, *cert. denied*, 290 Ala. 368, 276 So. 2d 628 (1973), can be distinguished on its facts from the present case, we think that in principle they are the same. It is clear that the consent to search may be given on actions alone. *Burrell v. State*, 45 Ala. App. 664, 235 So. 2d 913 (1970). In *Burrell* this Court held that where the defendant volunteered the whereabouts of a gun, there simply was no search and hence no warrant was required. 45 Ala. App. at 666, 235 So. 2d 913. Here the defendant told the police where two shell casings were. The third casing was also in that same exact location. Consequently we uphold the search without a warrant as reasonable pursuant to the consent of the defendant."

382 So. 2d at 591-92.

We further note that, as this court recognized in *Bradley v. State*, 494 So. 2d 750, 764 (Ala. Cr. App. 1985), "[a] significant, but not controlling, factor to consider in examining the totality of the circumstances to determine voluntariness is whether or not the accused initiated the original contact with the police." For example, in *Kelly v. State*, 75 Wis. 2d 303, 249 N.W.2d 800 (1977) (cited in *Bradley*), the defendant called the police under circumstances implying that the victim had shot himself or had been shot by someone other than the defendant. In finding that the seizure of a gun, the shell within the gun, and the slug on the floor was not the result of an unconstitutional search because the search was made pursuant to the defendant's consent, the court found very persuasive the fact that the defendant initiated contact with the law enforcement personnel. It noted that "there was an implied consent not only to aid the victim but to determine what had caused the death or injury and who was responsible." 75 Wis. 2d at 313, 249 N.W.2d at 805. Likewise, in the case at bar, we find crucial the facts that appellant initiated the contact with the police by reporting that Ms. Montgomery had committed suicide, that he requested assistance, and that he was very cooperative with the authorities.

We reaffirm and adopt our opinion rendered on this issue in the first appeal. We find from the totality of the circumstances that appellant's consent to the

> search was freely and voluntarily given. We find again that the search without
> a warrant in this case was reasonable pursuant to the consent of appellant.

*Hubbard*, 500 So. 2d at 1220-24.

Thus, while the trial court made no explicit findings of fact regarding the motion to suppress, the appellate court addressed in detail the Fourth Amendment issues raised in the motion, providing the "meaningful appellate review necessary to erect a *Stone v. Powell* bar to [federal] review of the claim." *Tukes*, 911 F.2d at 514 (11th Cir. 1990)(trial court's lack of explicit findings, combined with summary affirmance of appellate court, prevented assertion of the *Stone v. Powell* bar). *See also Agee v. White*, 809 F.2d 1487, 1490 (11th Cir. 1987); *Rainey v. Thigpen*, 1992 W.L. 549133, *2 (N.D. Ala. 1992), *aff'd*, 13 F.3d 409 (11th Cir.), *cert. denied*, 513 U.S. 950, 115 S. Ct. 365, 130 L. Ed. 2d 318 (1994).

The petitioner thus had a full and fair opportunity to litigate his Fourth Amendment claims in state court. Also, the state courts gave these claims their full and fair consideration, as is evidenced by the findings and conclusions issued by the Alabama Court of Criminal Appeals. Thus, under *Stone v. Powell*, this court is without authority to grant the requested relief on this ground.

**IV.    Conclusion.**

Having carefully addressed each of the claims for habeas corpus relief asserted by the petitioner in this action, the court finds them either meritless or barred from review on one or more grounds. None of the claims entitles the petitioner to relief, and, therefore, the petition for writ of habeas corpus is due to be denied. A separate final judgment to that effect will be entered.

Done, this **3rd** of February, 1998.

Edwin L. Nelson
United States District Judge